IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STATE AUTOMOBILE MUTUAL INSURANCE COMPANY | § § § | |
| **Plaintiff** | § § | |
| v. | § § | |
| FREEHOLD MANAGEMENT, INC. AND RETAIL PLAZAS, INC. | § § § | CIVIL ACTION NO. 3:16-cv-02255-L |
| **Defendants** | § § | |
| v. | § § | |
| FREEHOLD MANAGEMENT, INC., RETAIL PLAZAS, INC., AND RPI DENTON CENTER, LTD. | § § § § | |
| **Counter-Plaintiffs** | § | |

---

### APPENDIX IN SUPPORT OF DEFENDANTS AND COUNTER-PLAINTIFFS' AMENDED MOTION TO STRIKE THE EXPERT TESTIMONY OF PAUL NILLES

---

Robert W. Loree
State Bar No. 12579200
Todd Lipscomb
State Bar No. 00789836
Cassandra Pruski
State Bar No. 24083690

LOREE & LIPSCOMB
777 E. Sonterra Blvd., Suite 320
San Antonio, Texas 78258
Telephone: (210) 404-1320
Facsimile:  (210) 404-1310
rob@lhllawfirm.com
todd@lhllawfirm.com
cassie@lhllawfirm.com

Attorneys for Defendants/Counter-Plaintiffs

## TABLE OF CONTENTS

| Description | Appendix page(s) |
|---|---|
| Deposition of Paul Nilles taken April 10, 2018 | 3-96 |
| Report and C.V. of Paul Nilles | 97-99 |

## CERTIFICATE OF SERVICE

I certify that the Freehold Entities have served a true and correct copy of the foregoing document and attachments on August 30, 2018 through the Court's electronic filing (CM/ECF) system to the following counsel of record:

Charles B. Mitchell, Jr.
Michael Shane O'Dell
Naman, Howell, Smith & Lee, PLLC
405 Forth Worth Club Building
306 West 7th Street
Fort Worth, Texas 76102-4911

Christopher D. Kratovil
Alison R. Ashmore
DYKEMA COX SMITH
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6400
Facsimile: (214) 462-6401

/s/ Todd Lipscomb
Todd Lipscomb

Paul David Nilles

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3    STATE AUTOMOBILE MUTUAL       §
      INSURANCE COMPANY             §
 4                                  §
          Plaintiff                 §
 5                                  §
      v.                            §
 6                                  §
      FREEHOLD MANAGEMENT, INC.     §
 7    AND RETAIL PLAZAS, INC.       §  Civil Action No.
                                    §  3:16-cv-02255-L
 8        Defendants                §
                                    §
 9    v.                            §
                                    §
10    FREEHOLD MANAGEMENT,          §
      INC., RETAIL PLAZAS,          §
11    INC., AND RPI DENTON          §
      CENTER, LTD.                  §
12                                  §
          Counter-Plaintiffs        §
13

14    ********************************************************

15              ORAL AND VIDEOTAPED DEPOSITION OF

16                    PAUL DAVID NILLES

17                      April 10, 2018

18    ********************************************************

19        ORAL AND VIDEOTAPED DEPOSITION OF PAUL DAVID

20    NILLES, produced as a witness at the instance of the

21    Defendants/Counter-Plaintiffs, and duly sworn, was taken

22    in the above-styled and -numbered cause on the 10th day

23    of April, 2018, from 11:15 a.m. to 1:43 p.m., before

24    Jennifer L. Campbell, CSR in and for the State of Texas,

25    reported by machine shorthand, at the offices of Naman
```

Paul David Nilles

1  Howell Smith & Lee PLLC, 306 West 7th Street, Suite 405,

2  Fort Worth, Texas, pursuant to the Federal Rules of

3  Civil Procedure.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:
           Mr. Charles B. Mitchell, Jr.
 4         NAMAN HOWELL SMITH & LEE PLLC
           306 West 7th Street
 5         Suite 405
           Fort Worth, Texas 76102
 6         (817) 509-2025
           charles.mitchell@namanhowell.com
 7

 8    FOR THE DEFENDANTS/COUNTER-PLAINTIFFS:
           Mr. Todd Lipscomb
 9         LOREE & LIPSCOMB
           777 East Sonterra Boulevard
10         Suite 320
           San Antonio, Texas 78258
11         (210) 404-1320
           todd@lhllawfirm.com
12

13    ALSO PRESENT:
           Mr. Anthony Marlar, Videographer
14

15

16

17

18

19

20

21

22

23

24

25
```

Paul David Nilles

4

```
 1                           INDEX

 2

 3    Appearances. . . . . . . . . . . . . . . . . . . . .3

 4    PAUL DAVID NILLES

 5         Examination by Mr. Lipscomb. . . . . . . . . . .6

 6    Changes and Signature . . . . . . . . . . . . . . 91

 7    Reporter's Certificate. . . . . . . . . . . . . . 93

 8                         EXHIBITS

 9    NO.              DESCRIPTION                    PAGE

10    Exhibit 1     . . . . . . . . . . . . . . . . . . . . . .8
                    Counter-Plaintiff's Notice to Take the
11                  Oral/Videotaped Deposition of Paul Nilles

12    Exhibit 2     . . . . . . . . . . . . . . . . . . . . . .9
                    NILLES-000001-26
13
      Exhibit 3     . . . . . . . . . . . . . . . . . . . . . 11
14                  SA-004755-4762

15

16

17

18

19

20

21

22

23

24

25
```

1                         EXHIBITS (cont.)

2    NO.              DESCRIPTION                        PAGE

3    Exhibit 4        .....................................18
                      Tab 1    SA-003623-3627
4                     Tab 2    SA-003617-3622
                      Tab 3    SA-003607-3614
5                     Tab 4    SA-003597-3605
                      Tab 5    SA-003590-3596
6                     Tab 6    SA-003565-3566
                      Tab 7    SA-003555-3561
7                     Tab 8    SA-003504-3526
                      Tab 9    SA-003502-3503
8                     Tab 10   SA-003499-3501
                      Tab 11   SA-003422-3425
9                     Tab 12   SA-002749-2750
                      Tab 13   SA-002746-2748
10                    Tab 14   SA-002733-2736
                      Tab 15   SA-002737-2741
11                    Tab 16   SA-002742-2745
                      Tab 17   SA-002144-2149
12                    Tab 18   SA-002078-2016
                      Tab 19   SA-003929-3939
13                    Tab 20   SA-004379-4384
                      Tab 21   SA-004553-4568

14

15                         REPORTER'S NOTE
     Quotation marks are used for clarity and do not
16   necessarily reflect a direct quote.

17

18

19

20

21

22

23

24

25

Paul David Nilles

```
 1                    (Exhibits 1 through 4 marked.)

 2                    THE VIDEOGRAPHER:  We're now on record.

 3    The date is April 10th, 2018.  The time is 11:15 a.m.

 4    This is the videotaped deposition of Paul Nilles.  Would

 5    counsel please state your appearances for the record.

 6                    MR. MITCHELL:  Charles Mitchell on behalf

 7    of the Plaintiff State Automobile Mutual Insurance

 8    Company.

 9                    MR. LIPSCOMB:  And Todd Lipscomb on behalf

10    of Freehold Management, Inc., Retail Plazas, Inc., and

11    RPI Denton Center, Limited.

12                    THE VIDEOGRAPHER:  Will the court reporter

13    please swear in the witness.

14                         PAUL DAVID NILLES,

15    having been first duly sworn, testified as follows:

16                         EXAMINATION

17    BY MR. LIPSCOMB:

18        Q.   Could you please state your full name for the

19    record?

20        A.   Paul David Nilles.

21        Q.   Good morning, Mr. Nilles.  My name is Todd

22    Lipscomb, and I represent the Defendants in this case,

23    Freehold Management, Retail Plaza, Inc., and RPI Denton

24    Center, in a lawsuit involving State Automobile Mutual

25    Insurance Company.
```

Paul David Nilles

7

```
 1        A.   Okay.

 2        Q.   You understand you've been designated as an

 3   expert in this case?

 4        A.   Yes.

 5        Q.   Have you ever given a deposition before?

 6        A.   Yes.

 7        Q.   And on approximately how many occasions?

 8        A.   Six or less.

 9        Q.   Have any of those been in Texas?

10        A.   No.

11        Q.   Have any of those been in federal court?

12        A.   I do not know.

13        Q.   I'll briefly go over the rules a little bit

14   with you just as kind of a reminder.  The first is, as

15   you can see, the court reporter is taking down my

16   questions and the answers you provide.

17        A.   Okay.

18        Q.   Because of that -- you're doing a very good job

19   of it so far -- we need audible answers to everything.

20        A.   Yes.

21        Q.   If you allow me to complete my question, I'll

22   allow you to complete your answer; that way we're not

23   talking over each other, and we have a clean record.

24        A.   Yes.

25        Q.   If there's any question you don't understand,
```

Paul David Nilles

8

```
 1   please feel free to ask me to rephrase.  I'll attempt to
 2   do so; otherwise, I'm going to probably assume that you
 3   understand the question.
 4        A.   Okay.
 5        Q.   If you need to take a break for any reason, I
 6   ask that you answer the question that's currently
 7   pending; but otherwise, we can take a break at any time.
 8        A.   Okay.
 9        Q.   In front of you is what's been marked as
10   Deposition Exhibit No. 1.  Have you seen this document
11   before?
12        A.   Yes.
13        Q.   And that's your deposition notice for today's
14   deposition, correct?
15        A.   Yes.
16        Q.   And you'll see attached as page 3 to Exhibit
17   No. 1 is a list of documents you were asked to provide.
18        A.   Yes.
19        Q.   Did you look for these documents?
20        A.   Yes.
21        Q.   Now, I understand that counsel for State Auto
22   also filed some objections to some of these items.
23        A.   Okay.
24        Q.   Have you seen those objections?
25        A.   No.
```

```
 1         Q.   Let me ask you, is there any documents that you
 2    are aware of that have been withheld that you found in
 3    request to Exhibit A that are not contained in Exhibits
 4    2 through 4 in front of you?
 5         A.   Not to my knowledge.
 6         Q.   Okay.   If you could look at Exhibit No. 2,
 7    please.   And could you identify what is contained in
 8    Exhibit No. 2?
 9         A.   Number 2 includes my bio; also includes a
10    statement of my opinions, as well as some billing
11    invoices; and then there are e-mail cover -- copies of
12    e-mail cover sheets to those invoices.   That's it.
13         Q.   Are you aware of any billing records that have
14    not been produced?
15         A.   No.
16         Q.   Now, I assume that you intend to be paid for
17    today's time.
18         A.   Yes.
19         Q.   Have you included that in the billing records
20    yet?
21         A.   I do not know the answer to that.
22         Q.   If you look at the last page of Exhibit No. 2,
23    there appears to be some travel expenses.   Is that from
24    Des Moines to DFW?
25         A.   Yes.   That would be for this deposition.
```

Paul David Nilles
10

```
 1          Q.  Okay.  The travel expenses are.

 2          A.  Yes.

 3          Q.  Does this include your time for today's

 4     deposition or preparation for today's deposition?

 5          A.  No.

 6          Q.  Okay.  So intend that you'll probably be

 7     billing for that as well.

 8          A.  Yes.

 9          Q.  Do you bill for your travel time?

10          A.  Yes.

11          Q.  Is that the same rate as your consultation

12     time?

13          A.  No.

14          Q.  Okay.  What rate do you charge for your travel

15     time, and what rate do you charge for your consultation

16     time?

17          A.  Travel time is $75 an hour; consulting time is

18     $150 an hour.

19          Q.  And is that different from the rate that you

20     charged when you were with GC3?

21          A.  Yes.

22          Q.  What rate were you charging at GC3?

23          A.  The legal time while at GC3 was, I believe,

24     $250 an hour.

25          Q.  What other rates would you be charged at?
```

Paul David Nilles

```
 1        A.   Regular consulting time would've been $220 an
 2   hour.
 3        Q.   And are those the two categories of your time
 4   in this file?
 5        A.   Yes.
 6        Q.   With regard to Exhibit No. 2, is the -- I guess
 7   both the first and third pages -- or fourth pages,
 8   excuse me -- first and fourth pages are copies of -- I
 9   think you called it your bio?
10        A.   Yes.
11        Q.   Is this up-to-date?
12        A.   Yes.
13        Q.   And attached is pages 2 and 3 of Exhibit No. 2
14   you identified as your opinions in this case.
15        A.   Yes.
16        Q.   Was this generated on or about January 4th,
17   2018?
18        A.   Yes.
19        Q.   Okay.   Are you aware of any other opinions you
20   have in this case that are not contained in this
21   exhibit?
22        A.   No.
23        Q.   If you could look at Exhibit No. 3 in front of
24   you.   And can you identify that for me, please?
25        A.   Exhibit No. 3 is State Auto's scope of loss.
```

1        Q.    Was this document generated by you?

2        A.    No.

3        Q.    Do you know who it was generated by?

4        A.    I believe it was generated by Paul Douglas.

5        Q.    What did you use Exhibit No. 3 for?

6        A.    This exhibit was presented to me to provide to

7    our roofing subcontractor for pricing.

