IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STATE AUTOMOBILE MUTUAL INSURANCE COMPANY, *Plaintiff* | § § § | |
| v. | § § | |
| FREEHOLD MANAGEMENT, INC. AND RETAIL PLAZAS, INC., *Defendants* | § § § § | CIVIL ACTION NO. 3:16-CV-02255-L |
| v. | § § | |
| FREEHOLD MANAGEMENT, INC., RETAIL PLAZAS, INC., AND RPI DENTON CENTER, LTD. | § § § § | |

---

**STATE AUTOMOBILE MUTUAL INSURANCE COMPANY'S SECOND AMENDED BRIEF IN SUPPORT OF ITS MOTION TO STRIKE AND/OR EXCLUDE THE EXPERT TESTIMONY OF MATT PHELPS, ROCCO CALACI, ROGER GRIMM, GARY B. TREIDER, AND CAROLYN COLEMAN**

---

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Now comes State Automobile Mutual Insurance Company (hereinafter "State Auto"), Plaintiff in the declaratory judgment action, and files this its Second Amended Brief in Support of its Motion to Strike and/or Exclude the Expert Testimony of Matt Phelps, Rocco Calaci, Roger Grimm, Gary B. Treider, and Carolyn Coleman, and would show this Court the following:

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................... iii

I.    INTRODUCTION .........................................................................................................1

II.   SUMMARY OF THE ARGUMENT.................................................................................2

III.  STANDARDS GOVERNING ADMISSIBILITY OF EXPERT OPINIONS.............................4

IV.   ARGUMENTS AND AUTHORITIES ..............................................................................6

      A.   Matt Phelps ....................................................................................................6
           i.    Phelps relied on his observations of the Property nearly two
                 years after the storm struck and he failed to adjust his
                 calculations to account for differences between the Denton
                 airport and the subject Property, leading to inaccurate results ...................6
           ii.   Phelps' methodology is unreliable and was not properly
                 applied to the facts of this case.........................................................7
           iii.  The errors in Phelps' report would not assist the trier of fact,
                 but would only confuse the jury .........................................................11
      B.   Rocco Calaci ................................................................................................12
      C.   Roger Grimm ...............................................................................................14
           i.    Roger Grimm's testimony is not reliable or relevant to the
                 instant suit and would not assist the trier of fact and,
                 therefore, his testimony should be excluded...........................................14
           ii.   Any additional testimony Roger Grimm has given
                 concerning State Auto's alleged failure to conduct a fair and
                 impartial investigation should be struck for failure to comply
                 with Federal Rule of Civil Procedure 26(a)(2)(B) ...................................16
      D.   Gary B. Treider ...........................................................................................18
      E.   Carolyn Coleman .........................................................................................19
           i.    The Court Should Exclude Carolyn Coleman's Wildly
                 Varying Damage Estimates................................................................19
           ii.   Carolyn Coleman's Current Damage Estimate Is Based on
                 Flawed Data ...................................................................................21

V.    CONCLUSION...........................................................................................................22

VI.   PRAYER....................................................................................................................22

**STATE AUTOMOBILE MUTUAL INSURANCE COMPANY'S SECOND AMENDED BRIEF IN
SUPPORT OF ITS MOTION TO STRIKE AND/OR EXCLUDE THE EXPERT TESTIMONY OF MATT
PHELPS, ROCCO CALACI, ROGER GRIMM, GARY B. TREIDER, AND CAROLYN COLEMAN**

Doc# 6885663.DOCX                                                                    **Page ii**

# TABLE OF AUTHORITIES

**Rules**

FED. R. CIV. P. 26(a)(2)(B)................................................................ 14, 16, 17

FED. R. CIV. P. 37(c)(1) ........................................................................ 14, 16

FED. R. EVID. 702 ........................................................................ 4, 5, 6, 19, 22

**Cases**

*Ancho v. Pentek Corp.*, 157 F.3d 512 (7th Cir. 1998)................................... 5, 15

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194 (4th Cir. 2001) ....................... 5

*Cummins v. Lyle Indus.*, 93 F.3d 362 (7th Cir. 1996) ..................................... 4

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)................. 4, 5, 6, 12, 14, 22

*Engenium Solutions, Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757 (S.D. Tex. 2013) ........... 6

*Hahn v. United Fire & Cas. Co.*, 2017 U.S. Dist. LEXIS 53178
(W.D. Tex. Apr. 6, 2017)........................................................ 9, 10, 11

*In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1231 (5th Cir. 1986)................. 5

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999) ......................... 4

*Lauzon v. Senco Prod., Inc.*, 270 F.3d 681 (8th Cir. 2001). ......................... 5, 8

*Nicolau v. State Farm Lloyds*, 951 S.W.2d 444 (Tex. 1997). ......................... 16

*Sobrino-Barrera v. Anderson Shipping Co.*, 495 F. App'x 430 (5th Cir. 2012). ................. 16, 17

*Watkins v. Telsmith, Inc.*, 121 F.3d 984 (5th Cir. 1997)................................... 4

## I. INTRODUCTION

This case arises out of a dispute over coverage under a property insurance policy issued by Plaintiff State Auto. State Auto provided an insurance policy PBP 2603242 02 to Freehold Management, Inc. c/o Retail Plazas, Inc. with a policy period of September 30, 2013 to September 30, 2014 ("the policy"). [Doc. 1 at 2]. Allegedly, on April 3, 2014, a severe storm with large hail (the "storm") struck the Denton area. [Doc. 1 at 2]. Defendants filed a claim on an insurance policy provided by Plaintiff (the "policy") for damages sustained to their shopping center located at 500-1900 West University, Denton, Texas 76201(the "Property") as a result of the storm. [Doc. 1 at 3].