8        Q.    Did you participate in the creation of Exhibit

9    No. 3?

10       A.    No.

11       Q.    Do you have any opinions or criticisms of

12   what's contained in Exhibit No. 3?

13       A.    I do not.

14       Q.    Have you been provided any additional

15   information regarding the scope of work at the Denton

16   Center?

17       A.    No.

18       Q.    And when I say "the Denton Center," what is

19   your understanding of what that is?

20       A.    My understanding of the Denton Center would

21   include the structures, the businesses, highlighted in

22   this scope of loss.

23       Q.    Did you look at any of the other structures at

24   this location?

25       A.    No.

Paul David Nilles

```
 1          Q.   Okay.  At the bottom right-hand corner of

 2    Exhibit No. 3 is a date of April 3rd, 2018.  Were you

 3    given a copy of this document prior to that?

 4          A.   Yes.

 5          Q.   This is probably just a print date off, like, a

 6    computer screen.

 7          A.   As far as I know.

 8          Q.   Okay.  Do you know when you were provided a

 9    copy of Exhibit No. 3?

10          A.   It would've been in or around the date of our

11    assignment to provide a subcontractor for State Auto.

12          Q.   I think I got that right, but what was your

13    understanding of what your assignment from State Auto

14    was?

15          A.   Our assignment was to provide a roofing

16    contractor to provide an estimate of repairs based upon

17    State Auto's scope of loss.

18          Q.   Have you ever visited the Denton Center?

19          A.   No.

20          Q.   Have you ever supervised a construction project

21    in Texas?

22          A.   Yes.

23          Q.   Any in the DFW area?

24          A.   No.

25          Q.   How many have you supervised in Texas?
```

Paul David Nilles

```
 1        A.   Around a dozen.

 2        Q.   Were any of those commercial strip centers?

 3        A.   No.

 4        Q.   Did any of those have built-up gravel roofing?

 5        A.   Yes.

 6        Q.   How many?

 7        A.   Approximately six or seven.

 8        Q.   So basically all of the construction projects

 9   you've supervised in Texas.

10        A.   Please --

11        Q.   Sure.  Sure.

12        A.   -- suggest it again.

13        Q.   And I may have written this down wrong.  Did

14   you say that you've done about half a dozen projects in

15   Texas?

16        A.   Around a dozen.

17        Q.   About a dozen.

18             So about half of those involved built-up

19   gravel roofing, then.

20        A.   Approximately, yes.

21        Q.   What cities were those properties located in?

22        A.   Beaumont and surrounding towns.

23        Q.   The projects you were involved in that involved

24   built-up gravel roofing, were those in relation to

25   insurance claims?
```

Paul David Nilles

15

1        A.   Yes.

2        Q.   Were those in relation to hurricane damages?

3        A.   Yes.

4        Q.   Was it Ike or was it Rita?

5        A.   Rita.

6        Q.   What type of structures were those projects?

7        A.   They would've been churches, schools, some

8   residential, and office complexes associated with the

9   church and schools.

10       Q.   And the residential properties are also

11  associated with the churches and schools?

12       A.   Yes.

13       Q.   Okay.  This is with your work while you were

14  with GC3, correct?

15       A.   Yes.

16       Q.   And GC3 is a subsidiary of GuideOne Insurance.

17       A.   Yes.

18       Q.   And GuideOne Insurance, kind of one of their

19  niches is insuring churches.

20       A.   Yes.

21       Q.   And often those churches have schools

22  associated with them.

23       A.   Yes.

24       Q.   Were all the schools that you worked on with

25  regard to Hurricane Rita associated with churches?

Paul David Nilles

16

1        A.   Yes.

2        Q.   And were all the projects you were involved

3    with insured by GuideOne?

4        A.   No.

5        Q.   Do you recall who they were insured by?

6        A.   Catholic Mutual.

7        Q.   Were all 12 of them -- or approximately 12 or

8    so with Catholic Mutual?

9        A.   Yes.

10       Q.   To the best of your understanding, does

11   Catholic Mutual have a relationship with GuideOne?

12       A.   No.

13       Q.   They simply hired GC3 to do consulting

14   services.

15       A.   Yes.

16       Q.   And when you said that you get involved in the

17   construction, did GC3, were they actually involved in

18   the construction process with these 12 claims?

19       A.   Yes.

20       Q.   Did you help in the adjusting process?

21       A.   No.

22       Q.   So you were not involved in preparing any of

23   the estimates for Catholic Mutual?

24       A.   I was not.

25       Q.   Okay.  Was someone else at GC3?

Paul David Nilles

```
 1        A.   Yes.

 2        Q.   Okay.   Who would that be?

 3        A.   That would've been Eric Johnson.

 4        Q.   So someone at GC3 assisted in the

 5   claims-handling process with Catholic Mutual in

 6   developing estimates for settlement of the claim.

 7        A.   Yes.

 8        Q.   Then after the claim was settled, on

 9   approximately 12 occasions, the insureds decided to hire

10   GC3 to do the work.

11        A.   Yes.

12        Q.   And you supervised the repair and

13   reconstruction process.

14        A.   Yes.

15        Q.   And on those projects with regard to Hurricane

16   Rita, the scope had already been agreed upon by the

17   parties.

18        A.   Yes.

19        Q.   You were in a situation of simply implementing,

20   ensuring that scope was done properly.

21        A.   Yes.

22        Q.   Were you involved in any warranty work?

23        A.   No.

24        Q.   Would that be someone else's department?

25        A.   Yes.
```

Paul David Nilles

18

```
 1        Q.   Do you know if there were any warranty claims
 2   made on the work that was done in conjunction with
 3   Hurricane Rita?
 4        A.   No.
 5        Q.   No, you don't know, or no, there were no claims
 6   made?
 7        A.   There were no claims made.
 8        Q.   Thank you.
 9        A.   You're welcome.
10        Q.   That's one of those examples of perhaps not the
11   best question.
12             If you could look at Exhibit No. 4 in front
13   of you as well.  And you'll see that it has -- it's been
14   nicely organized with Tabs 1 through 20 on the side.
15        A.   Yes.
16        Q.   Okay.  Can you identify this for me, please?
17        A.   Exhibit 4?  All of Exhibit 4?
18        Q.   Yes, please.
19        A.   Exhibit 4 contains e-mails, service invoices,
20   estimates, scopes, bids, and proposals.
21        Q.   In preparation for today's deposition, have you
22   reviewed any documents that are not contained in
23   Exhibits 2, 3, or 4?
24        A.   No.
25        Q.   In preparation of your opinions in this case,
```

Paul David Nilles

```
 1   have you reviewed any documents that are not contained
 2   in Exhibits 2, 3, or 4?
 3        A.   No.
 4        Q.   When you were handling the claim -- or excuse
 5   me.  When you were performing your assignment on behalf
 6   of State Auto, were there any documents that you
 7   reviewed or you used to assist you that are not
 8   contained in Exhibits 2, 3, or 4?
 9        A.   No.
10        Q.   Feel free to look at your biography if you need
11   to, but if you can kind of walk me through your
12   educational background.
13        A.   You want me just to describe it?
14        Q.   Yes, please.
15        A.   Okay.  My educational background is I have a
16   associate of applied science degree from Iowa Lakes
17   Community College in farm management, I have a four-year
18   degree in business management from the University of
19   Phoenix, and I have a master's degree in management from
20   the University of Phoenix.
21        Q.   What year did you obtain your farm management
22   degree?
23        A.   In 1983.
24        Q.   And how about your bachelor of science in
25   business management?
```

Paul David Nilles

```
 1        A.   2008, I believe.

 2        Q.   And your master's in management?

 3        A.   2010.

 4        Q.   Did any of your course work on any of those

 5   degrees involve the construction industry?

 6        A.   Yes.

 7        Q.   Okay.  Which degree?

 8        A.   The applied sciences, farm management.

 9        Q.   Did you have any construction or roofing

10   courses in conjunction with your bachelor of science and

11   business management or your master of management degree?

12        A.   No.

13        Q.   What construction courses did you have with

14   regard to your farm management degree?

15        A.   Iowa Lakes provided a building trade or

16   building sciences course that was a part of the farm

17   management syllabus.

18        Q.   Is this kind of one course that was kind of an

19   overview to common building practices associated with

20   farms?

21        A.   Yes.

22        Q.   Did any of that discuss gravel-covered built-up

23   roofs?

24        A.   No.

25        Q.   Okay.  Do you consider yourself to be an expert
```

Paul David Nilles

1    with regard to gravel-covered built-up roofs?

2        A.  No.

3        Q.  Where did you learn about the construction

4    industry?

5        A.  I grew up -- my family, my father in

6    particular, was a carpenter.  And when he bought his

7    farm in 1968, during the off-season, he would work for a

8    contractor.  And so every building on our farm we built,

9    tore down the existing and rebuilt that one.  So it

10   started off there as far as construction experience is

11   concerned.

12              Obviously, I went to Iowa Lakes Community

13   College and learned a little bit there through a

14   semester of construction school there.  Most of my

15   experience in construction then began when I got into

16   the insurance field as a claims adjuster.

17              And as a claims adjuster, over the course

18   of 15 years, I have taken many construction classes; for

19   an example, under training, the Insurance Technical

20   Training Institute here in Dallas, which is an advanced

21   course in construction and estimating.  I've taken

22   various trade schools or training courses, not

23   necessarily schools, but training courses provided by

24   anywhere from roofing contractors to engineering

25   agencies, but most of my training has come by handling

Paul David Nilles

22

1   claims on the front part of -- on the front end of it,

2   handling claims and working with roofing contractors

3   over those 15 years.

4          When I went to work in the construction

5   industry, a lot of my experience then and knowledge came

6   from actually working with our project managers, as well

7   as working with our subcontractors that performed work.

8   We also had -- with GC3, we had a roofing division, an

9   individual by the name of Billy Owens, who I would

10  consider a true expert in the roofing industry, and I

11  worked with him in putting together educational forums

12  that both of us taught to the insurance companies.  And

13  then I also worked in the last -- within the last five

14  years with the Des Moines Area Community College

15  building the trades department and developing

16  construction courses for adjuster training, so I was

17  able to gather knowledge through their professors at the

18  Des Moines Area Community College while putting together

19  syllabuses and training programs.

20       Q.   When you graduated with your farm management

21  degree in 1983, where did you begin working?

22       A.   I went back home to farm with my father.

23       Q.   If you can kind of walk me through your work

24  history, then.

25       A.   After I graduated with -- from Iowa Lakes

Paul David Nilles

```
 1   Community College, I went back to the family farm to

 2   farm with my father.  I had four younger brothers.

 3   Wasn't long after that got started where my father said,

 4   You're going to have to find something different because

 5   I can't support you along with four others.  He really

 6   wanted to get me started in farming, but the finances --

 7   he was just coming out of the farm crisis.  I'm proud to

 8   say that my father was the one that managed the farm

 9   crisis very well, but he could not get me started and

10   suggested I probably better find something else.

11                 From there I went back to school to

12   Des Moines Area Community College in finance, and I did

13   not graduate from DMACC; however, they did place me

14   through work at a bank called First Financial Savings &

15   Loan where I began a banking career.

16                 From there I went on to -- was hired away

17   from First Financial Savings & Loan to the Iowa National

18   Guard Credit Union and was a vice president for the Iowa

19   National Guard Credit Union lending department.  They

20   brought me on primarily because I am a 21-year vet with

21   the United States Air Force and particularly assigned to

22   the Iowa Air National Guard in Des Moines, Iowa.

23                 From there I was hired away from the Iowa

24   National Guard Credit Union, in particular because they

25   merged -- they were getting ready to merge with a larger
```

Paul David Nilles

```
 1    national credit union, and so that started off my

 2    insurance career.  And I was hired away by Cincinnati

 3    Insurance Company as a field claims representative in

 4    the Des Moines area.

 5              I worked there for approximately four --

 6    between four and five years, and then I was hired away

 7    from Cincinnati Insurance Company by United Fire &

 8    Casualty.  When I was hired away from there, I became a

 9    regional claims supervisor where I was overseeing, I

10    believe, six to eight field adjusters handling claims on

11    multiline claims.

12              From United Fire & Casualty -- that lasted

13    approximately four to five years when I was hired away

14    by GuideOne Insurance in Des Moines.  And from there I

15    became their national property claims supervisor

16    responsible for all large losses -- property losses, and

17    those losses were losses that exceeded $150,000.  I was

18    also responsible for the oversight -- not necessarily

19    the supervision, but claim file audit of approximately

20    60 adjusters, so we would do file audits.

21              From there I was hired away by SERVPRO

22    international -- or SERVPRO Restoration out of

23    Nashville, Tennessee, and I was -- my position there was

24    a commercial manager, so I managed all of the commercial

25    business that was brought through their national
```

Paul David Nilles

1  accounts programs and sent out to their large loss

2  franchises.