Plaintiff hired Haag Engineering to inspect the property for damage caused by the storm. [Doc. 16-1 at 6]. Following a number of inspections, Haag issued a report concluding that the Kroger roof and surrounding built up gravel roofs were not damaged as a result of the April 3, 2014 storm. [*Id.*]. On July 15, 2014, Plaintiff sent a partial denial of Defendants' claim, reasoning that some of the damage to the roofs was not covered under the policy. [Doc. 82 at 3]. Subsequently, Defendants recovered $1,036,397.17 to cover storm damage and depreciation to the Property. [Doc. 1 at 3].

On March 11, 2016, Defendants hired an engineer, Matt Phelps ("Phelps"), to conduct an independent inspection. *Appendix Ex. A, p. 14* at 19:12. Following his inspections, Phelps concluded that the roof over the Kroger store was damaged as a result of the storm. [Doc. 16-1 at 7]. Plaintiff reviewed the report but disagreed with Phelps' findings. On June 20, 2016, Defendants sent a demand letter to Plaintiff. [Doc. 16-1 at 8]. To date, Defendants estimate the damage to the Denton Center exceeds $16 million. [Doc. 82 at 4]. Plaintiff contends that the additional damage, claimed by Defendants, is not covered under the terms of the policy it

provided to Defendants.   [Doc. 1 at 3].   Subsequent to the filing of initial disclosures, Defendants' expert issued a new report claiming additional damages to other built up gravel roofs other than the Kroger roof.  [Doc. 16-1 at 8].  The parties could not resolve the coverage issues and the extent of covered damages and, therefore, State Auto filed a declaratory judgment action, Cause No. 3:16-CV-02255-L on August 3, 2016.  [Doc. 1].

Ultimately, the issue is whether State Auto has paid the Freehold entities for all of the covered damages at the Property that is the subject of this suit.  [Doc. 1 at 3].  The analysis of whether or not all of the covered damages have been paid necessarily includes a number of issues—was the damage caused by a covered peril, did the alleged cause occur during the policy period, and more specifically, did the alleged cause of the damage occur on or about the date reported in the claim.

## II. SUMMARY OF THE ARGUMENT

Defendants have designated five experts in this case—Matt Phelps, Rocco Calaci ("Calaci"), Roger Grimm ("Grimm"), Gary Treider ("Treider"), and Carolyn Coleman ("Coleman") (collectively "the experts").  [Doc. 42].  The nature of their testimony is as follows:

(1) Phelps is a licensed engineer and is expected to testify to the alleged hail and wind damage caused by the April 3, 2014 storm [*Id.* at 2–4];

(2) Calaci is a meteorologist whose testimony is likely to include the conditions of the April 3, 2014 storm as well as weather conditions historically in the area and the damage that likely resulted from same [*Id.* at 4–7];

(3) Grimm is an insurance specialist and is expected to testify concerning the duty of good faith and fair dealing and State Auto's alleged bias in hiring Haag Engineering [*Id.* at 7–8];

(4) Treider is expected to testify as to his inspections of the Property, the alleged damage, the cause of the damage, and the estimated cost to repair the Property [*Id.* at 8–11]; and

(5) Coleman is a contractor who is expected to testify on the proper method and costs to repair the roofs from the alleged storm damage [*Id.* at 11–13].

The crux of this motion is that the experts' testimony is not reliable and will not assist the trier of fact in determining the issues before this Court. Defendants' experts cannot distinguish what alleged hail damage was caused by this storm or that the alleged hail damage occurred during the policy period. Furthermore, the experts' reports and testimony are flawed for various reasons, as is explained more fully below. Accordingly, their testimony will not assist the jury in any way.

The Freehold entities allege that State Auto has not paid for all of the covered damages caused by the April 3, 2014 hail event, and therefore State Auto is liable to Defendants for breach of contract and violations of the Texas Insurance Code and Deceptive Trade Practices Act. [Doc. 6 at 5–13]. The experts' testimony will not aid the jury in determining whether State Auto has paid the Freehold entities for all covered damages caused by the April 3, 2014 hail storm or whether State Auto breached its duty of good faith and fair dealing in hiring Haag to inspect the property. As discussed herein, Defendants' experts' opinions and methodologies are unreliable and provide no additional clarification on the issues before the Court. Only one of Defendants' experts—Coleman—examined the property immediately after the storm. However, Coleman acknowledges that she is not a hail or wind expert. Defendants' hail and wind expert— Phelps—did not conduct his inspection of the Property until March 2016, almost two years after the reported April 3, 2014 hail event and, therefore, cannot accurately depict the condition of the roof surfaces immediately after the April 3, 2014 storm or prior to any other hail event occurring during, or outside the State Auto policy period. In addition, Phelps, as well as several of the

other experts, relied on inaccurate data which was then relied on by the other experts, resulting in incorrect and skewed results that were not properly applied to the facts of this case.

This Court should exclude and/or limit Defendants' experts' testimony, because they do not meet the reliability and relevance standards expressed in *Federal Rule of Evidence* 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The experts' testimony is inaccurate, irrelevant, and will not assist the jury in making a fact finding and will only confuse the jury as to the existence of hail/wind damage, completely disregarding the State Auto policy period and the timing in which the alleged hail damage occurred.

### III. STANDARDS GOVERNING ADMISSIBILITY OF EXPERT OPINIONS

In *Daubert*, the United States Supreme Court addressed the principles applicable to determining the admissibility of opinion testimony offered by expert witnesses under the *Federal Rule of Evidence* 702. *Daubert*, 509 U.S. at 589, 113 S. Ct. at 2795. Rule 702 allows a qualified expert to testify "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. An expert's testimony must rest both on a reliable foundation and be relevant to the task at hand. *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2879. The trial court has the obligation and broad discretion to be the "gatekeeper" in determining the reliability and relevance of the proposed evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999).