3         I was there for about 18 months and then

4  was hired back to GC3.  It was GuideOne Taylor Ball at

5  that time, but I was hired back to GuideOne Taylor Ball

6  and as the president of TC3, which was a subsidiary of

7  GuideOne Taylor Ball, with the sole purpose of

8  developing business outside of GuideOne.

9         In 2012, GuideOne Taylor Ball and TC3

10  merged and became GC3.  Under GC3, I acted -- or my

11  position was the executive vice president, and I was in

12  charge of business development, and I also handled

13  various consulting jobs as an overflow.

14     Q.  Was the Denton Center project that we're

15  involved here today one of those overflow assignments?

16     A.  No, it was not.

17     Q.  Do you know why that file was assigned to you?

18     A.  I do not know.

19     Q.  When -- make sure I get it right -- TC3 was

20  merged into GC3, you became the executive vice president

21  of business development and marketing.

22     A.  When TC3 was merged with GuideOne Taylor

23  Ball --

24     Q.  Okay.

25     A.  -- it became GC3, and my role under GC3 was

1  business development and marketing.

2      Q.   Were you an executive vice president of the

3  company?

4      A.   Yes.

5      Q.   Was your primary focus the introduction and

6  integration of restoration and construction project

7  management processes into the claims-handling process of

8  insurance carriers and their property claims adjusting

9  staff?

10     A.   Yes.

11     Q.   What year did you begin working for Cincinnati

12  Insurance Company?

13     A.   I believe it was 1989.

14     Q.   So just so I can make sure I have the

15  chronology right, after graduated with your farm

16  management degree, you went back to work for the family

17  farm for approximately five to six years.

18     A.   I was working on the family farm for about a

19  year, maybe two.  I had various odd jobs, so when Dad

20  asked me to find something else -- I had jobs like I

21  managed a Godfather's Pizza, I went to work for other

22  farms in the -- farmers in the area picking up odd jobs

23  until I decided at that point in time that I needed

24  to -- I don't say "needed," but wanted to have a better

25  career path, and that's what sent me down the career

Paul David Nilles

```
 1    path of enrolling at DMACC and ultimately led me to
 2    working in the banking industry.
 3         Q.  And so you worked in the banking industry what:
 4    four --
 5         A.  It would've -- yeah, it would've been, yeah,
 6    three to four years.
 7         Q.  You mentioned that you were an Air Force
 8    veteran.
 9         A.  Yes.
10         Q.  What years did you serve in the Air Force?
11         A.  1981 -- January of 1981 to June of 2001.
12         Q.  I assume with the other careers you were -- you
13    were an active reservist.
14         A.  Yes.
15         Q.  And I assume that in June of '01 you were
16    honorably discharged.
17         A.  Yes.
18         Q.  When you were helping out either through your
19    odd jobs or on the family farm, did you build or observe
20    the construction of any built-up gravel roofs?
21         A.  No.
22         Q.  Is it fair to say that at least prior to 1989
23    you had no experience with either the construction or
24    investigation of built-up gravel roofs?
25         A.  That would be correct.
```

Paul David Nilles

1      Q.   In 1989 began as a field representative for

2   Cincinnati Insurance.

3      A.   Yes.

4      Q.   I would guess that as part of that process you

5   probably had some basic training in claims-handling.

6      A.   Yes.

7      Q.   Did you have any training in roofing or

8   construction practices?

9      A.   With Cincinnati Insurance Company?

10     Q.   Correct.

11     A.   We would've had a little bit of training that

12   would've been put on by their claims training

13   department.

14     Q.   At that point were you doing primarily

15   residential claims?

16     A.   No.

17     Q.   Commercial?

18     A.   Yes.

19     Q.   Did you investigate or handle any claims for

20   built-up gravel roofs?

21     A.   I'm sure I did.  I don't recall them.

22     Q.   And when I'm talking about built-up --

23   "built-up gravel roofs," what is your understanding of

24   what a built-up gravel roof is?

25     A.   Built-up gravel roof can include multiple plies

Paul David Nilles

1  of asphalt roofing laid over by a hot tar and ballasted

2  either in the tar or laid loosely.

3      Q.  And when you were a field rep with Cincinnati

4  Insurance, where were you located out of?

5      A.  Des Moines.

6      Q.  And you handled claims primarily in the

7  Des Moines area.

8      A.  Yes.

9      Q.  When you went to work for United Fire &

10  Casualty, were you also based out of Des Moines?

11      A.  Yes.  I need to make a statement about

12  Cincinnati.

13      Q.  Oh, sure.

14      A.  Partway through Cincinnati's work I was

15  relocated to Lawrence, Kansas, where I opened up a

16  claims territory for Cincinnati Insurance Company, which

17  included Western Missouri and Eastern Kansas.  And so I

18  was handling claims basically from Topeka, Wichita east

19  to the Missouri border and then all of Kansas City,

20  Missouri.

21      Q.  And then when you were with United Fire &

22  Casualty, you were supervising six to eight field

23  adjusters on a regional level.

24      A.  Yes.

25      Q.  Primarily based out of the Des Moines area.

Paul David Nilles

30

```
 1    Was it covering the entire state or . . . ?
 2         A.   I was based out of Cedar Rapids, Iowa, the
 3    corporate office, and the adjusters that I served --
 4    that I supervised were in Illinois, Michigan, and
 5    Wisconsin.
 6         Q.   When you were supervising these adjusters, did
 7    you go out in the field with them, or did you do desk
 8    audits?
 9         A.   Both.
10         Q.   So by way of chronology, you began working with
11    GuideOne in approximately '98, 1999?
12         A.   1999.
13         Q.   And where were you based out of?
14         A.   Des Moines.
15         Q.   But you handled claims across the country
16    because you were their large loss adjuster.
17         A.   Yes.
18         Q.   And that included some in Texas.
19         A.   Yes.
20         Q.   How long were you with GuideOne before you went
21    to work for SERVPRO?
22         A.   Approximately four and a half years.
23         Q.   So sometime in 2003, 2004 you went to work for
24    SERVPRO?
25         A.   2003.
```

Paul David Nilles

```
 1        Q.   Okay.   Is that when a lot of mold claims were
 2   being made?
 3        A.   No.
 4        Q.   That was before then?
 5        A.   Let me retract that.   The mold claims
 6   would've -- I mean, the mold issue -- I'll just put it
 7   that way -- in Texas would've been going on prior to me
 8   going to SERVPRO, yeah.
 9        Q.   And so they were kind of in expansion mode
10   expecting that this might go nationwide.
11                  MR. MITCHELL:   Objection, form.
12        A.   As for?
13        Q.   Mold claims or restoration claims for water
14   damage.
15                  MR. MITCHELL:   Same objection.
16        A.   I can't answer that.
17        Q.   Part of your job at SERVPRO was trying to
18   recruit national accounts for large losses.
19        A.   That's correct.
20        Q.   Did a lot of those kind of business activities
21   include going to carriers in case they had large water
22   losses?
23        A.   Yes.
24        Q.   Was that in association with the mold issue, as
25   you put it?
```

1    A.  No.

2        Q.  What type of issues was that primarily

3    associated with?

4        A.  It was a -- it could be various reasons why.

5    The purpose that we were developing or trying to develop

6    relationships with commercial carriers is to provide our

7    restoration services in -- as a whole to these carriers.

8        Q.  So could be, for example, if there was a fire

9    loss.

10       A.  A fire loss, yes.

11       Q.  A water loss?

12       A.  A water loss, yes.

13       Q.  Because primarily, SERVPRO is involved in

14   trying to help situations where they can restore the

15   property or rescue the property from -- that's been

16   damaged.

17       A.  Yes.

18       Q.  Did you do any claims-handling while you were

19   with SERVPRO?

20       A.  No.

21       Q.  That was just trying to generate new business

22   for the company.

23       A.  That's correct.

24       Q.  And then so approximately 2005 you went back to

25   GC3.

Paul David Nilles

```
 1        A.   Yes.

 2        Q.   Well --

 3        A.   It would've been GuideOne Taylor Ball.

 4        Q.   Right.  GuideOne Taylor Ball and then TC3 and

 5   eventually GC3.

 6        A.   Yes.

 7        Q.   Now, that entire time period there you were

 8   involved in both construction-related activities and

 9   claims-handling.

10        A.   Where?

11        Q.   With GC3 or its related entities:  Taylor Ball,

12   TC3, any of those companies.

13        A.   While I was with GuideOne Taylor Ball, slash,

14   TC3, slash, GC3, my role was business development and

15   marketing, as well as consulting services.

16        Q.   What percentage of the time would you say you

17   were doing business development and marketing compared

18   to consulting services?

19        A.   Probably 85 percent of the time I was doing

20   marketing and business development.

21        Q.   And about 15 percent of the time you were doing

22   consulting work like you did on this file.

23        A.   Correct.

24        Q.   Did anyone other than administrative staff at

25   GC3 assist you with the services you provided with
```

1    regard to the Denton Center?

2         A.   Yes.

3         Q.   Who would that be?

4         A.   Billy Owens.

5         Q.   And what did he do?

6         A.   When I needed a roofing subcontractor to

7    respond to State Auto, he suggested Hallmark Roofing.

8    And at the end of our participation in this particular

9    file, I asked Billy Owens to take a look at a proposal

10   put together by West End [sic] for tapered insulation.

11        Q.   Were these two services that Mr. Owens provided

12   the only things that anyone other than administrative

13   staff at GC3 did on the file other than yourself?

14        A.   Yes.

15        Q.   Under your certifications you've listed Master

16   Builders of Iowa.  What is that?

17        A.   Master Builders of Iowa is the Iowa chapter of

18   AGC, the Association of General Contractors of America.

19        Q.   And what is involved in becoming a member of

20   the Master Builders of Iowa?

21        A.   There is a membership application that is

22   filled out by the company, GC3, and I am sure -- I don't

23   know this for sure, but I'm sure there's a membership

24   fee that's associated with it as well.

25        Q.   What does it mean when you have executive

Paul David Nilles

```
 1   leadership certified?

 2       A.   They have a course that MBI puts on for

 3   construction executives that helps them with management

 4   skills of their company.

 5       Q.   With regard to that certification, is that more

 6   geared towards how to manage a construction company, or

 7   is it more geared towards, what I would say, the actual

 8   construction practices?

 9       A.   How to manage a construction company.

10       Q.   The second certification you have listed is a

11   Senior Claims Law Associate designation.  What is that?

12       A.   That is a educational course I believe put on

13   by the American Educational Institute.  It's a

14   continuing education course that claims adjusters will

15   take that highlights claims law.

16       Q.   And is that kind of like insurance law and

17   regulations?

18       A.   It involves insurance law and regulations.

19       Q.   And -- but it'd be based on various states.

20       A.   Yes.

21       Q.   Okay.  With regard to your services that you

22   provided to State Auto, other than reviewing the

23   subcontractors' estimates and the estimates provided by

24   Tice, did you give them any advice on how to adjust or

25   handle the claim?
```

1    A.   No.

2    Q.   Are you familiar with any of the adjustment

3    deadlines in Chapter 542 of the Texas Insurance Code?

4    A.   No.

5    Q.   The third certification you have is an

6    associate in claims.   What is that?

7    A.   That is another designation for continuing

8    education in the insurance industry for claims staff.

9    Q.   And again, this is a designation that helps

10   with the -- scratch that.

11                Is the associate in claims related to the

12   insurance industry or relating more to the construction

13   industry?

14   A.   Insurance industry.

15   Q.   Training.   What is Xactimate?

16   A.   Xactimate is an estimating platform tool.

17   Q.   And it's a computerized program that's supposed

18   to provide, I guess, a composite of construction prices

19   for a particular geographic area.