The first tier of the analysis requires an examination of the reliability of the expert testimony, based on (1) the qualifications of the expert and (2) the grounds upon which the expert bases his opinion. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997) (citing *Cummins v. Lyle Indus.*, 93 F.3d 362, 367 (7th Cir. 1996)). The focus is on whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts

in issue. *Daubert*, 509 U.S. at 592–93, 113 S.Ct. at 2796.  Rule 702 provides guidelines to aid the trial court in ascertaining the validity of the opinion: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methodology; and (3) the witness has applied the principles and methodology reliably to the facts of the case.  FED. R. EVID. 702; *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 n. 1 (4th Cir. 2001).  Other non-exclusive factors include: (1) whether the theory has been/can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the potential or known rate of error; (4) whether the theory has been generally accepted; (5) whether the theory is from litigation or naturally flowed from research; (6) whether other alternative explanations have been ruled out; and (7) whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.  *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686–87 (8th Cir. 2001).

In the second tier of the *Daubert* analysis, the trial court must also determine that the testimony "fits" the case before it; that is, the evidence will assist the trier of fact by being relevant to the issues raised in the case.  FED. R. EVID. 702; *Daubert*, 509 U.S. at 591–92; 113 S.Ct. at 2795–96.  As the Fifth Circuit Court of Appeals has explained, "the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.  Indeed, the premise of receiving expert testimony is that it will assist the trier of fact to understand the evidence or to determine a fact in issue." *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1231, 1233 (5th Cir. 1986).  The expert must testify to something more than what is obvious to a layperson to be of any assistance to the jury.  *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998).

As the gatekeeper, this Court has the duty to determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether the testimony would assist the trier of fact with a fact at issue.  *Daubert*, 509 U.S. at 589.  The expert's opinion must be derived by scientific methods and

cannot be the expert's mere subjective belief or unsupported speculation. *Watkins*, 121 F.3d at 990. "The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met." *Engenium Solutions, Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757, 769 (S.D. Tex. 2013) (citing *Daubert*, 509 U.S. at 593, n.10.).

## IV. ARGUMENTS AND AUTHORITIES

### A. Matt Phelps

Matt Phelps' testimony concerning the damage to the roof of the property as a result of this storm should be excluded for the reason that his testimony is not based on a reliable foundation and is not relevant to the instant case and, therefore, does not meet the standards set forth in *Federal Rule of Evidence* 702. Specifically, Phelps' testimony should be excluded because it is based on inaccurate data that was incorrectly applied to the facts of this case and Phelps uses unreliable principles and methodologies that have not/cannot be tested, has not been subjected to peer review or publication, and has no potential or known rate of error. Because of these deficiencies, Phelps' testimony is not relevant and would not assist the jury in determining the issues before this Court.

> **i. Phelps relied on his observations of the Property nearly two years after the storm struck and he failed to adjust his calculations to account for differences between the Denton airport and the subject Property, leading to inaccurate results.**

Phelps' first visit to the Property did not take place until March 22, 2016, nearly two years after the storm struck the Denton Center. *Appendix Ex. B*, p. 30 at 2. The only roof he inspected during his inspection was the Kroger Building and the adjacent roof. *Appendix Ex. A*, p. 15. *Id.* at 43:8–:18. In addition to the two year gap between the storm and his inspection, Phelps' findings were based on his observations at the property and meteorological data from a nearby airport, which was located approximately four miles away because there were no reports assessing hail size or actual wind gusts at the Denton Center on the date of the storm. *Appendix Ex. A*, p. 16 at 46:12–

47:1.   Accordingly, Phelps' resulting findings were riddled with errors and criticisms.   Justin Kestner explained the errors in Phelps' report during his deposition. *Appendix Ex. C,* p. 247-255. Kestner explained that because Phelps was relying on weather data from the airport, he used the wrong Exposure Category and did not account for the reduced roof height at the Denton Center. *Id.* *Appendix Ex. C,* P. 250 at 41:1–:20.   Due to this error, Phelps' calculations were based on an 82-mile-an-hour maximum wind gust, which was indicative of the maximum wind gusts recorded at the airport—in a different Exposure Category—and at a 20% increased height as compared to the height of the roof at the Denton Center. *Id.* Had Phelps used the proper Exposure Category and proper height of the roof, his test results would have been different.[1] *Id.* In fact, the results would have been so different, that Kestner estimated that using Phelps' numbers, each of the tests would have passed. *Id.* Appendix *Ex. C,* p. 250 at 40:24–:25.   This is further supported by the fact that there has been no evidence produced by either party—aside from the experts themselves—to support that there were 82 mile-per-hour wind gusts at this property.   Given Phelps' failure to account for these differences, Kestner opined that it was "confusing why he'd, Mr. Phelps, would present the data at 45 PSF as pass/fail at that point. Confusing, if not misleading." *Id.* Appendix *Ex. C,* p. 250at 41:18–:20.

### ii. Phelps' methodology is unreliable and was not properly applied to the facts of this case.

Plaintiff further argues that Phelps' testimony should be excluded because according to Phelps' own testimony, his methodology has not been tested, is not subject to peer-review or

---

[1] And then, more correctly, if you would've used a reduction, as Mr. Marshall laid out in the one report where you've got to correct from Exposure Category C at the airport to Exposure Category B at the shopping center, then you correct for the roof height—roughly a 20 percent reduction, I believe, per his report—these calculated pressures would go down even further. And that is using the 82-mil-an-hour maximum recorded wind gust. But I didn't see anything at the shopping center to indicate that there was an 82-mile-an-hour wind gust. Appendix *Ex. C.,* p. 250 41:1–11.

publication, has no known rate of error, if any, and is not generally accepted. *See Lauzon*, 270 F.3d at 686–87 (providing a non-exhaustive list of factors the court may consider in determining whether an expert is qualified to provide expert testimony). Moreover, Phelps' conclusions rely heavily on data extrapolated from a vacuum uplift test known as ASTM E907, which has not been the industry standard since 2013 and is less stringent than the current industry standard FM-152 test. *Appendix Ex. C*, p. 251-252 at 77:6-28; 78:1-20.