20   A.   Yes.

21   Q.   Do you use Xactimate in your line of work?

22   A.   Yes.

23   Q.   Do you consider Xactimate to be reliable?

24   A.   At times.

25   Q.   What is your criteria for determining when

Paul David Nilles

1   Xactimate is being reliable and when it is not?

2       A.   In some cases, depending upon the structure

3   that we are working with, the complexity of the

4   structure may not be -- the components may not be found

5   under Xactimate database or their pricing, the database

6   pricing, or scoping, for that matter.

7       Q.   Make sure I understand it.   With regard to

8   those items that are in Xactimate, you find those to be

9   accurate; is that correct?

10      A.   Yes.

11      Q.   Where you sometimes find difficulties, is that

12  due to the nature of specific construction projects

13  there may be things that are required that there is not

14  an Xactimate price for?

15      A.   That's correct.

16      Q.   And then in those circumstances, you have to

17  find an alternative source for that information.

18      A.   Yes.

19      Q.   Do you ever have to find alternative sources of

20  information if the pricing is provided by Xactimate?

21      A.   Yes.

22      Q.   Okay.   When would those circumstances be?

23      A.   As a contractor, if we are looking at the scope

24  and we look at the estimate and we feel that the price

25  provided by Xactimate may be overpriced or underpriced,

Paul David Nilles

```
 1    doesn't matter, if we feel that that price is outside of
 2    what we would consider the market value or
 3    reasonableness, then we will do additional research.
 4         Q.  What is your understanding of how Xactimate
 5    determines the market price?
 6         A.  My understanding and what I was told by
 7    Xactimate is that they have a group of researchers that
 8    reaches out to various contractors all across the United
 9    States asking them for their pricing on their specific
10    trade that they provide.
11         Q.  And then, in turn, the computer program
12    provides this pricing on a regional area.
13         A.  Yes.
14         Q.  So for example, Xactimate, there is a price
15    list for the DFW area.
16         A.  That is correct.
17         Q.  Okay.  And then that's also updated according
18    to time in terms of the price list as provided today may
19    be different than what it was five years ago.
20         A.  That is correct.
21         Q.  Updated on quarterly basis?
22         A.  I do not know the answer to that.
23         Q.  Okay.  If Xactimate goes to the trouble of
24    asking this large number of contractors for their
25    pricing, why do you believe there are sometimes
```

Paul David Nilles

```
 1    instances where that pricing is either over or under the

 2    fair market value?

 3         A.   What we have found or what we have experienced

 4    is that Xactimate doesn't always capture the market with

 5    regards to the value, the market value of the

 6    competitive pricing that might be out there.  And so

 7    when we see that happening, then what we'll do is go out

 8    and get competitive bids.

 9         Q.   When you get those competitive bids, do you

10    just get one bid, or do you get multiple bids?

11         A.   We can get -- we typically get multiple bids.

12         Q.   With regard to the Denton Center, did you

13    review Xactimate pricing for any of the work that you

14    were reviewing?

15         A.   No.

16         Q.   Okay.  Is there a reason you did not use

17    Xactimate to evaluate the scope of work provided by

18    State Auto in Exhibit 3?

19         A.   Would you restate the question, please.

20         Q.   Sure.  My understanding of Exhibit 3 is that

21    this is the scope of work that was provided to you by

22    State Auto.

23         A.   Yes.

24         Q.   And that you then talked to Billy Owens, and he

25    put you in touch with a company named Hallmark out of
```

Paul David Nilles

 1    Waxahachie, Texas, to procure a bid for doing that work.

 2        A.   Yes.

 3        Q.   Why did you go to a contractor rather than

 4    pricing it through Xactimate?

 5        A.   They wanted a price that our subcontractor

 6    could perform for.  For me to simply put an estimate

 7    together, we do not provide or self-perform our work.

 8    So we went to Hallmark, who self-performs work, and

 9    asked for a bid for them to do the work based upon State

10    Auto's scope of loss.

11        Q.   They provided you a subcontracting bid.

12        A.   A subcontracting bid.

13        Q.   And then if you were going to be supervising

14    this work, you would be the general contractor.

15        A.   We would if we were asked to do that.

16        Q.   And then that's -- traditionally you'd put 10

17    and 10, 10 percent profit and 10 percent overhead, on

18    top of that subcontractor's bid to compensate you for

19    your services.

20        A.   No.

21        Q.   Okay.  How do you charge for overhead and

22    profit?

23        A.   GC3 charges a flat fee.

24        Q.   And how much is that?

25        A.   Ten percent.

Paul David Nilles

41

```
 1          Q.   Is that standard in the industry?

 2          A.   I don't know.

 3          Q.   Have you seen estimates for general contractors

 4     where it's 10 percent overhead and 10 percent profit?

 5          A.   I have.

 6          Q.   Is that the general rule of thumb as to what's

 7     standardized in the industry?

 8          A.   I don't know the answer to that.

 9          Q.   Could you have generated an Xactimate bid based

10     upon State Auto's scope?

11          A.   As far as GC3?

12          Q.   Correct.

13          A.   Yes, we could've.

14          Q.   But you did not do that in this case.

15          A.   That is correct.

16          Q.   And that's because State Auto didn't want an

17     Xactimate bid; they wanted a bid from a subcontractor.

18               MR. MITCHELL:  Objection, form.

19          A.   That's what we were asked to provide.

20          Q.   Did they tell you not to use Xactimate?

21          A.   No.

22          Q.   Did they tell you you could use Xactimate

23     instead?

24          A.   No.

25          Q.   Were you under specific instructions to get a
```

Paul David Nilles

42

```
 1    bid from a subcontractor in the Dallas-Fort Worth area?

 2         A.   No.

 3         Q.   What were your instructions from State Auto?

 4         A.   Our instructions were to provide a roofing

 5    contractor that could provide roofing services in the

 6    DFW area.

 7         Q.   And that, after talking to Billy Owens, was

 8    Hallmark Construction?

 9         A.   Yes.

10         Q.   And you gave them the name of Hallmark

11    Construction.

12         A.   Gave who the name?

13         Q.   Sherri King at State Auto.

14         A.   Yes.

15         Q.   But all bids from Hallmark were supposed to go

16    through you so you could review them.

17         A.   Yes.

18         Q.   And you were the one who provided State Auto's

19    scope of work to Hallmark.

20         A.   Yes.

21         Q.   Just want to make sure I understand it.  What

22    was the reason why you went through a subcontractor

23    rather than providing the Xactimate bid?

24         A.   We were asked to provide a subcontractor bid by

25    State Auto.
```

Paul David Nilles

1    Q.  Did you speak with anyone other than Sherri

2    King at State Auto about the Denton Center?

3    A.  I would've had some conversations with Paul

4    Douglas.

5    Q.  So all of your communications regarding the

6    Denton Center would've either been through Sherri King

7    or Paul Douglas.

8    A.  Yes.

9    Q.  Did Sherri King or Paul Douglas tell you why

10   they wanted a subcontractor estimate rather than an

11   Xactimate estimate?

12   A.  They wanted a subcontractor estimate, slash,

13   bid, if you will, because they wanted somebody who could

14   perform the repairs and stand by the number they

15   provided.

16   Q.  And did that request come from Paul Douglas or

17   Sherri King?

18   A.  Sherri King.

19   Q.  Why was only one subcontractor's bid obtained

20   rather than multiple?

21   A.  I don't know the answer to that.

22   Q.  But her instruction was only obtain one bid.

23   A.  Provide one bid.

24   Q.  Do you think it's generally prudent to get

25   multiple bids when you're trying to price a roofing job

Paul David Nilles

1  of this size?

2          MR. MITCHELL:  Objection, form.

3      A.  I can't answer that.

4      Q.  But it's GC3's standard practice to usually

5  acquire multiple subcontractor bids when they're doing

6  the work, correct?

7      A.  Yes.

8      Q.  And at least GC3 considers it -- on the

9  construction work that that's the best practice, to

10  obtain multiple subcontractor bids when possible.

11      A.  Yes.

12      Q.  Is there any reason other than the instructions

13  from State Auto that you could not have acquired

14  multiple subcontractor bids for the Denton Center?

15      A.  Had we provided additional bids for the

16  Denton Center, we would've wanted to be down on-site

17  to look at the property, but we were not asked to do

18  that.

19          MR. MITCHELL:  Objection, nonresponsive.

20      Q.  When you receive more than one subcontractor

21  bid, you need to make a site visit, correct?

22      A.  Typically we do, yes.

23      Q.  You were not authorized to make a site

24  business -- visit with regard to the Denton Center,

25  correct?

1      A.   To the best of our knowledge, we were not.

2      Q.   Did you have any discussions with anyone at

3   State Auto as to why you had -- were not given authority

4   to go down and make a site visit?

5      A.   No.

6      Q.   Did you request to make a site visit?

7      A.   No.

8      Q.   Prior to the Denton Center, did you have any

9   personal experience with Hallmark Roofing &

10  Construction?

11     A.   No.

12     Q.   Nor any of the employees at that company.

13     A.   No.

14     Q.   Who did you deal with at Hallmark Construction?

15     A.   Kenny.

16     Q.   Do you remember Kenny's last name?

17     A.   Kenny Hall.

18     Q.   Did you deal with anyone at Hallmark

19  Construction other than Kenny Hall?

20     A.   I had some e-mails from his spouse.  I believe

21  her name was Monica.

22          MR. LIPSCOMB:  We've been going about an

23  hour, Mr. Nilles.  Do you need a break of any sort?

24  Would you like some water?

25          THE WITNESS:  Yes, please.

Paul David Nilles

```
 1                      MR. LIPSCOMB:  Yeah, no problem.  Let's go
 2   off the record.
 3                      THE VIDEOGRAPHER:  Now off record,
 4   12:17 p.m.
 5                      (A break was taken from 12:17 p.m. to
 6                      12:26 p.m.)
 7                      THE VIDEOGRAPHER:  We're now on record.
 8   The time is 12:26 p.m.
 9        Q.   (BY MR. LIPSCOMB)  Mr. Nilles, will you look at
10   Exhibit No. 2 if you need to.  There's a two-page, I
11   guess, listing of your opinions in this case.
12        A.   Would that be pages 2 and 3?
13        Q.   Yes.
14        A.   Yes, sir.
15        Q.   Okay.  Was this document prepared by you?
16        A.   Yes.
17        Q.   Okay.  And these are all the opinions that you
18   intend to express in this case.
19        A.   Yes.
20        Q.   Have you reviewed any Tice estimates for
21   works -- for work to be performed outside of the scope
22   of the State Auto -- provided by State Auto in Exhibit
23   No. 3?
24                      MR. MITCHELL:  Objection, form.
25        A.   No.
```

Paul David Nilles

```
 1        Q.   Okay.   Have you reviewed any bids for work to

 2   the concrete decking of any of the roofs at the Denton

 3   Center?

 4        A.   No.

 5        Q.   You didn't offer any opinions regarding the

 6   concrete decking?

 7        A.   No.

 8        Q.   Have you reviewed either the report or

 9   estimates from a company called Chaparral Consulting?

10        A.   No.

11        Q.   Or a gentleman by the name of Mr. Gary Treider?

12        A.   No.

13        Q.   Have you reviewed any of the engineering

14   reports in this case?

15        A.   No.

16        Q.   Do you intend to offer any opinions as to

17   the -- whether or not the scope provided by State Auto

18   addressed all the damages at the Denton Center?

19        A.   No.

20        Q.   If I understand it, then, basically what you're

21   here to provide expert opinion on is what the proper --

22   the reasonable and necessary costs for the items

23   included in Exhibit No. 3 would be.

24        A.   Yes.

25        Q.   And that is based upon your review of the
```

Paul David Nilles

1  Hallmark Roofing bid, as well as any supplements or Code

2  Compliance issues that you addressed during the

3  adjustment of the claim.

4      A.   Yes.

5      Q.   Are you aware of any other topics you intend to

6  provide opinions on?

7      A.   No.

8      Q.   Were you ever asked to perform any of the

9  actual work at the Denton Center?

10     A.   No.

11     Q.   Were you ever under the impression that you

12  were going to be asked to perform the work at the Denton

13  Center?

14     A.   No.

15     Q.   Did -- were you aware that at the time of the

16  adjustment of the claim the Denton Center had already

17  retained a general contractor?