By Phelps' own admission, his data has no known error rate. Phelps testified that there is no rate of error associated with his visual assessment, *Appendix Ex. A, p. 18* at 82:1–:9, data collection analysis, *id. Appendix Ex. A, p. 19-20* at 83:20–84:6, flat roof assessment, *id. Appendix Ex. A, p. 20* at 84:9–:13, and photographic evidence, *id. Appendix Ex. A, p. 21* at 85:8. He also testified that he was not aware of the error rate for the weather data used, *id. Appendix Ex. A, p. 19* at 83:13–:15, or his own methodology/opinions, attesting that "[i]t's never been measured" *Appendix Ex. A, p. 24* (90:22). Phelps further acknowledged that his reports are not peer-reviewed. *Id. Appendix Ex. A, p. 23* at 89:25–90:4.

Although Phelps testified that his methodology is recognized in the community as evidenced by the fact that it is taught by Haag, *id. Appendix Ex. A, p. 21-22* at 85:20–86:10, Plaintiff's Haag experts refute this. Timothy Marshall of Haag Engineering testified that "There is no methodology in the industry that says that you can use [FM1-52—a factory mutual standard, wind] to determine whether wind uplift damage is present or not. And it's because you don't know what the roof looked like before [the event]." *Appendix Ex. D, p. 260* at 22:9–23:7. Marshall went on to explain his criticisms as follows:

> The theory that you can damage the field of a built-up roof by wind uplift and use a test that is not to be used for wind uplift storm damage is completely taking it out of context and is contrary to what the knowledge is

> in engineering about how to go out and evaluate a built-up roof for wind damage. And there's no peer reviewed paper. None of his references in his report point to the methodology that supports him.

*Id. Appendix Ex. D, p. 262* at 120:23–121:5.

> [I]t's [also] the way of thinking that you can damage or uplift the field of a roof without having edge damages or parapet damages, and that's totally contrary to what he was taught and totally contrary to what the industry says how damage initiates with built-up roofing.

*Id. Appendix Ex. D, p. 263* at 127:8–:13. In addition, Marshall testified that Phelps is the only engineer he is aware of that believes wind damage can be latent or hidden; there are no peer-reviewed papers that support latent or hidden wind damage as wind damage is obvious. *Id. Appendix Ex. D, p. 261* at 54:18–55:17.

In fact, Phelps' ability to apply his methodology to the facts of a case has previously been found to be unreliable. Phelps used the same methodology in *Hahn v. United Fire & Cas. Co.*, 2017 U.S. Dist. LEXIS 53178 at *13–15 (W.D. Tex. Apr. 6, 2017) to conclude that a hail storm damaged a roof. There, the court struck his report and testimony as unreliable given his inability to "reliably appl[y] his principles and methods to the facts of th[e] case." *Id.* at *15. The court reasoned as follows:

> [I]n his report, Phelps provides no basis for the Court to evaluate the methodology or reasoning behind his later assertion that the roof was functionally damaged by the storm at issue. Phelps's analysis employs mathematical calculations to determine the amount of energy, in joules, that would have been exerted by a 1.75 inch in diameter hailstone hitting the roof of the Property while the wind was blowing at 67 miles per hour. His calculations take into account various forces and factors to make this determination, including the approximate size of the hail, its density, its terminal velocity due to gravity, the effect of the wind on the hail's downward force, and the pitch of the roof. Phelps also analyzed the roof of the Property. This analysis included Phelps's counts of the number of screws on various parts of the roof, the number of hail impact points on the roof, and Phelps's measurement of the approximate size of those impact points. But these two parts of Phelps's data—the calculations

regarding the amount of energy with which the hail may have hit the roof, and the number and size of impact points on the roof—say little or nothing about whether the roof of the Property was functionally damaged by the hail. Phelps has not, for example, accounted for the roofing material in his calculations, nor has he indicated that he observed impact points at which water could penetrate the roof. Certainly, the roofing material itself plays a significant role in whether a certain amount of force (from falling hail) causes damage. For example, bullet-proof glass might exhibit no damage whatsoever when subject to the forces at issue in Phelps's calculations, while drywall might be completely and functionally ruined when subjected to the same forces. As Defendant points out, "whether a hailstone supposedly released 4 or 40 joules of energy is meaningless without knowing how much energy the roofs were designed to withstand." Further, one can easily imagine visual or cosmetic "damage" that is not functional "damage"—most minor hail damage to the hoods of cars would fall into this category. Phelps's data, analysis, and calculations simply do not speak to whether or not the damage to the Property is cosmetic or functional damage, thus the Court cannot accept the testimony from his deposition suggesting otherwise, nor can it conclude that he has reliably applied his principles and methods to the facts of this case. The Court will thus sustain Defendant's objection to Plaintiff's use of Phelps's report in opposition to its motion for summary judgment and grant Defendant's motion to exclude the expert testimony of Matt B. Phelps.

*Id.* at *13–15 (internal citations to the record and footnotes omitted).