18     A.   No.

19     Q.   Did you have any communications with Tice

20  Enterprises?

21     A.   No.

22     Q.   Okay.   With regard to the opinions in your

23  report, Option (a)(1) -- or (1)(a) just indicates in

24  approximately May of 2014 is when you were contacted by

25  State Auto to look at this file.

Paul David Nilles

1       A.   Yes.

2           Q.   Contained in Exhibit 2 are your billing

3    records, both when you were at GC3 and now with your own

4    company, correct?

5       A.   Yes.

6           Q.   Okay.   Are you aware of any billing or expenses

7    that are not included in Exhibit No. 2?

8       A.   No.

9           Q.   The scope of this project identified in your

10   report at (1)(a) where it says "bids on the Grandy's,

11   China King, and Kroger strip mall facilities," was that

12   scope given to you by State Auto?

13      A.   Yes.

14          Q.   Okay.   And then in (1)(b) you then identify

15   that the scope provided by Mr. Paul Douglas was what you

16   were supposed to provide to the subcontractor and have

17   them bid out.

18      A.   Yes.

19          Q.   Okay.   You obtained the name of Hallmark

20   Roofing from Billy Owens.

21      A.   Yes.

22          Q.   Okay.   Did you do anything personally to

23   investigate the qualifications of Hallmark Roofing or

24   Kenny Hall?

25      A.   No.

Paul David Nilles

1      Q.  You relied solely upon Mr. Owens'

2  recommendation?

3      A.  Yes.

4      Q.  Do you know what Mr. Owens did to vet Kenny

5  Hall or Hallmark's Construction's credentials?

6      A.  No.

7      Q.  Do you know if there is any type of preapproved

8  list of subcontractors that GC3 uses?

9      A.  No.

10      Q.  And I did that -- I think I got my question --

11  when you say "no," are you saying no, there is no list,

12  or are you -- are you saying that you don't know if

13  there is a list?

14      A.  I don't know if there is any list.

15      Q.  Okay.  But as far as you know, you recommended

16  and, in turn, used Hallmark Roofing based upon solely

17  the recommendation of Billy Owens.

18      A.  Yes.

19      Q.  But with regard to GC3, he's kind of your

20  roofing specialist there.

21      A.  Yes.

22      Q.  But --

23      A.  And I am assuming you're talking about Billy

24  Owens.

25      Q.  Yes.

Paul David Nilles

1          A.   Yes.

2          Q.   And -- but you don't know what Billy Owens did

3     or what process he used to choose Hallmark Roofing.

4          A.   I do not.

5          Q.   And prior to making contact with Kenny Hall,

6     you'd never had any conversations with him?

7          A.   No.

8          Q.   Never exchanged e-mails?

9          A.   No.

10         Q.   As you sit here today, what can you tell me

11    about qualifications of Hallmark Roofing & Construction?

12         A.   The qualifications that I can give you about

13    Hallmark Roofing is that they have, on other projects

14    for GC3, performed as a subcontractor on various

15    projects that we've had roofing needs for.  They have

16    met GC3's guidelines to be a subcontractor underneath of

17    GC3.  Their performance has been satisfactory, and we

18    have received all of the waivers that were required, the

19    bills have been paid as a subcontractor, and we have

20    also received feedback from our clients that the work

21    was satisfactory.

22         Q.   You do not know any specific details about the

23    credentials of either Hallmark Construction or Kenny

24    Hall, correct?

25         A.   That's correct.

1      Q.   You do know that Hallmark Construction has been
2   used on other GC3 projects.
3      A.   Yes.
4      Q.   Do you know how many?
5      A.   From that date of loss?
6      Q.   Let's go it this way first:   How many times had
7   Hallmark Roofing been used prior to April 2014?
8      A.   I don't know.   It'd be a guess.   I'm guessing
9   half a dozen times.
10      Q.   But there had been at least several instances
11   where they had been used.
12      A.   Yes.
13      Q.   And so when you went to talk to Mr. Billy
14   Owens, I assume he told you that -- when he gave you the
15   name Hallmark Roofing that they had been used on at
16   least some projects in the past with satisfactory
17   results.
18      A.   Yes.
19      Q.   Since the date of loss, has Hallmark Roofing
20   been continued -- does GC3 continue to use Hallmark
21   Roofing?
22      A.   Yes.
23      Q.   Do you know approximately how many more
24   projects they've done?
25      A.   Dozens.

1      Q.  Were you personally involved in any of those?

2      A.  No.

3      Q.  The results you reported from those additional

4  projects, were those also told to you by Mr. Owens?

5      A.  Yes.

6      Q.  Would it be fair to say that Mr. Billy Owens

7  knows more about the qualification and credentials of

8  Hallmark Roofing and Kenny Hall than you do?

9      A.  Yes.

10     Q.  Other than being aware that they have worked as

11 a subcontractor for GC3 with satisfactory results, is

12 there anything else you can tell us about the

13 credentials and qualifications of Kenny Hall or Hallmark

14 Roofing?

15     A.  No.

16     Q.  Do you know the names of any other roofing

17 subcontractors that GC3 uses in the DFW area?

18     A.  There is a roofing contractor that we use, and

19 it's called DMW, and I don't know what the DMW stands

20 for.

21     Q.  You just know them as DMW.

22     A.  Yes.

23     Q.  Other than DMW, do -- are there any other

24 roofers?

25     A.  That's it.

Paul David Nilles

54

```
 1          Q.   Okay.  So in the Dallas --
 2          A.   In the Dallas area.
 3          Q.   Okay.  And other than the initials "DMW," do
 4    you know anything else about that company?
 5          A.   No.
 6          Q.   Have you ever used them as a recommendation for
 7    either a bid or construction work?
 8          A.   I personally have not.
 9          Q.   Okay.  Was that one of the companies that
10    Mr. Owens gave you when you asked him the name of a
11    subcontractor?
12          A.   No.
13          Q.   How have you learned that GC3 also uses DMW?
14          A.   On past projects between the date of loss until
15    current.
16          Q.   And you just saw their name.
17          A.   Yes.  They were discussed in our management
18    team meetings.
19          Q.   Did you discuss Hallmark Roofing in your
20    management team meetings?
21          A.   Yes.
22          Q.   Okay.  Can you tell me about these discussions?
23          A.   Most of the discussions were based upon
24    projects that were currently underway where we were
25    reroofing structures, projects underway, and many of
```

Paul David Nilles

```
 1    those discussions were on the progress of those reroofs,
 2    and those discussions would've also included when they
 3    were going to be completed and to make sure that they
 4    were on schedule and on budget.
 5         Q.   So you've never supervised any work actually
 6    performed by Hallmark.
 7         A.   No.
 8         Q.   But during management team meetings, you were
 9    either hearing or involved in discussions when
10    Hallmark's work was being discussed.
11         A.   Yes.
12         Q.   And the two issues of focus would be, one, is
13    their work being performed on schedule.
14         A.   Yes.
15         Q.   And were they staying on budget.
16         A.   Yes.
17         Q.   One of the things that GC3 markets to insurance
18    companies is that they can save them approximately 15 to
19    30 percent from construction bids, correct?
20         A.   Yes.
21         Q.   And that's part of the process here.
22         A.   Yes.
23         Q.   Making sure that if you're going to promise to
24    do that for somebody you live up to it.
25         A.   That's correct.
```

Paul David Nilles

56

1    Q.   And when GC3 used Hallmark, were they able to

2    meet that target goal?

3    A.   As far as I know, yes.

4    Q.   And then in those instances, GC3 would then be

5    compensated for 10 percent of the overall project as

6    their general contractor fee.

7    A.   Yes.

8    Q.   When you were evaluating the bids for the

9    Denton Center, you originally received Hallmark's bid,

10   correct?

11   A.   Yes.

12   Q.   Did you make any adjustment or changes to it?

13   A.   Not to my knowledge.

14   Q.   Did you have any criticisms of it?

15   A.   No.

16   Q.   Okay.   When there were differences between Tice

17   Enterprises and Hallmark, Ms. King would contact you and

18   ask you to look at them, correct?

19   A.   Yes.

20   Q.   And you would attempt to reconcile those

21   differences in some way or form.

22   A.   Yes.

23   Q.   Okay.   And there would be times that you would

24   agree that -- with Tice that perhaps something needed to

25   be added to it, and there were times when you would

1  disagree with Tice and think that some items were

2  unnecessary.

3      A.  Yes.

4      Q.  And feel free to look at your notes if you need

5  to.  Do you recall any of the specifics where either

6  changes had to be made because either you agreed or

7  disagreed with what Tice was asking to supplement to

8  Hallmark's bid?

9          And Mr. Nilles, if it would help you, we

10 can go off the record, and you can look through there,

11 if that helps you.

12     A.  I'm here.

13     Q.  Okay.

14     A.  Under Exhibit 4 -- I'll just reference

15 Exhibit 4 --

16     Q.  Okay.

17     A.  -- Tab 18, Sherri King would've received from

18 Tice Enterprises a scope and estimate from Tice for

19 additions or upgrades -- not -- upcharges.  That's a

20 better word for that.  This would've been an example

21 where this was provided to me for review, which I did.

22 My review would've included a couple different things:

23 number 1, my review of Hallmark's estimate in

24 relationship to the scope; and number two would've been

25 a phone call and/or an e-mail to Kenny Hall to address

Paul David Nilles

1  these particular line items as highlighted by Tice.

2      Q.  So if I'm looking at Exhibit 4, Tab 18, there's

3  an e-mail from December 4th, 2014, at 2:49 --

4      A.  Yes.

5      Q.  -- p.m. from you to Kenny.

6      A.  Yes.

7      Q.  Okay.  And not only do you look at the

8  upcharges, you have Kenny look at them as well.

9      A.  Yes.

10     Q.  Okay.  And then after you've both had a chance

11 to look at them, you kind of get in a phone conversation

12 and compare notes.

13     A.  Yes.

14     Q.  If we turn to the second page of that exhibit,

15 a page at the bottom you'll see is labeled SA-002079.

16     A.  Yes.

17     Q.  Okay.  There's, I guess, a list of upcharges

18 for the next, I'm guessing, six pages identified by Tice

19 Enterprises.

20     A.  Yes.  Pages 1 through 7.

21     Q.  Okay.  And so if you look at the first page of

22 that where it says "Kroger Strip Center Additions."

23     A.  Yes.

24     Q.  The first line on there, "Hallmark line 3 cap

25 flashing.  Flashings are large.  See estimate line 1 for

Paul David Nilles

1    upcharge."

2        A.   Yes.

3        Q.   There then seems to be a line through that.

4        A.   Yes.

5        Q.   Okay.  Is that line something you did, or is

6    that line provided on Tice's addition?

7        A.   That would've been a line I put in there.

8        Q.   That's something that you thought did not need

9    to be added.

10       A.   That is correct.  I would've had a conversation

11   with Kenny with regards to that line item for an

12   upcharge in cost compared back to his estimate to make

13   sure that we could indeed place a like kind and quality

14   product back on the roof for that price.  And if Kenny

15   said that he could do that for that number that he

16   provided, then I drew a line through this.

17       Q.   So if I were to go through this addition and

18   see lines drawn through items, those are items that you

19   thought were already incorporated into the Hallmark

20   estimate.

21       A.   That is correct.

22       Q.   If there are items that -- where there are not

23   lines, those are things that you would consider need to

24   be added to the bid.

25       A.   Those would be items that I sent back to Kenny

Paul David Nilles

 1    to have him take a look at to make sure that they were

 2    included in his estimate or not included, and if they

 3    weren't, should they have been included, and then

 4    confirmed whether they should or not through Kenny.

 5         Q.   Okay.  So I see, for example, on this page, the

 6    first page of Tice's additions, they wanted to add

 7    synthetic stucco repair at Planet Tans and see line item

 8    7.  You've crossed that out.

 9         A.   Yes.

10         Q.   And there's a handwritten note says, "Included

11    in Hallmark lines 23-29."

12         A.   Yes.

13         Q.   And so that's a reference where you thought it

14    was already included in the Hallmark bid.

15         A.   Yes.

16         Q.   Are these your handwritten notes?

17         A.   Yes.

18         Q.   Okay.  In contrast, there are two items that

19    were listed that did not have lines through them.  Were

20    these items you then sent to Kenny and had him, first of

21    all, tell you whether or not they were necessary; and

22    then, two, if so, bid them out?

23         A.   Yes.

24         Q.   Okay.  And did he do that for all the items in

25    Exhibit 4, Tab 18, that do not have lines crossed

1    through them?

2        A.   Yes, as far as I know.

3        Q.   When I get to page 3 of this Kroger Strip

4    Center Additions from Tice I see a section at the bottom

5    of the page, one for lighting and one for HVAC.