The court's reasoning in *Hahn* can be equally applied to the facts presented here. Although the issue in *Hahn* pertained to Phelps' improper definition of "damage" as compared to the definition contained in the policy, his methodology did not account for the roofing material or the roof's ability to withstand the amount of force described. Phelps' report in this case states that "According to the [] weather reports, the subject storm event produced a 3-second gust of approximately 82 mph, and hailstones ranging from 0.5 in. to 4.25 in. fell *in the vicinity of the subject property*. Field investigation and photo documentation revealed damage to the gravel ballast roofs of the property. The cap sheet showed numerous hail impact points that led to thinning of the membrane." *Appendix Ex. E, p. 314* at 47 (emphasis added). Phelps goes on to conclude that "it is more likely than not that the capacity of the entire roof membrane has been

reduced, and the membrane is no longer compliant with present building codes." *Id.* Notably, Phelps is unable to opine that the wind and hail measured nearby was also present at the Property at issue. Phelps also never explains what the current building codes require and how the roof at issue in this case fails to comply with current building codes. Phelps merely states without any evidence to support his conclusory statement that the roof of this Property is not in compliance with current building codes.

He then concludes that "[t]he substrate also experienced indentations from hail impacts that resulted in reduced structural integrity. The closed cell foams that served as insulation were critically damaged. Therefore, all hail impacted roof components must be removed and replaced to restore the structural soundness and insulation property of the roof." *Id.* Again, Phelps provides no evidence or support for these conclusory statements such as identifying how much energy the roofs were designed to withstand—this was the same error he made in *Hahn.* Assuming, for argument's sake, that the hail did reduce the structural integrity of the roof, Phelps' report does not shed any light on how much of a reduction of the structural integrity of a roof is necessary to require the replacement of an entire roof. A single hail stone could reduce the structural integrity of a roof, but certainly an entire roof would not need to be replaced as a result of the impact of a single hail stone. Furthermore, as previously mentioned, Phelps' calculations failed to account for height differences between the airport, where his measurements are based, and the subject Property, which only further diminishes the accuracy of these blanket assertions.

### iii. The errors in Phelps' report would not assist the trier of fact, but would only confuse the jury.

Finally, Phelps made a number of mistakes in his report, which would only confuse the jury. Kestner noted that Phelps incorrectly cited and labeled the tables and graphs provided in his report: "The data sheets and the tables correlate, but then the tables and the graphs do not correlate." *Appendix Ex. C, P. 249* at 35:23–25. Kestner went on to provide an example to show how he reached this conclusion:

> Per tables, test square 1, Building 1 should have a deflection, a maximum deflection of .275 inches at 44.8 PSF.[2] And that, clearly, is not what's in the graph there.
>
> So it appears that Mr. Phelps—again, that the graph, for what he labeled Building 1 should be Building 5. It appears that the graph that he labeled for Building 2 should be Building 4.

*Id. Appendix Ex. C, p. 249* at 37:5–12. The incorrectly displayed data within Phelps' report in connection with the incorrectly obtained data due to Phelps' failure to account for the differences between the airport and the Property at issue will only serve to confuse the jury.

For the foregoing reasons, Phelps' testimony is not reliable, not relevant, and would not assist the trier of fact and, therefore, does not satisfy either prong of the *Daubert* test and should be excluded.

### B. Rocco Calaci

Rocco Calaci's testimony regarding the analysis of the meteorological conditions on April 3, 2014, as well as his analysis of the hail and wind conditions on said date fails to rise to the level required by *Daubert* or its progeny. Calaci's opinions are neither reliable nor relevant, and therefore fail both prongs in *Daubert*. Further, it is clear that Calaci's expertise on hail and wind analysis is far more limited than how Plaintiff presents Calaci's capability.

---

[2] Upon additional questioning, Kestner showed where these numbers were derived from in Phelps' report to illustrate that these numbers correlated to a specific building, which is how he was able to determine the error.

**STATE AUTOMOBILE MUTUAL INSURANCE COMPANY'S SECOND AMENDED BRIEF IN SUPPORT OF ITS MOTION TO STRIKE AND/OR EXCLUDE THE EXPERT TESTIMONY OF MATT PHELPS, ROCCO CALACI, ROGER GRIMM, GARY B. TREIDER, AND CAROLYN COLEMAN**

Calaci's report contains numerous generalizations and is based on mere speculation, which will not assist the jury in any way.   For instance, Calaci's report refers to photographs of telephone poles that tilted due to alleged tornadic activity. *Appendix Ex. F, p. 551, 556* at 10, 15.  These pictures contain no dates or explanations as to when this tornadic activity occurred, thus leading the reader to believe that the April 3, 2014 storm caused these telephone poles to tilt.   However, at Calaci's deposition, he was presented with photographs showing the very telephone poles tilting as far back as 2013 on Google Maps, over one year before the alleged storm. *Appendix Ex. G, p. 572-573* at 31:23-33:1.  Calaci could not provide an explanation as to why he did not conduct any research whatsoever to determine the reliability or the relevance of his observations, and instead argued that he found it to be compelling and worth citing to in his report.  *Id.*  This flagrant speculation on his part is simply not reliable or relevant to the case at hand and will not assist the trier of fact.

Moreover, Calaci utilized tests that are highly speculative to garner results that are highly subjective.  Calaci admitted many of the tests he relied upon to assess weather conditions on the day of the incident can be inaccurate.  For instance, during his deposition Calaci admitted that when scanning radar images through the height of storms, it is frequently the case that the while there is hail in the atmosphere, the hail never actually touches the ground. *Id. Appendix Ex. G, p. 573* at 34:18-:21.  In other words, Calaci admitted that the radar data he relied upon to state that hail hit the ground on the day of the incident is flawed and often yields inaccurate results.  Similarly, while his report indicated that there was tornadic activity on the day of the storm by stating that there was presence of hook activity and wind sheer or gate-to-gate sheer, he conceded that the presence of hook activity, wind sheer, and gate-to-gate sheer does not actually

indicate tornadic activity. *Appendix Ex. F, p. 551, 562, 564* at 10, 21, 23; *Appendix Ex. G, p. 573* at 33:2-:16.