6        A.   Yes.

7        Q.   Okay.   Those items have been crossed out, but

8    it says, "Adjusted by Sherri."

9        A.   Yes.

10       Q.   What does the "adjusted by Sherri" mean?

11       A.   Those were line items that were not a part of

12   Hallmark's estimate because they had been addressed by

13   Sherri or State Auto separately.   The lighting, I can't

14   remember exactly on the lighting if that -- I don't

15   think that was the parking lot lights; I think that was

16   some interior lighting in the grid.   But those

17   particular areas were specifically addressed by State

18   Auto outside of Hallmark.

19       Q.   And it looks like that for both of these

20   there's issues being questioned about the overhead and

21   profit charges.

22       A.   Yes, according to this document.

23       Q.   Then Sherri then made the decision without your

24   input as to whether or not that should be added.

25              MR. MITCHELL:   Objection, form.

1    A.   I don't know the answer to that.

2    Q.   Did you give Sherri any input with regard to

3  the lighting or HVAC that's identified on SA-002081?

4    A.   No.

5    Q.   On SA-002085 -- should be page 7 of that

6  report -- there is a listing for Kroger roof, and it has

7  a line through it.

8    A.   Yes.

9    Q.   Why does Kroger roof have a line through it?

10   A.   I was informed by State Auto that those

11  particular line items would not need to be addressed in

12  Hallmark's estimate because they would be paid on an as-

13  incurred basis.

14   Q.   And this is as of December 4th, 2014.

15   A.   Yes.

16   Q.   Okay.  And so the items that were going to be

17  paid on per-incurred basis that you did not need to

18  evaluate were the Kroger roof, correct?

19   A.   The -- there's a line through the Kroger roof.

20  That was just where the reference structure was.  The

21  line -- the actual stuff that -- items that were to be

22  handled on an incurred basis would've been underneath

23  the Kroger roof.

24   Q.   Okay.  So let me make sure I understand this.

25  On SA-002085, there's a listing of several items that

Paul David Nilles

```
 1    Tice was asking to have added or supplemented to the
 2    bid, correct?
 3         A.   Yes.
 4         Q.   The first two, "painting on the property" and
 5    then "the paint has been compromised, the property was
 6    painted in 2013," have not been crossed through.
 7         A.   Correct.
 8         Q.   Those are things that you would've sent to
 9    Kenny to be evaluated.
10         A.   Yes.
11         Q.   Because you never visited the property.
12         A.   That's correct.
13         Q.   Okay.  And then in turn, I assume at some point
14    he at least reported back to you on those two issues.
15         A.   Yes.
16         Q.   Okay.  As you sit here, do you recall what the
17    result of that was?
18         A.   I believe that if we would go through
19    Hallmark's there was a revision to his estimate that did
20    include those line items.
21         Q.   Okay.  The next item is the Kroger roof and has
22    a line through it.
23         A.   Yes.
24         Q.   Why was the Kroger roof item crossed out?
25         A.   As I was -- I was just mentioning sitting here
```

1    thinking about it, I can't tell if it was because it was

2    the Kroger roof in total or if it was a mistake where

3    the Kroger roof involves the temporary repairs and then

4    the Dumpsters, telehandlers, permit, so I can't answer

5    that question.

6        Q.  Did Sherri King ever have any conversation with

7    you about whether or not the Kroger roof needed to be

8    replaced or repaired?

9        A.  No.

10       Q.  And I know I asked about conversations.  Did

11   she ever send any e-mails to you or documents that you

12   can recall in which she said whether or not the Kroger

13   roof needed to be estimated or repaired?

14       A.  None other than what was provided in the scope

15   of loss.

16       Q.  And to the best of your knowledge, that scope

17   of loss did not include the Kroger roof, correct?

18       A.  I would have to take a look at it.

19       Q.  Okay.  The next item on here that's been

20   crossed off is "temporary repairs left off estimate."

21   Is that one of the items that Sherri was going to

22   handle?

23       A.  I assume so.  I don't know for sure.

24       Q.  Was it one of the items she says as they were

25   incurred?

Paul David Nilles

1      A.   I don't recall.

2      Q.   Okay.   The next items that are crossed out

3   says, "Also:  Items to be left open until invoices

4   obtained."  Are these five items the items that are

5   specifically not to be adjusted because those wouldn't

6   be incurred costs?

7      A.   Yes.

8      Q.   If you could look at the scope of work, what is

9   your understanding from that scope as to what was to be

10  estimated with regard to the Kroger roof?

11     A.   According to the scope of loss, the University

12  Kroger's address 500 to 824, University Kroger's, the --

13  actually has title "Strip Mall Krogers," it says:  "One,

14  CIS report on AC units; two, tear out, replace tile per

15  engineer's report; three, repair TPO, waiting on

16  engineer report for repair protocol; four, tear out

17  coping metal; five, replace coping metal; six, remove

18  and replace gutter coping combination; seven, spud and

19  reinstall gravel 3 foot at parapet and curbs; eight,

20  remove and replace mod bit parapet curbs up to

21  16 inches; nine, remove and replace mod bit parapet over

22  16 inches to 3 foot; ten, remove, reset wall panel metal

23  ribbed; eleven, tear out roof vent turbine large;

24  twelve, replace roof vent turbine large; thirteen, tear

25  out gutter 6 inch; fourteen, replace gutter 6 inch;

Paul David Nilles

```
 1   fifteen, tear out vent cap; sixteen, replace vent cap;

 2   seventeen, tear out, replace metal caps medium;

 3   eighteen, tear out, replace metal caps large; nineteen,

 4   EIFS repair per square foot; twenty, EIFS color coat per

 5   square foot; twenty-one, EIFS repair trim; twenty-two,

 6   EIFS decorative molding trim, 6 inches to 12 inches; and

 7   twenty-three, paint siding, paint siding rough surface,

 8   two-coat spray."

 9               On line 21 I will note that -- says "EIFS

10   repair trim west of both towers, west of gables other

11   than Kroger," and on No. 22, it addresses "west of both

12   towers and west of gables other than Kroger."

13       Q.   Have you seen an aerial photograph or drawing

14   of the Denton Center?

15       A.   Yes.

16       Q.   And there's actually a Kroger anchor store and

17   then a series of additional stores that are attached to

18   it.

19       A.   Yes.

20       Q.   Okay.  When this is referring to the strip mall

21   at Kroger's, based upon your reading of some of these

22   items, that includes work not only on the Kroger portion

23   of the build itself, but also some of those buildings

24   that were attached to it.

25       A.   I can't answer that question.
```

Paul David Nilles

1    Q.   You don't know one way or another.

2    A.   I do not.

3    Q.   Okay.  With regard to Item No. 2, where it says

4   "tear out and replace the tile per engineer's report,"

5   you were never given an engineer's report, were you?

6    A.   No.

7    Q.   Did you ever provided an engineering report to

8   Hallmark?

9    A.   No.

10    Q.   Do you know if anyone else provided an

11   engineering report to Hallmark?

12    A.   I do not.

13    Q.   Okay.  Are you aware of any communications with

14   anyone at State Auto directly with Hallmark rather than

15   going through you?

16    A.   Yes.

17    Q.   Okay.  Is that things that Sherri King did?

18    A.   Yes.

19    Q.   As well as Paul Douglas.

20    A.   Yes.

21    Q.   Okay.  But you don't know whether or not those

22   engineering reports were provided to them directly.

23    A.   I do not know.

24    Q.   And I would say that would be the same for Item

25   No. 3, which is the repair of the TPO.

1        A.   Yes.

2        Q.   Did you ever discuss any engineering reports

3    with anyone at State Auto or at Hallmark?

4        A.   No.

5        Q.   And no one ever asked you for any feedback on

6    whether or not you agreed with them.

7        A.   Nobody did.

8        Q.   Okay.   Do you know what the cause of loss at

9    the Denton Center was alleged to have been?

10       A.   Hail.   And wind.

11       Q.   But other than having a generalized knowledge

12   that you were assisting with a wind and hail claim, you

13   weren't provided any other details about the storm, were

14   you?

15       A.   No.

16       Q.   You weren't asked to review any weather data.

17       A.   No.

18       Q.   You weren't asked to give any opinions

19   regarding causation of any damage of the property.

20       A.   No.

21       Q.   We talked about in Exhibit No. 4 at Tab 18 a

22   series of items that -- or additions that were requested

23   by Tice that you went through and evaluated.

24       A.   Yes.

25       Q.   Do you recall there being any more instances of

Paul David Nilles

69

```
 1    that other than what's contained in Exhibit 18?

 2         A.   Just the west end tapered insulation proposal.

 3         Q.   And when Tice sent you, I guess, the supplement

 4    for the west end taper proposal, this is when you went

 5    and consulted Mr. Billy Owens again.

 6         A.   Yes.  I want to clarify that if I might.

 7         Q.   Oh, please.

 8         A.   We received the West Side invoice from Sherri

 9    King, State Auto, not directly from Tice.

10         Q.   And actually, I -- and I think -- I think I

11    messed that up.  I think I said west end kind of

12    referring to the building.  West Side was a --

13         A.   Oh, West Side.

14         Q.   -- subcontractor, correct?

15         A.   For Tice.

16         Q.   Okay.  And they sent an invoice for what type

17    of work?

18         A.   For tapered insulation.

19         Q.   Okay.  And they provided that to Sherri King.

20         A.   Yes.

21         Q.   And then Sherri King, in turn, asked you to

22    review the West Side tapered insulation proposal.

23         A.   Yes.

24         Q.   And that's when you consulted Billy Owens.

25         A.   Not initially.
```

Paul David Nilles

1    Q.   Okay.  Can you kind of tell me what happened?

2    A.   Yes.  When we received that from State Auto, I

3  passed that proposal on to Hallmark Roofing to check for

4  pricing -- actually, do two things:  number one, to

5  confirm that the City of Denton was requiring tapered

6  insulation to create positive flow; second, to review

7  the West Side invoice for reasonable costing.

8    Q.   Okay.

9    A.   When I reached out to Hallmark, they did not

10  immediately get back to me.  Billy Owens was in our

11  office, and so I took the West Side proposal to Billy

12  Owens to have him take a look at it for pricing, and he

13  provided his opinion.  I passed along his opinion to

14  State Auto on the West Side proposal.

15    Q.   The first part of your inquiry was to determine

16  whether or not the City of Denton was requiring tapered

17  insulation so that there can be more positive drainage

18  on the roof.

19    A.   Yes.

20    Q.   Did you do that personally, or did you rely

21  upon Hallmark for that?

22    A.   I relied upon Hallmark for that.

23    Q.   Did you ever directly contact the City of

24  Denton?

25    A.   No.

1    Q.   Do you know if Kenny did?

2    A.   Only what he told me.  He said he did.

3    Q.   And what did he tell you?

4    A.   He confirmed that the City of Denton was

5    requiring positive flow on the roof.

6    Q.   In fact, he sent you an e-mail saying that

7    he was not surprised that they were going to require

8    this.

9    A.   Yes.

10   Q.   Does it seem strange to you that if he was

11   expecting that to be required that it was not in his

12   original bid?

13   A.   No.

14        MR. MITCHELL:  Objection, form.

15   Q.   Why not?

16   A.   He was asked to provide an estimate based upon

17   the scope of loss provided by State Auto, and at the

18   time, the State Auto scope of loss did not address code

19   upgrade.

20   Q.   Other than your conversations with Kenny

21   regarding what the City of Denton was going to require,

22   did you have anyone -- conversations with anyone else

23   regarding Code Compliance with the City of Denton?

24   A.   No.

25   Q.   I would assume that you would then relay the

Paul David Nilles

72

```
 1    information that Kenny gave to you Ms. King.
 2         A.   Yes.
 3         Q.   Other than that, was there any other
 4    conversations about what the City of Denton would
 5    require?
 6         A.   No.
 7         Q.   With regard to the pricing provided by West
 8    Side, what did Mr. Owens tell you?
 9         A.   He felt that the pricing was very reasonable
10    for tapered insulation.
11         Q.   Did Hallmark give you an opinion whether or not
12    the -- West Side's pricing was reasonable or not?
13         A.   No.
14         Q.   But you reported what Mr. Owens told you back
15    to Ms. King.
16         A.   Yes.
17         Q.   Other than what we previously talked about in
18    Tab 18 of Exhibit 4 and the issues related to the
19    tapered insulation, do you recall any other
20    reconciliation between the Hallmark and Tice proposals?
21         A.   No.
22         Q.   I know you said you did not visit the property,
23    but did you ever fly down to Dallas-Fort Worth to
24    participate in a meeting regarding the Denton Center?
25         A.   No.
```

Paul David Nilles

1    Q.   Were you asked to by Ms. King?

2    A.   No.

3    Q.   Have you ever had any conversations with anyone

4    about a meeting that was held between representatives of

5    State Auto, Hallmark, and representatives of either Tice

6    or Freehold Management?