Finally, Calaci's testimony is not the product of reliable principles and testimony. Not only did Calaci rely on indicators that are not accurate, but he failed to conduct any sort of test to determine the potential or known rate of error. *Appendix Ex. G, p. 574* at 44:12-45:9. During his deposition, Calaci even admitted that "they're opinions, and depending on how you want to look at things, you could either decide for yourself and decide against yourself." *Id. Appendix Ex. G, p. 575* at 45:1-:3. In other words, Calaci admits that his report and the methodology he utilized is highly subjective, and therefore, not accurate. Calaci also admitted that he didn't even know how to conduct a test to determine the possible rate of error, as he stated that, "I don't know how I would go about doing it." *Id. Appendix Ex. G, p. 575* at 45:8-:9. Because Calaci relied on subjective, unreliable methods, his testimony will not assist the jury in any way, and therefore, his testimony should be excluded.

### C. Roger Grimm

Grimm's threadbare opinions are not sufficient to permit him to testify as an expert witness in this case. Under *Daubert*, expert opinions are only admissible if they are both relevant and reliable. 509 U.S. at 589. Grimm's opinions do not satisfy either prong; his opinions are unreliable and would not assist the trier of fact in rendering a decision as to whether State Auto acted in bad faith and, therefore, his testimony should be excluded. Furthermore, any additional opinions Grimm has testified to that were not included in his expert report should be excluded pursuant to Federal Rules of Civil Procedure 26(a)(2)(B) and 37(c)(1).

   i.   **Roger Grimm's testimony is not reliable or relevant to the instant suit and would not assist the trier of fact and, therefore, his testimony should be excluded.**

Grimm's opinions concerning State Auto's handling of this case, specifically with respect to the hiring of Haag Engineering, are not reliable given that they are not based on any scientific facts or data and are not the product of reliable principles and methodology. A review of Grimm's report illustrates that his basis for concluding Haag's hiring constituted bias is because Haag has previously been found to be biased in favor of insurance companies and the same is likely true in this case. Aside from the fact that his opinions are not reliable or based on any scientific facts or data, Grimm's testimony should be struck on the basis that it is not relevant and would not assist the trier of fact. "[A]n expert . . . must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury." *Ancho*, 157 F.3d at 519. Grimm's testimony does not aid the jury in determining whether State Auto committed bad faith.

Grimm has not provided any testimony or evidence to show how State Auto's hiring of Haag Engineering constituted bias *in this case*. In Grimm's report, he concluded that State Auto engaged in biased hiring and that State Auto knew Haag had previously been found to have acted in favor of insurance companies. *Appendix Ex. H, p. 579-582.* However, the only explanation Grimm proffered to support his position was that: "Given Haag's history one has to question State Auto's reasons for hiring Haag to investigate this claim. . . . Given Haag's history, and in particular the history of the two engineers involved, I find it very hard not to have the perception of biased hiring in this case. The question has to be asked, why Haag?" *Id. Appendix Ex. H, p. 580* at 2. These conclusory opinions were re-asserted during Grimm's deposition when he was asked about the basis for his opinion that Haag was biased in this particular case. Grimm responded that "they've been proven in the past to be biased. So the possibility of them being based in this case exists." *Appendix Ex. I, p. 590* at 61:23–:25. According to Grimm, the basis for this opinion is that a Haag representative has continued to advocate on behalf of State Auto post litigation and Haag has been

found to be biased in the past. However, upon further inquiry, Grimm noted that whether a duty of good faith and fair dealing even exists once litigation has started is questionable.

Notably, Grimm's assertion that Haag Engineering is biased is derived the court's holding in *Nicolau v. State Farm Lloyds*, 951 S.W.2d 444 (Tex. 1997). *Appendix Ex. H, p. 579-582.* However, aside from the court's holding in *Nicolau*, Grimm has not provided any additional information or insight based upon experience or otherwise that support his conclusion about bias in this case. Grimm's opinion that Plaintiff breached its duty of good faith and fair dealing is based solely on the holding in the case cited above where Haag engineers were found biased. Grimm's opinion that Haag was biased was formed long before he was retained in this action and is not based on any case-specific information. This is supported by the fact that the only information Grimm relied upon in forming his opinions of bias were the pleadings, three of Haag's reports prepared in this action, and three court case summaries. *Appendix Ex. H, p. 579-582.* If this is the basis for Grimm's testimony, the courts' holdings finding bias can be described as "obvious to the layperson," and would not assist the trier of fact in rendering a decision on whether State Auto committed bad faith. Therefore, Grimm's conclusory statements are unreliable, irrelevant, and should be excluded.

    **ii.  Any additional testimony Roger Grimm has given concerning State Auto's alleged failure to conduct a fair and impartial investigation should be struck for failure to comply with Federal Rule of Civil Procedure 26(a)(2)(B).**

Federal Rule of Civil Procedure 26(a)(2)(B) provides that "Unless otherwise stipulated or ordered by the court, . . . . [the disclosure of expert testimony] must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them." Any opinions that are not properly disclosed in accordance with the rule may be excluded "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Sobrino-Barrera v.*

*Anderson Shipping Co.*, 495 F. App'x 430, 433 (5th Cir. 2012) (upholding the trial court's decision to strike the expert's testimony when he offered new opinions that were not included in his report).

The same is true here. Grimm's report focused exclusively on State Auto's hiring of Haag Engineering as a basis for concluding that State Auto did not conduct a fair and unbiased investigation of this loss. In fact, in the opening paragraph of Grimm's report he states, "you have retained me to opine on State Automobile Mutual Insurance Company's (State Auto) hiring of Haag Engineering (Haag) to investigate a storm loss that happened to Denton Center on April 3, 2014." The entirety of his report focused solely on State Auto's hiring of Haag Engineering. During Grimm's deposition, for the first time, he listed a number of additional acts taken by State Auto that he believed constituted bad faith. The sudden change between Grimm's report and deposition testimony was also noted by Plaintiff's expert, Thomas Veitch, during his deposition when he was asked if he had any criticisms of Grimm's report or testimony:

> Well, yes. I thought his report was actually pretty limited to one subject, and that was the opinion that Haag Engineering was a biased engineering firm because of problems they had maybe 20 years ago or whatever and had that opinion and that was all. Then in his deposition, he suddenly comes up with a bunch other - - a bunch of other opinions about bad faith and bad claims handling and so forth.