7    A.   The only conversation I had was an e-mail

8    conversation where State Auto was requesting that

9    Hallmark meet them on-site to be a part of the meeting.

10   Q.   Okay.  Kenny said he was going to be busy that

11   day, but Sherri said, I'll pay you two to three times

12   your rate because it's important for you to be there.

13   A.   I don't know what that conversation was, but

14   she really wanted Hallmark there.

15   Q.   Do you know why?

16   A.   No.

17   Q.   She never had any conversations with you about

18   that.

19   A.   No.

20   Q.   After the meeting, did she ever discuss what

21   happened at the meeting with you?

22   A.   No.

23   Q.   How did you meet Sherri King?

24   A.   I would've met Sherri King out at the State

25   Auto corporate office when I was visiting with her boss,

```
 1    Mark Chenetski.

 2         Q.   Do you know approximately what year that would

 3    have been?

 4         A.   No.

 5         Q.   At some point you went out to State Auto trying

 6    to recruit their business.

 7         A.   Yes.

 8         Q.   Was this on behalf of GC3?

 9         A.   On behalf of TC3.

10         Q.   TC3 at the time.  Okay.  Gives a little window

11    of the time, doesn't it?

12         A.   Yes.

13         Q.   Okay.  So you go out to solicit their business.

14         A.   Yes.

15         Q.   You meet with Ms. King's supervisor

16    Mr. Chenetski.

17         A.   Yes.

18         Q.   And at some point going through the office, you

19    kind of do a meet-and-greet, and you meet Sherri King.

20         A.   Yes.

21         Q.   After that time, did she start referring TC3

22    business?

23         A.   Yes.

24         Q.   Do you know what type of volume of work it was?

25         A.   No.
```

1      Q.  Do you know in terms about how -- dollars and

2  cents in a given year, how much it would be,

3  approximately?

4      A.  No.

5      Q.  During the course of TC3 and, eventually, GC3's

6  relationship with State Auto, Sherri King referred

7  numerous files for your assistance, correct?

8          MR. MITCHELL:  Objection, form.

9      A.  I don't know how many.  I'm not sure I'd

10  category it as numerous, but yes, she did make

11  assignments to GC3.

12      Q.  Would you say it was more than 100?

13      A.  No.

14      Q.  More than 50?

15      A.  No.

16      Q.  Okay.  You did -- did you ever meet her at one

17  of the PLRB conventions?

18      A.  No.

19      Q.  Okay.  There was a conversation, I think, in

20  one of the e-mails where you were talking about you were

21  going there, but she was not going that particular year

22  because of budget constraints.

23      A.  Yes.

24      Q.  Have you ever personally met Sherri other than

25  that office visit you had at State Auto when you were

Paul David Nilles

```
 1    recruiting business on behalf of TC3?

 2         A.   No.

 3         Q.   Everything else was either done by phone or

 4    through e-mails.

 5         A.   Yes.

 6              MR. LIPSCOMB:   Let's go ahead and take a

 7    break.

 8              THE VIDEOGRAPHER:   Now off record,

 9    1:09 p.m.

10              (A break was taken from 1:09 p.m. to

11                1:24 p.m.)

12              THE VIDEOGRAPHER:   Now on record, 1:24 p.m.

13         Q.   (BY MR. LIPSCOMB)   Mr. Nilles, if you could

14    please turn back to your January 4th, 2018, expert

15    report.   Should be contained in Exhibit 2.   If you look

16    at Item (g) in your report, it says that GC3 was asked

17    to provide an electrical contractor.   Is that CSEG, the

18    company you provided?

19         A.   Yes.   Critical Electric Systems Group.

20         Q.   So CESG.

21         A.   CESG.

22         Q.   And how did you acquire that name?

23         A.   They were a company that worked for one of our

24    GC3 consultants, project manager consultants, on a

25    project that we had down in Dallas.
```

1          Q.   Okay.   Other than based upon the recommendation

2     of that consultant, do you know anything else about

3     CESG's background or credentials?

4          A.   No.

5          Q.   They were again asked to provide a scope of

6     work based upon -- or excuse me.   Scratch that.

7                    CESG was asked to provide a bid based upon

8     the scope of work provided by State Auto.

9          A.   To the best of my knowledge, yes.

10         Q.   The reason I ask that is (h) says, "Electrical

11    scope of work was provided by State Auto."

12         A.   Yes.

13         Q.   Okay.   Do you have a copy of that in your file?

14         A.   I do not.

15         Q.   Okay.   Based upon statement contained in (h),

16    did State Auto, to the best of your knowledge, directly

17    provide that to CESG?

18         A.   I don't know the answer to that.

19         Q.   Okay.   So you don't know as you sit here today

20    how CESG obtained the scope of work for the Denton

21    Center project.

22         A.   That's correct.   Can I make a --

23         Q.   Oh, please do.   Please.

24         A.   I do know that there are e-mails that were

25    provided by Paul Douglas of those light fixtures, the

Paul David Nilles

78

1   parking lot lights, and those I know were forwarded on

2   to CESG.  As far as whether that was a scope of work or

3   a scope of loss I can't tell you.

4        Q.  But again, the process work, you didn't make a

5   determination of what lights, either repair work or

6   replacement work, needed to be done.

7        A.  I did not.

8        Q.  That was something that was done by someone at

9   State Auto.

10       A.  Correct.

11       Q.  And then the price for that was bid upon by

12  CESG.

13       A.  Yes, sir.

14       Q.  And your role in that process would be, one,

15  recommending CESG.

16       A.  Yes.

17       Q.  And two, once CESG came up with their proposal,

18  evaluating it for cost.

19       A.  Yes.

20       Q.  Did you have any other involvement in

21  evaluating the light repair and replacement?

22       A.  No.

23       Q.  If you look at Item (p) in your report, it's

24  where you say that you believe that the cost of the

25  Hallmark and the CESG bids reflect the reasonable and

Paul David Nilles

1  necessary cost to do the work for the scopes of repair

2  provided by State Auto.

3      A.  Based upon the scope provided by State Auto,

4  yes.

5      Q.  Okay.  And I just want to make a little bit of

6  a clarification.  That's actually the scope of repair

7  provided by State Auto and then the revisions that were

8  made to that based upon either Tice's suggestions or

9  going back and forth with the Denton Code Compliance

10  department.

11      A.  Yes.

12      Q.  So whatever those final numbers are, it's your

13  opinion that the final numbers for that particular scope

14  of work, that final scope of work done by Hallmark and

15  Critical Electric Systems Group, are reasonable and

16  necessary in Denton County.

17      A.  Yes.

18      Q.  If you could look at Exhibit No. 4.  Under Tab

19  1, there is an e-mail from July 31st, 2014, which

20  includes Hallmark's first invoice for the work they

21  performed on the Denton Center.

22      A.  Yes.

23      Q.  And that's where they did a site visit,

24  consulted, and then prepared an estimate based upon the

25  scope of work.

Paul David Nilles

80

```
 1        A.   Yes.

 2        Q.   Okay.  And you thought that number was

 3   reasonable.

 4        A.   Yes.

 5        Q.   Okay.  And the reason I say this is this

 6   invoice is not included in the billing invoices that

 7   were included in your other exhibit, but it is attached

 8   to this e-mail, correct?

 9        A.   That's correct.

10        Q.   Okay.  And so the Hallmark invoices that you're

11   aware of are the invoice that we are looking at now, as

12   well as the second invoice, which is attached to, I

13   believe, Exhibit 2.

14        A.   Yes.

15        Q.   Okay.

16        A.   If I can double-check Exhibit 2 --

17        Q.   Yeah, please do.  Please do.

18        A.   -- I just want to verify that.

19        Q.   I believe it should be the second-to-last page.

20        A.   Yes, that would be correct.

21        Q.   Are you aware of any other invoices for

22   Hallmark for their services?

23        A.   Excuse me?

24        Q.   Are you aware of any other invoices for

25   Hallmark's services?
```

Paul David Nilles

81

1       A.   No.

2       Q.   What is your understanding of the damage that

3   was done by the storm to the signs at the Denton Center?

4       A.   My understanding is that the sign -- the damage

5   to the signs were the metal wraps to the signs.

6       Q.   You explain to the jury what you mean by metal

7   wraps?

8       A.   The metal frames, the sheet metal that the --

9   that the sign would hold the illuminants in, were

10  damaged.  We were told by State Auto, Paul Douglas, that

11  the innards -- that would be the ballasts, the light

12  fixtures, things like that -- were operational and that

13  we would only need to address the sheet metal.

14      Q.   Did he send you any photos or tell you what was

15  wrong with the sheet metal?

16      A.   He did not say what was wrong with the sheet

17  metal; he did send photos.

18      Q.   Okay.  From seeing the photos, could you

19  ascertain what was wrong with the metal?

20      A.   Just saw some dents in the metal.

21      Q.   Did you see anything was showing that it was

22  warped or bent?

23      A.   No.

24      Q.   Are those photos contained in the documents you

25  brought here today?

1    A. No.

2    Q. Okay. Do you have any photos of the Denton

3 Center?

4    A. I do not.

5    Q. Now, I understand that you are no longer with

6 GC3; is that correct?

7    A. Correct.

8    Q. Okay. Were the materials perhaps in the files

9 at GC3 that you did not take to you when you went to

10 your new job?

11    A. They should be.

12    Q. Okay. And that would include things relating

13 to the Denton Center.

14    A. Yes.

15    Q. Have you retained any personal files, those

16 that you personally have retained documents from,

17 regarding the Denton Center?

18    A. No.

19    Q. The documents that you have reviewed in

20 preparation for today's deposition, as well as for your

21 opinions in this case, are all documents that were

22 provided to you by counsel for State Auto.

23    A. Yes.

24    Q. And those documents should hopefully come from

25 either your former employer, GC3, or State Auto.

Paul David Nilles

```
1       A.   Yes.

2       Q.   But you do not have any personal documents, and

3   you had nowhere to personally look for any documents.

4       A.   That's correct.

5       Q.   And that includes some possible photographs out

6   there.

7       A.   Yes.

8       Q.   Okay.   Do you recall reviewing any other

9   photographs other than damage to the signs?

10      A.   No.

11      Q.   Okay.

12      A.   Can I clarify that?

13      Q.   Oh, sure.

14      A.   In preparation for this or over the -- when we

15  were looking at --

16      Q.   Let me break that down.   So in preparation for

17  either today's deposition or the opinions in your

18  January 2018 report, did you review any photos that are

19  not included in either Exhibits 2, 3, or 4?

20      A.   No.

21      Q.   Okay.   But during the process of assisting

22  State Auto with its claim, there may have been

23  additional pictures you looked at, including pictures of

24  the three signs.

25      A.   Yes.
```

Paul David Nilles

84

```
 1        Q.   Okay.  And there might have been some
 2    additional pictures as well.
 3        A.   Yes.
 4        Q.   As you sit here today, can you recall any of
 5    those photos?
 6        A.   No.
 7        Q.   But to the extent that they would be in a file
 8    that GC3 has, at least you would have given them a
 9    cursory glance when you were working on the project.
10        A.   Yes.
11        Q.   Okay.  And there may have been more than that
12    if you actually saw the photos themselves.
13        A.   Yes.
14        Q.   Okay.  What was your understanding of the
15    damage that had been done to the exterior lights at the
16    Denton Center?
17        A.   My understanding that some of the light
18    fixtures had been dented, leaned over as far as bent.
19    That was the extent of the damage.
20        Q.   I want to make sure I understand.  So the metal
21    casing around where kind of the light would be you
22    understood there to be some dents in.
23        A.   The housing.
24        Q.   Okay.  And then some of the poles had been bent
25    over in the storm as well.
```

1     A.   That's what I was told.

2     Q.   Okay.   Did you receive any photos of that?

3     A.   Yes.

4     Q.   Okay.   Would those photos again hopefully be in

5   GC3's file, but they're not something that you have in

6   your personal possession?

7     A.   That is correct.

8     Q.   Okay.   But you recall seeing some photos of the

9   light poles being bent.