*Appendix Ex. J, p. 597-598* at 178:24–179:6. Not only should this testimony be excluded given Grimm's inability to provide a basis as to why these acts constituted bad faith, but this testimony should also be excluded because these opinions were not included in Grimm's expert report as required by Federal Rule of Civil Procedure 26(a)(2)(B). *See Sobrino-Barrera*, 495 F. App'x at 433.

### D. Gary B. Treider

Treider's testimony should also be excluded given that his findings are not reliable or relevant to the instant case. Like Phelps, Treider's first visit to the property was in November of 2015, about one year and six months after the storm. *Appendix Ex. K, p. 605-607* at 31:24; 67:23; 75:20. Thus any observations made as to hail or wind damage are unreliable as there is no way to rule out the possibility that the damage observed was not caused by a weather event either prior to or subsequent to the storm at issue in this case and whether the alleged damage was incurred during the policy period. The mere fact that the alleged damage Treider observed is consistent with the weather data from the date of this loss does not eliminate the potential that the damage was, in fact, caused by a storm that occurred outside the policy period.

Plaintiff further contends that Treider's findings are not reliable and will not assist the jury given that he used the incorrect price list. During Treider's deposition, he stated that he used the program known as Xactimate to build his price list. *Id. Appendix Ex. K, p. 608* at 87:7. In explaining how Xactimate operates, Treider testified that the program updates quarterly and, therefore, the price list Xactimate was using at the time Treider compiled his damage estimate was not the price list in effect in 2014 when the storm occurred. *Id. Appendix Ex. K, p. 608* at 87:7–:21. In fact, he acknowledged that he generally uses the current price list as opposed to the price list that applied at the time of loss. *Id. Appendix Ex. K, p. 608* at 87:9–:11. He then explained that the 2018 price list—the price list he used—is higher today than the price list in effect in 2014. *Id. Appendix Ex. K, p. 609* at 90:2–:4. Accordingly, Treider's damage estimate is based on incorrect data and reflects an inflated damages amount. This would, without doubt, confuse a jury. Defendants' claims of breach of contract and violations of the insurance code are based on Plaintiff's refusal to

pay the claim as presented in 2014. This includes the proof of loss that was requested from Defendants in April of 2014. Had Defendants completed the proof of loss as and when requested, the damage estimate would have been based off the prices in 2014. If the jury was entitled to hear evidence of Plaintiff's alleged wrongful conduct in denying Defendants' claim based on the information then available, using a damage model based off a 2018 price list would only confuse the jury and it would prejudice the Plaintiff as the 2018 prices are higher than they were in 2014. Defendants cannot, nor should they be permitted, to use a 2018 price list to reflect damages that were incurred in 2014.

Additionally, for the reasons previously discussed, Plaintiff contends that Phelps' and Calaci's testimony and findings are not reliable or relevant to the instant case. Treider testified during his deposition that he relied on the tests and findings made by Phelps and Calaci in rendering his own findings. Given that Phelps' and Calaci's opinions are flawed for the reasons set forth above, Treider's findings should similarly be struck as it would not assist the factfinder in this case.

### E. Carolyn Coleman

The court should exclude Carolyn Coleman's testimony related to the storm damage at the Denton Center because it does meet the standards set forth in Rule 702 of the *Federal Rules of Evidence*. Specifically, Ms. Coleman's testimony is deficient and fails to meet federal standards because her assertions have varied significantly over the course of this litigation due to her reliance on inconsistent price list guidelines and a lack of expertise relevant to the subject matter of this case. Therefore, the court should exclude Ms. Coleman's testimony because it will not assist the trier of fact to understand the evidence or to determine a fact in issue.

**i.    The court should exclude Carolyn Coleman's wildly varying damage estimates.**

Ms. Coleman, a close family friend of Freehold Management's owner, first became involved with Freehold's alleged damage estimates shortly after the storm hit the Denton Center on April 4, 2014. *Appendix Ex. L, p. 618-620* at 15:12-:25; 16:1-:20; 23:11-:25; 24:1-:25; 25:1-:12. Ms. Coleman is primarily a general contractor that specializes in submitting bids for repairs to commercial properties. *Appendix Ex. M, p. 627* at 166:2-:11. Within the context of this case she is offering testimony related to the "scope and price" of the alleged storm damage in this case. *Appendix Ex. L, p. 617* at 12:18-:22. Ms. Coleman holds herself out as an expert in assessing the scope and price of storm damage, but, ironically, one of Freehold's damage experts, Gary Treider, considers her only to be a contractor with no real expertise to determine reliable pricing in relation to the scope of work in this case. *Appendix Ex. K, p. 610* at 97:2-:9. Moreover, Ms. Coleman does not know how to conduct scientific tests that determine the extent of suspected hail damage on commercial roofs. *Appendix Ex. L, p. 621* at 47:2-:10.