10    A.   Yes.

11    Q.   Okay.   If you look at Exhibit No. 15 to

12   Exhibit 4.

13    A.   Tab 15?

14    Q.   Yes.   That's a better way to phrase it.

15   Exhibit 4, Tab 15.   There is an October 9th, 2014,

16   e-mail from yourself to Sherri King.

17    A.   Yes.

18    Q.   Okay.   And attached to that is the -- CESG's

19   bid for the lights.

20    A.   Yes.

21    Q.   Okay.   And it looks like there was roughly

22   $35,000 worth of damage to those lights.

23    A.   Yes.

24    Q.   You found that cost to be reasonable and

25   necessary for the repair of the lights at the Denton

Paul David Nilles

```
 1    Center.
 2         A.   Yes.
 3         Q.   But again, you're not offering opinions whether
 4    or not that damage was caused by hail or wind.
 5         A.   No.
 6         Q.   If you can look at Exhibit No. 19 -- or Tab
 7    No. 19 to Exhibit 4.  The tabs are great, but that's the
 8    only downside.  I want to keep calling them exhibits.
 9              This is a January 8th, 2015, e-mail from
10    yourself to Sherri King, correct?
11         A.   Yes.
12         Q.   Okay.  "Here are Jenny's final numbers."  Is
13    that Kenny's wife?
14         A.   It -- no.  That's a typo.
15         Q.   Okay.  So that -- so these are actually Kenny's
16    final numbers.
17         A.   Yes.
18         Q.   Okay.  And this is -- so after you received
19    Tice's requested additions --
20         A.   Yes.
21         Q.   -- or upcharges, then Kenny went back, revised
22    his estimate on what you and he agreed to were
23    necessary, and then he prepared this new bid.
24         A.   Yes.
25         Q.   Is this inclusive of the prior work to be done,
```

1    or is this just in addition to the prior work?

2        A.   This would have been in addition to the prior

3    work.

4        Q.   Okay.   So if I'm looking at Bates-labeled

5    document SA-003930 through SA-003939, there was an

6    additional $636,600.22 worth of work that you agreed

7    needed to be added to Hallmark's original estimate.

8        A.   No.

9        Q.   Okay.

10       A.   What this estimate represents is that there

11   were revisions to Hallmark's original number --

12       Q.   Okay.

13       A.   -- that addressed the upcharges that Tice was

14   looking for or had asked for.   And Hallmark then went

15   through, looked at Tice's upcharge request, and those

16   that were confirmed were then added to the original

17   Hallmark estimate.

18       Q.   Okay.   And that's what I wanted to clarify on.

19   So this $636,600.22 is the Hallmark turnkey bid.

20       A.   Yes.

21       Q.   Okay.   So it includes the prior work they were

22   preparing to do, as well as the additional upcharges.

23       A.   That's correct.

24       Q.   And so if we wanted to calculate the actual

25   amount of the approved upcharges, we could take this

Paul David Nilles

```
 1   estimate, deduct the original estimate, and see the
 2   difference.
 3        A.   Yes.
 4        Q.   Okay.  Your current employer is Professional
 5   Claims Partners, LLC.
 6        A.   Yes.
 7        Q.   Okay.  When did you, I guess, create that
 8   company?
 9        A.   That company was created in June of 2017.
10        Q.   When did you begin working for Professional
11   Claims Partners, LLC?
12        A.   March 10th, 2018.
13        Q.   Now, one of your partners in that is a Kari
14   Nilles.
15        A.   Yes.
16        Q.   Daughter?  Wife?
17        A.   My wife.
18        Q.   Okay.  And so she started that company in June
19   of last year and then you left GC3 and began working for
20   the same company in March of this year.
21        A.   Yes.
22        Q.   Was there a reason for your decision to go to
23   work with your wife?
24             MR. MITCHELL:  At this point, I'm going
25   to -- let's go off the record.
```

Paul David Nilles

```
 1              MR. LIPSCOMB:  Oh, okay.

 2              THE VIDEOGRAPHER:  Now off record,

 3    1:40 p.m.

 4              (A break was taken from 1:40 p.m. to

 5              1:42 p.m.)

 6              THE VIDEOGRAPHER:  Now on record, 1:42 p.m.

 7      Q.  (BY MR. LIPSCOMB)  Mr. Nilles, before we went

 8    off the record, I asked you a question about the reason

 9    that you left CG3.  It is my understanding that based

10    upon the advice of personal counsel, not the attorneys

11    representing State Auto here today, you've been advised

12    not to answer any questions regarding you leaving CG3;

13    is that correct?

14      A.  That is correct.  And it's GC3.

15      Q.  GC3.  Excuse me.  Thank you.

16      A.  Yes, sir.

17      Q.  Have you understood all my questions today or

18    asked me to rephrase?

19      A.  I have understood all of your questions.

20      Q.  Is there anything at this time you feel the

21    need to correct or change?

22      A.  Not at this time.

23      Q.  Have I been professional to you?

24      A.  Yes, sir.

25              MR. LIPSCOMB:  I'll pass the witness.
```

1               MR. MITCHELL:   We'll reserve ours till time

2    of trial.

3               THE VIDEOGRAPHER:   Now off record,

4    1:43 p.m.

5               (Proceedings concluded at 1:43 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              CHANGES AND SIGNATURE

2

   WITNESS NAME:  PAUL DAVID NILLES
3  DATE OF DEPOSITION:  04/10/2018

4
   PAGE      LINE    CHANGE         REASON
5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____
```

1          ACKNOWLEDGMENT OF DEPONENT

2      I, PAUL DAVID NILLES, do hereby certify that I

3  have read the foregoing pages, and that the same is a

4  correct transcription of the answers given by

5  me to the questions therein propounded, except for the

6  corrections or changes in form or substance, if any,

7  noted in the attached Changes and Signature page.

8

9

10  _____

11      PAUL DAVID NILLES                    DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Paul David Nilles

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3    STATE AUTOMOBILE MUTUAL        §
      INSURANCE COMPANY              §
 4                                   §
         Plaintiff                   §
 5                                   §
      v.                             §
 6                                   §
      FREEHOLD MANAGEMENT, INC.      §
 7    AND RETAIL PLAZAS, INC.        § Civil Action No.
                                     § 3:16-cv-02255-L
 8       Defendants                  §
                                     §
 9    v.                             §
                                     §
10    FREEHOLD MANAGEMENT,           §
      INC., RETAIL PLAZAS,           §
11    INC., AND RPI DENTON           §
      CENTER, LTD.                   §
12                                   §
         Counter-Plaintiffs          §
13

14

                     REPORTER'S CERTIFICATION
15               DEPOSITION OF PAUL DAVID NILLES
                        April 10, 2018
16

17           I, Jennifer L. Campbell, Certified Shorthand

18    Reporter in and for the State of Texas, hereby certify

19    to the following:

20           That the witness, PAUL DAVID NILLES, was duly

21    sworn by the officer and that the transcript of the oral

22    deposition is a true record of the testimony given by

23    the witness;

24           I further certify that pursuant to FRCP Rule

25    30(e)(1) that the signature of the deponent:
```

Lexitas

1          __X__ was requested by the deponent or a party

2     before the completion of the deposition and is to be

3     returned within 30 days from the date of receipt of the

4     transcript.  If returned, the attached Changes and

5     Signature page contains any changes and the reasons

6     therefor;

7          _____ was not requested by the deponent or a

8     party before the completion of the deposition.

9          I further certify that I am neither counsel

10    for, related to, nor employed by any of the parties or

11    attorneys to the action in which this proceeding was

12    taken.  Further, I am not a relative or employee of any

13    attorney of record in this cause, nor am I financially

14    or otherwise interested in the outcome of the action.

15          Subscribed and sworn to on this the 30th day

16    of April, 2018.

17

18

19    _____

      Jennifer L. Campbell
20    Texas CSR No. 8674
      Expiration Date:  12/31/18
21    Lexitas - Dallas
      Firm Registration No. 459
22    6500 Greenville Avenue, Suite 445
      Dallas, Texas 75206
23    (214) 373-4977

24

25



**Paul Nilles | Executive Vice President**
Business Development
GC3, LLC
1200 12ᵗʰ Street Suite 201
West Des Moines, Iowa 50265
Office: 515-267-2490
Cell: 515-556-4906

January 4, 2018

I represent the following:

1) A complete statement of all opinions I will express and the basis and reasons for them:

    a) On or about May of 2014, GC3 was retained by State Auto to contact and coordinate a roofing contractor in the Dallas area for the purpose of providing bids on the Grandy's, China King, and Kroger Strip Mall facilities;

    b) State Auto's local adjuster provided the scope of work to be bid by GC3's roofing sub-contractor;

    c) GC3 contacted and coordinated bidding services with Hallmark Roofing;

    d) GC3 provided Hallmark Roofing the scope of work bid packages that were provided by State Auto;

    e) Hallmark Roofing made multiple site visits in preparation for their bids;

    f) Hallmark Roofing provided bids for the following locations: Grandy's; China King; Kroger Strip Mall; Firestone; University Baja Auto Insurance; H&R Block; Little Ceasars; Denton Athletics; and the Movie Tavern;

    g) GC3 was also asked to provide an electrical contractor for the purposes of bidding out the damaged parking lights;

    h) Electrical scope of work was provided by State Auto;

    i) GC3 contacted and coordinated the electrical bidding services with Critical Electric Systems Group, LLC;

    j) Critical Electric Systems Group, LLC performed an on-site inspection and provided a bid based upon the scope of loss provided by State Auto;

    k) GC3 was also asked to have Hallmark Roofing gather local building code information for the roof replacements;

    l) Hallmark provided their findings along with subsequent additional bid(s)for the code upgrade costs;

    m) GC3 was also asked to review Tice Enterprises' scope change request with Hallmark Roofing for scope and pricing considerations;

Doc# 6527117.DOCX

n) GC3 reviewed those changes with Hallmark Roofing and State Auto, with Hallmark Roofing providing a revised bid on those items considered valid;

o) Finally GC3 and Hallmark Roofing were asked to review a roofing tapered insulation estimate provided by West End Roofing Siding, and Windows.

p) It is GC3's and my opinion that if it is determined that the properties are determined to be damaged by events covered by Freehold's insurance policy that the reasonable and necessary costs to repair or replace the roofs and other structures are the amounts provided in the bids and estimates of Hallmark (Kenny Hall) and Critical Electric Systems Group, LLC (Hoyt Moore). This opinion is based on reasonable construction certainty.

2) The facts or data considered by the witness in forming them;
   a. State Auto adjusters scope of loss;
   b. Hallmark Roofing site inspection and bids; and
   c. Critical Electric Systems Group, LLC site inspection and bid

3) Any exhibits that will be used to summarize or support them;
   a. Emails and Bids
      i. Previously produced within the documents bates numbered as SA-001548 through SA-004717.

4) The witness's qualifications, including a list of all publications authored in the previous 10 years;
   a. See attached resume

5) A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
   a. None

6) A statement of the compensation to be paid for the study and testimony in the case.
   a. GC3 is paid at an hourly rate of $ 250.00 per hour;
   b. Plus all incurred expenses



**HELPING YOU REBUILD
YOUR WORLD**

**Paul Nilles, M.M.**
**Executive Vice President**
**Business Development**

Paul currently holds the position of Executive Vice President, overseeing all marketing and business development operations of GC3, LLC. GC3, LLC provides a wide range of restoration and reconstruction management services along with providing catastrophic recovery services direct to commercial insurance providers and their policy holders.

Paul has over 15 years' experience in property large loss claims adjusting; claims supervision; and claims management along with over 30 years of restoration and construction management experience of which the last 12 years having been employed GC3, LLC.

Since 2003, Paul's primary focus is the integration of mitigation and reconstruction project management processes into the claims handling processes for the insurance industry and its respective property claims professionals; while developing long term relationships within the mitigation, construction, and insurance industry.

### *Experience*

- Restoration and Construction Industry, 15 Years
- Insurance Industry, 15 Years

### *Education*

- M.M. Business Management, University of Phoenix
- B.S. Business Management, University of Phoenix
- A.A.S. Farm Management, Iowa Lakes College

### *Certifications*

- Master Builders of Iowa, Executive Leadership Certified
- Senior Claims Law Associate Designation
- Associate in Claims

### *Training*

- Xactimate 28 Training Series
- IICRC Water Damage Restoration
- IICRC Fire/Smoke Restoration
- Insurance Technical Training Institute Property Loss Estimating

### *Memberships*

- Master Builders of Iowa - Member
- Property Loss Research Bureau – Affiliate Member
- Various Claims Associations – Affiliate Member