Ms. Coleman asserts that the over $16 million dollar variance from her initial damage estimate in 2014 to her most recent estimate in 2016 is attributed to Plaintiff's scope of work demands in 2014. *Appendix Ex. M, p. 628-630* at 201:12-:25; 202:1-:25; 203:1-:25; 204:1-:25, 205:1-:25; 206:1-:25; 209:1-:25). However, in the same exchange she admits that State Auto did not have absolute control over the scope of work in her estimate but asserts that she did not include the contested damage in her original estimate. *Id.* In fact, her testimony verifies that her original estimate did not include the contested damage to the Kroger Section of the Denton Center as requested by Kay Mead because there was "no evidence" of hail damage to the Kroger Section of the Denton Center's roof at the time of her original estimate. *Id. Appendix Ex. M, p. 630* at 207:23-:25; 208:1-19. The likely motivation for the incredibly inflated damage estimate in 2016 is a reliance on an incorrect price list, the inclusion of the originally excluded Kroger

roof section of the Denton Center, and an expectation of winning the bid for the potential repairs to the Denton Center. *Id. Appendix Ex. M, p. 631* at 215:5-17.

Taking into account Ms. Coleman's assertions, the incredible variance from her 2014 estimate to her 2016 estimate, and Ms. Coleman's personal relationship with the owner of the Denton Center, a trier of fact can only conclude that her motivations are personal and far from an objective expert opinion that is based in specialized knowledge that will help a trier of fact understand the evidence or determine the a fact in issue. Therefore, the court should exclude Ms. Coleman's opinions and testimony because it will not assist the trier of fact in determining the issues before the court in this case.

### ii.   Carolyn Coleman's current damage Estimate is based on flawed data.

One of the central weaknesses of Ms. Coleman's 2016 damage estimate is the time that elapsed between the 2014 storm and her outrageously inflated 2016 estimate.   From a purely practical standpoint, other hail storms have struck the Denton Center in the interim between both estimates, and as Ms. Coleman stated in her first deposition, she does not know how to conduct the proper tests to separate fresh damage from past damage. *Appendix Ex. L, p. 621* at 47:2-:10. Therefore, it would be improper to expose a trier of fact to information that is either based on faulty assumptions or insufficient expertise.

From a technical standpoint, Ms. Coleman's 2014 and 2016 estimates were generated from an industry software application, Xactimate. *Id. Appendix Ex. L, p. 618* at 13:8-12; 13:13-25; 14:1-5.  As stated earlier, Gary Treider, explained that the producers of Xactimate issue quarterly software updates that also update the price lists used by the software to generate estimates. *Appendix Ex. K, p. 608* at 87:7-21.  He also went on to explain that updated price lists are higher than the older versions in Xactimate. *Id. Appendix Ex. K, p. 609* at 90:2-4.  Although

Ms. Coleman is not usually *Johnny-on-the-spot* when it comes to updating the Xactimate software, she does update the software when she has time. *Appendix Ex. L, p. 618* at 13:13-25; 14:1-5. Therefore, it is safe to assume that she updated her Xactimate software at some point between her 2014 estimate and her 2016 estimate. Consequently, Ms. Coleman's 2016 damage estimate is based on flawed data and reflects an inflated price list that is not relevant to the alleged damage from 2014. Accordingly, exposing the jury to this flawed estimate will undoubtedly create confusion and prevent the jury from fulfilling their duty in this case.

Freehold's claims are based on State Auto's refusal to pay for damages that allegedly occurred during the 2014 storm; thus, allowing the jury to hear evidence that is based on Ms. Coleman's 2016 estimate is the exact scenario that the court should prevent because it will not assist the trier of fact in determining the issues before the court in this case.

## V. CONCLUSION

For the reasons cited above, Defendants' experts' reports and opinions are based on stale and/or inaccurate information, yielded incorrect results, were not based on sufficient facts or data, and were not properly applied to the facts of the instant case. Given these deficiencies, among others, the experts' testimony will not assist the trier of fact in resolving the issues before this Court. None of Defendants' experts' satisfy the reliability and/or relevance prongs of *Daubert* or Rule 702 of the Federal Rules of Evidence. Accordingly, Defendants' experts' testimony should be struck.

## VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, State Auto, respectfully prays that this Court grant their Motion to Exclude Expert Testimony of Matt Phelps, Rocco Calaci, Roger Grimm, Gary B. Treider, and Carolyn Coleman, as well as for any further relief to which they may be justly and equitably entitled.

Respectfully submitted, this 30th day of August, 2018.

/s/Charles B. Mitchell, Jr.
**CHARLES B. MITCHELL, JR.**
State Bar No. 14207000
Federal ID No. 16627
**MICHAEL SHANE O'DELL**
State Bar No. 24065835
NAMAN, HOWELL, SMITH  & LEE, PLLC
306 West 7th Street, Suite 405
Fort Worth, Texas 76102-4911
Telephone:     817.509-2040
Facsimile:     817.509-2060
Email: charles.mitchell@namanhowell.com
Email: sodell@namanhowell.com

**ATTORNEY FOR PLAINTIFF,
STATE AUTOMOBILE MUTUAL
INSURANCE COMPANY**

## CERTIFICATE OF CONFERENCE

On August 6, 2018, counsel for Defendant conferred with Todd Lipscomb, counsel for Defendants, Freehold Management, Inc. and Retail Plazas, Inc., regarding the merits of this motion in an attempt to resolve the matters addressed in same and was advised that Defendants' counsel was opposed to this motion.

/s/Charles B. Mitchell, Jr.
**CHARLES B. MITCHELL, JR.**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served on the 30th day of August, 2018, as follows via E-mail and via the Court's ECF system, which sent notification to the following:

*Via E-mail and Via E-Service*
Robert W. Loree
Todd Lipscomb
Cassandra Pruski
Law Offices of Loree & Lipscomb
The Terrace at Concord Park
777 E. Sonterra Blvd., Suite 320
San Antonio, Texas 78258

*Via E-mail and E-Service*
Christopher D. Kratovil
Alison R. Ashmore
DYKEMA COX SMITH
1717 Main Street, Suite 4200
Dallas, Texas 75201

/s/ Charles B. Mitchell, Jr.
Charles B. Mitchell, Jr.