IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **STATE AUTOMOBILE MUTUAL**<br>**INSURANCE COMPANY,** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:16-CV-2255-L** |
| | § | |
| **FREEHOLD MANAGEMENT, INC.;** | § | |
| **RETAIL PLAZAS, INC.; and** | § | |
| **RPI DENTON CENTER, LTD.,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are the parties' motions to strike or exclude expert testimony: (1) Defendants' Motion to Strike the Expert Testimony of Hallmark Roofing (Doc. 135), filed August 6, 2018; Defendants' Amended Motion to Strike the Expert Testimony of Timothy Marshall (Doc. 183), filed August 29, 2018; Defendants' Amended Motion to Strike Expert Testimony of Paul Nilles (Doc. 190), filed August 30, 2018; and Plaintiff State Automobile Mutual Insurance Company's Amended Motion to Strike and/or Exclude the Expert Testimony of Matt Phelps, Rocco Calaci, Roger Grimm, Gary B. Treider, and Carolyn Coleman (Doc. 196), filed August 30, 2018.

The court has considered the motions, responses, replies and evidence submitted by the parties (unless indicated otherwise) and rules as follows: Defendants' Motion to Strike the Expert Testimony of Hallmark Roofing (Doc. 135) is **granted**; Defendants' Amended Motion to Strike the Expert Testimony of Timothy Marshall (Doc. 183) is **denied**; Defendants' Amended Motion to Strike Expert Testimony of Paul Nilles (Doc. 190) is **granted**; Plaintiff State Automobile Mutual

Insurance Company's Amended Motion to Strike and/or Exclude the Expert Testimony of Matt Phelps, Rocco Calaci, Roger Grimm, Gary B. Treider, and Carolyn Coleman (Doc. 196) is **granted** with respect to Matt Phelps, Rocco Calaci, and Roger Grimm, and **denied** with respect to Gary B. Treider and Carolyn Coleman.

## I.     Factual and Procedural Background

Plaintiff State Automobile Mutual Insurance Company ("Plaintiff" or "State Auto") brought this action, pursuant to 28 U. S.C. § 2201 and 28 U. S.C. §1332, against Defendants Freehold Management, Inc. ("Freehold") and Retail Plazas, Inc. ("Retail") seeking a declaratory judgment regarding the parties' rights and obligations under an insurance policy ("Policy") and whether roof damage alleged to have been sustained during a storm on April 3, 2014, to property located in a shopping center in Denton, Texas ("Property"), was covered by the Policy. RPI Denton Center, Ltd. ("RPI") was subsequently allowed to join the action as Defendant and Counterclaimant. The court refers collectively to Freehold, Retail, and RPI as "Defendants" or "Freehold."

Defendants have countersued for approximately $900,000. The parties agree that State Auto has paid Defendants $1,036,397.17 to date for repairs that have been made to the Property since the April 2014 storm. Defendants, however, allege that they are entitled to recover additional damages to repair a Kroger roof located in the shopping center. Based on information they obtained from Tice Enterprises, Ltd., the general contractor who was hired to make the roof repairs on the Property, Defendants hired engineer Matt Phelps ("Phelps") of APEC Engineering and Laboratory LLC ("APEC") to conduct an independent investigation of the roof damage because they believed that the investigation performed by David Teasdale ("Teasdale") of Haag Engineering ("Haag") on behalf of State Auto was inadequate and biased. Defendants allege that they provided State Auto with a

copy of Phelps's March 31, 2016 report and request for additional damages to repair the Kroger roof, which was denied by State Auto by letter dated April 27, 2016. Defendants allege that they then sent State Auto a demand letter on June 20, 2016, regarding these additional damages.

This declaratory judgment action by State Auto followed on August 3, 2016. Defendants allege that they sent State Auto a second report by Phelps in 2017 that confirmed the Kroger roof, as well as the other remaining roofs at the Denton shopping center, sustained wind and hail damage as a result of the April 3, 2014 storm and needed to be replaced. Defendants contend that State Auto has failed to make a proper claims decision on their request for additional damages, delayed adjusting this claim in bad faith, and has not fully paid Defendants for roofing repairs to the Property.

Defendants have asserted counterclaims against State Auto based on theories of breach of contract, violations of Chapters 541 and 542 of the Texas Insurance Code, violations of sections 17.46(5), (7), (12), and (20) of the Texas Deceptive Trade Practices Act ("DTPA"), and breach of the duty of good faith and fair dealing under Texas common law. At the heart of these claims is Defendants' contention that State Auto failed to conduct an adequate and reasonable investigation of their claim for additional damages before denying it, unreasonably delayed in denying their claim for additional damages, used unfair claims settlement practices that involved the hiring of Haag, an allegedly biased engineering firm, and failed to pay their claim for additional damages after it knew or reasonably should have known, the claim for additional damages was covered under the Policy. Plaintiff and Defendants have also both asserted a number of affirmative defenses to each other's claims.

To say this litigation has been contentious is an understatement. Both parties have accused the other of engaging in abusive discovery or litigation tactics, and the number of discovery disputes

and discovery related delays, including discovery disputes involving the parties' experts, have resulted in a number of extensions of discovery, expert, and dispositive motion deadlines. Some of the case deadlines, including the discovery completion deadline, were extended by agreement of the parties without court intervention or official imprimatur of the court and were not included in any of the scheduling orders entered in this case. The parties also specifically moved the court to extend other deadlines, including discovery, expert, and dispositive motion deadlines, a number of times. To the extent granted, these requested extensions were incorporated into the six scheduling orders entered to date in this case.

The parties' respective challenges to the admissibility of various expert opinions is the most recent of their disputes. Together, the parties filed approximately 3,000 pages of materials in support of or in opposition to the other parties' expert challenges. Despite having the parties refile a number of their expert and summary judgment materials for failure to comply with this district's Local Civil Rules, none of the parties' materials that were filed in support of their respective expert challenges fully complies with this district's Local Civil Rules applicable to briefing and appendices. As the parties rely in large part on their respective experts in supporting or defending against the summary judgment motions filed, the court must resolve the expert challenges before ruling on the motions.

## II. Applicable Legal Standards

The parties have moved to strike or exclude the opposing party's expert opinions under Federal Rules of Civil Procedure 702, 26(a), and 37(c).

### A. Admissibility of Expert Testimony Under Rule 702

In a diversity case, the admissibility of evidence is a procedural issue governed by federal law. *See Reed v. General Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985). Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*

The trial court acts as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge" that is non-scientific in nature. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).[1] In its gatekeeping role, the court determines the admissibility of expert testimony based on Rule 702 and *Daubert* and its progeny.[2]

"The court may admit proffered expert testimony only if the proponent . . . demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable."

---

[1] In *Kumho Tire,* the Supreme Court resolved a split among the circuits and held that *Daubert*'s "gatekeeping" function applied to all expert opinion testimony based on specialized knowledge, not merely scientific expert testimony. Before *Kumho Tire*, the Fifth Circuit had held that *Daubert* applies to expert testimony based on engineering principles and practical experience. *See Watkins v. Telsmith, Inc*., 121 F.3d 984, 988 (5th Cir.1997).

[2] The amendments to Federal Rule of Evidence 702, effective December 1, 2000, essentially codify *Daubert* and *Kumho Tire.* The Advisory Committee's note to Rule 702 states that the determination of whether an expert's opinions are reliable if based upon sufficient facts or data calls for a "quantitative rather than qualitative analysis." In addressing this issue, the "question is whether the expert considered enough information to make the proffered opinion reliable. . . . The expert must base [his or her] opinion on at least the amount of data that a reliable methodology demands." 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268 (2d ed. 1987). Further, in reviewing a *Daubert* challenge, the court makes no credibility determinations; it only decides whether the threshold reliability standards have been satisfied. *See* Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

*E.E.O.C. v. S & B Indus., Inc.*, No. 3:15-CV-641-D, 2017 WL 345641, at *2 (N.D. Tex. Jan, 24, 2017) (citing *Kumho Tire Co.*, 526 U.S. at 147) (internal quotation marks omitted). The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turn[] upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted). To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Fed. R. Evid. 702(d) (requiring that an "expert has reliably applied the principles and methods to the facts of the case").

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Fed. R. Evid. 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight*, 482 F.3d at 355 (citation and internal quotation marks omitted). "The reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief," *Johnson*, 685 F.3d at 459 (internal quotation marks omitted); however, "there is no requirement that an expert derive his

opinion from firsthand knowledge or observation." *Deshotel v. Wal–Mart La., L.L.C.*, 850 F.3d 742, 746 (5th Cir. 2017) (internal quotation marks omitted).

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018) (quoting *Guy v. Crown Equip. Corp*., 394 F.3d 320, 325 (5th Cir. 2004)). "The proponent need not prove to the judge that the expert's testimony is correct, but [it] must prove by a preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). On the other hand, if "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable, as "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"[C]ourts consider the following non-exclusive list of factors when conducting the reliability inquiry: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). These factors, however, are not definitive or exhaustive. Rather, the reliability inquiry is flexible, and the district court conducting the *Daubert* analysis has discretion in determining which factors are most germane in light of the nature of the issue, the particular expertise, and the subject of the expert's testimony. *Daubert*, 509 U.S. at 593-95; *Kumho Tire Co.*, 526 U.S. at 142.

The Advisory Committee's Notes to Rule 702 contemplate that expert testimony may be based on experience, training, or both:

> Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *See, e.g., United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail); *Tassin v. Sears Roebuck*, 946 F. Supp. 1241, 1248 (M.D. La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches"). *See also Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

The Advisory Committee's Notes to Rule 702 further explain: "If the witness is relying solely or primarily on experience, then [he or she] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* This is because the "trial court's gatekeeping function requires more than simply taking the expert's word for it" that the claimed basis supports the opinion. *Id.* (citation and internal quotation marks omitted); *Pipitone*, 288 F.3d at 245-47 (finding expert testimony reliable when the expert explained how his experience in the field led him to opine that an absence of contamination of some samples did not undermine his conclusion that the plaintiff's infection came from the same drug). Overall, the trial court must strive to ensure that the expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*,

526 U.S. at 152. The relevance and reliability of expert testimony turn upon its nature and the purpose for which its proponent offers the testimony. *See, e.g., Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 195 (5th Cir. 2006) ("Of course, whether a proposed expert should be permitted to testify is case, and fact, specific.") (citing *Kumho Tire*, 526 U.S. at 150-51).

The district court's gatekeeping role, however, is not meant "to serve as a replacement for the adversary system: Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Primrose Operating Co. v. National Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)); *accord Williams*, 898 F.3d at 624 (quoting *Daubert*, 509 U.S. at 596). Thus, the district court's "*Daubert* analysis should not supplant trial on the merits," *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) (citation omitted), and, generally speaking, issues regarding the bases and sources of an expert's opinion that affect the weight of an opinion rather than the admissibility of the opinion "should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). The reasoning behind this general rule is consistent with the Advisory Committee's Notes to Rule 702, which state:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

## B. Exclusion of Expert Testimony for Failure to Disclose Under Rule 26(a)

Federal Rule of Civil Procedure 26(a)(2)(B) provides: "Unless otherwise stipulated or ordered by the court, . . . [the disclosure of expert testimony] must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them."  If a witness is not required to provide a written expert report, Rule 26(a)(2)(C) provides that a party's disclosure must state: "the subject matter on which the witness is expected to present evidence under Federal Rule of Civil Evidence 702, 703, or 705," and include "a summary of the facts and opinions to which the witness is expected to testify."  Any opinions that are not properly disclosed in accordance with the Rule 26(a) may be excluded "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Exclusion, however, is not mandatory or automatic but, instead, a matter of the court's discretion. *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990). In deciding whether to exercise its discretion and exclude an expert witness for failure to comply with Rule 26(a)(2), the court is guided by four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003) (citation omitted).

## III. Analysis

### A. Defendants' Motion to Strike Expert Testimony of Hallmark Roofing (Doc. 135)

Defendants move to strike the expert testimony of Hallmark Roofing ("Hallmark") under Rule 702 on the grounds that it is not relevant.  Specifically, Defendants contend that Hallmark's opinion is not relevant because it "only has opinions as to the replacement cost value of the scope of work provided by State Auto that is not in dispute." Defs.' Mot. 7.  In a footnote, Defendants also

contend that Plaintiff's designation for Hallmark is deficient under Federal Rule of Civil Procedure 26(a)(2), as it did not provide a report, or a 'summary of the facts and opinions to which the witness is expected to testify." *Id.* at 7 n.1.

For the first time in its reply, Defendants further assert that the designation for Hallmark is deficient for failing to "provide qualifications for or designate the witness on causation or identification of storm related damages." Defs.' Reply 2, 4-5. "Arguments raised for the first time in a reply brief are generally waived," as the responding party is deprived of the opportunity to respond to the new argument. *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). Defendants fail to explain why they could not have asserted this Rule 26(a) argument in their motion by the deadline set in the court's scheduling order for challenging experts. Accordingly, this argument is waived, and the court does not address it.

Defendants also assert, for the first time in their reply that, even if properly designated, Hallmark is not qualified under Rule 702 to give expert testimony. This issue was not raised in a timely fashion and, as a result, the court does not have the benefit of a response from Plaintiff in addressing; however, the trial court must always make certain that the expert opinion's is reliable under Rule 702 at "at each and every step." *Knight*, 482 F.3d at 355 (citation and internal quotation marks omitted). The court, nevertheless, need not address this issue, as it determines that Defendants' motion to exclude Hallmark's testimony under Rule 26(a) should be granted for failure to provide a summary of the facts and opinions to which this witness was expected to testify.

Regarding this issue, Plaintiff responds that Hallmark is a hybrid witness, that is, a nonretained expert witness who is also a fact witness and, as such, was not required under Rule 26(a)(2)(B) to provide an expert report. Plaintiff asserts that Hallmark was designated as an expert

witness out of an abundance of caution because, although it was anticipated to be a fact witness, its testimony may be expert in nature. Plaintiff contends that the opinions for these type of witnesses may be discovered through deposition and need not be fully disclosed in advance. Pl.'s Resp. 6 (citing *Kim v. Time Ins, Co.*, 267 F.R.D. 499, 501 (S.D. Tex. 2008)). Plaintiff further contends that "[t]he law is clear that this type of testimony does not require a report pursuant to Rule 26(a)(2)(C)." Pl.'s Resp. 7.

Defendants reassert that Plaintiff's disclosures under Rule 26 are deficient because it was required to *either* include an expert report "*or a summary of the facts and opinions to which the witness is expected to testify*" but did neither. Defendants, therefore, contend that their motion to strike must be granted.

It is undisputed that no report was prepared by Hallmark. Even assuming Rule 26(a)(2)(C) applies and relieved Hallmark from preparing an expert report, Plaintiff was still required under this rule to disclose the subject matter of the testimony Hallmark was expected to provide under Rules 702, 703, 704 705 and "a summary of the facts and opinions" to which a Hallmark was expected to testify. The case relied on by Plaintiff does state that opinions for nonretained expert witnesses "may be discovered through deposition, and need not be fully disclosed in advance of depositions." *Kim*, 267 F.R.D. at 501 (citation omitted). *Kim*, however, predates the 2010 amendments to Rule 26(a)(2), and this and other related conclusions in *Kim* regarding the scope of expert disclosures required under Rule 26 are based entirely on cases outside of the Fifth Circuit, and dealt with disclosing the identity of an expert under Rule 26(a)(2)(A) and the issue of whether disclosures for a nonretained expert under Rule 26(a)(2)(B) must be accompanied by a written report. *Kim* did not address the scope of the disclosures required for a nonretained expert that must now be made under Rule

26(a)(2)(C) as a result of the 2010 amendments to this rule. The 2010 Advisory Committee Notes to Rule 26(a) explain that "Rule 26(a)(2)(C) is added to mandate summary disclosures of the opinions to be offered by expert witnesses who are not required to provide reports under Rule 26(a)(2)(B) and of the facts supporting those opinions." Fed. R. Evid. 26 advisory committee's notes (2010 amendments). The Committee Notes further explain that "[t]his disclosure is considerably less extensive than the report required by Rule 26(a)(2)(B). Courts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have. . . . [, and] [t]he (a)(2)(C) disclosure obligation does not include facts unrelated to the expert opinions the witness will present." *Id. This less extensive disclosure standard, however, does not obviate the need to provide the disclosures expressly required by this rule.*

In its January 15, 2018 First Supplemental Rule 26(a)(2) Expert Disclosures (Doc. 37), Plaintiff identified Hallmark timely and indicated that it anticipated that Kenny Hall ("Hall") of Hallmark was expected to testify. This disclosure also provided a brief summary of the general subject matter of Hallmark's or Hall's anticipated testimony but does not include any information regarding Hallmark's or Hall's opinions or the facts supporting those opinions. Instead, this disclosure merely discloses as follows the general nature of Hallmark's anticipated testimony:

> Hallmark . . . [is] expected to testify, among other things, regarding the actual cost and method of repairs for the roofing material present on [Freeholds'] roof on the property that is the subject of this lawsuit. Hallmark [] inspected the property and provided estimates for the cost of roof repairs for the property at issue in this case among other things. Hallmark [] will likely testify regarding the cost of roof repairs at the aforementioned properties, and the market rate for the repairs included in the estimates.

*Id.* at 8. Plaintiff filed a supplemental disclosure for Hallmark on June 1, 2018 (Doc. 74), which contains the same information. The only difference is the addition of the statement: "See also the deposition testimony taken of Kenny Hall." *Id.* at 9. Both disclosures also indicate that "[a]ll documents related to Hallmark's [] involvement in this claim have been previously produced." *Id.*; First Supp. R. 26(a)(2) Expert Disclosures 9. According to the deposition testimony attached to Defendants' motion to strike, Hall was deposed on May 24, 2018, long after the deadline for rebuttal expert designations. The court, therefore, fails to see how Plaintiff's supplemental disclosure for Hall that merely references his deposition after-the-fact satisfies its disclosure obligations under Rule 26(a)(2)(C). Regardless, a party's production of documents and an opponent's after-the-fact deposition are not substitutes for the disclosures required to be made under Rule 26(a)(2)(C) before-the-fact as far as an expert witness is concerned, and such shenanigans defeat the rule's purpose for requiring a party to disclose the facts and opinions that a nonretained expert is expected to testify. *Securities and Exchange Commission v. Nutmeg Group, LLC*, No. 09 C 1775, 2017 WL 4925503, at *5 (N.D. Ill., Oct. 31, 2017).

As the disclosures for Hallmark were never made as required under Rule 26(a)(2)(C), the lack of any explanation by Plaintiff for not making the required disclosures, as well as the age of this case because of delays attributable to discovery and experts, the court concludes, for similar reasons explained herein with respect to Defendants' expert witness Roger Grimm, that a exclusion under Rule 26 of Hallmark's testimony, and Hall's testimony on behalf of Hallmark, is appropriate, even though Defendants do not contend or point to any particular prejudice they might suffer if the testimony is not excluded. At some point, the litigation in this case has to end, and further delays attributable to the parties' failure to comply with the court's scheduling order and make required

expert disclosures unnecessarily delay the resolution of their claims and defenses. The court, therefore, **grants** Defendants' motion to strike Hallmark's testimony on this ground and **excludes** Hallmark's and Hall's testimony and will not permit Hallmark or Hall to testify in this case for any purpose.[3]

### B. Defendants' Motion to Strike Expert Testimony of Timothy Marshall (Doc. 183)

Defendants move to strike the expert testimony of Timothy Marshall ("Marshall") on the ground that it is inadmissible under Rule 702 because it is unreliable. In a footnote, Defendants also contend that Marshall's testimony should be excluded because it is cumulative of testimony that Plaintiff's expert Teasdale will provide and, thus, unnecessary. Defendants contend that Marshall's testimony is unreliable because he relied on unreliable sources of information in opining regarding the meteorological conditions of the Property and the damage to the Property. In this regard, Defendants contend that Marshall never visited the Property site; did not get on the roofs; did not talk to any eyewitnesses; did not review the results of testing done by Haag; and did not inspect the damage to the Property or the samples taken by his own company. Defendants contend that Marshall, instead, simply reviewed Teasdale's report, including photos in the report, and "pulled some weather data." Defendants assert that Marshall's testimony is also unreliable because his methodology is unreliable, as he performed no methodology other than to look at Teasdale's photos and opine about the weather that would have caused the conditions in the photos. Defendants

---

[3] Even if the court had determined that exclusion under Rule 26 was not warranted, Hall would not be allowed to testify, as his testimony is inadmissible under Rule 702. After carefully reading the 142-page transcript of his deposition testimony, the court is still unable to determine with any certainty the factual bases for Hall's various estimates or how he arrived at the estimates. As such, his testimony does not satisfy Rule 702's requirement that expert testimony be reliable.

contend that Marshall did not even consider the weather data he obtained and reviewed in reaching his opinions about the size of the hail or wind speed on April 3, 2014.

Plaintiff disagrees and contends that the sources relied on by Marshall are reliable. Plaintiff asserts that Defendants mischaracterize Marshall's testimony and argue that his opinions are unreliable because he relied on data provided by Teasdale, but they have not moved to strike or shown that Teasdale's data or analysis is unreliable. Plaintiff further assert that there is no evidence that the data collected by Teasdale is unreliable. Plaintiff notes: "Ironically, Defendants have also attempted to argue that Marshall's sources are unreliable because he did not visit the Property, inspect the roof, or interview witnesses, when in fact, Defendants' own meteorologist, Rocco Calaci, conducted his investigation in precisely the exact same manner." Pl.'s Resp. 6.

Plaintiff contends that Marshall's methodology is reliable because:

his methods have been peer reviewed and published, the theories he relied on are generally accepted, he has ruled out other alternative explanations, and he clearly connected the proposed testimony with the facts of the case in his deposition and reports. For instance, throughout his deposition, Marshall testified that he utilized peer-reviewed methods throughout his investigation. App. Ex. D, p. 143, 148, 156 at 28:5-25; 54:18-22, 55:12-17, 120:23-121:5. Marshall also cited to articles that validated his assessment of the condition of the property during his investigation. App. Ex. D, p. 148 at 54:4-14. Finally, Marshall cited to numerous studies and theories that are generally accepted that verify his conclusions, and dispute the conclusions that Defendants' experts reached, thereby ruling out alternative explanations. App. Ex. D, p. 146, 148, 157 at 48:6-49:15, 55:12-17, 127:6-13.

*Id.* at 7-8.

In addition, Plaintiff maintains that Marshall's testimony is relevant because:

he is Plaintiff's sole meteorologist who can testify to how the conditions of April 3, 2014[,] did or did not impact the Property. In other words, without Marshall's testimony, Plaintiff has no expert who can testify as to what weather conditions were present on April 3, 2014, and how the weather impacted the Property. Further, Marshall's testimony is vital to assist lay persons understand why State Auto did not

accept Phelps'[s] determination that the weather on April 3, 2014[,] caused damage to the Property.

*Id.* at 9.

Defendants contend that the latter assertion by Plaintiff is "patently false." Defs.' Reply 8. They continue to argue in their reply that Marshall's testimony should be stricken because it is "unreliable and cumulative regurgitation of Teasdale's opinions from another person at the same company." *Id*. at 9.

The court has reviewed Marshall's expert report(s) and the deposition testimony cited by the parties. While Defendants contend that Marshall's testimony is unreliable because he performed no methodology other than to look at Teasdale's photos and opine about the weather that would have caused the conditions in the photos, his report refers to a number of articles and sources. In his deposition, Marshall was also questioned about the methodology he used, and it is apparent from the deposition transcript and, in particular, the exchange between counsel, that the parties disagree whether the methodology used by Marshall is appropriate and peer reviewed or accepted. Defense counsel also argued during the deposition that none of the articles referenced in Marshall's report supports his opinion.

Other than taking issue with the sources of information relied on by Marshall, however, Defendants have not articulated any reason why they believe Marshall's methodology is unreliable; nor do they explain how Marshall's citation to purportedly irrelevant articles renders his opinion unreliable. Moreover, the court determines that the reliability of the sources relied upon by Marshall goes to the weight of his testimony, not the admissibility. Likewise, that Marshall relied on the data and report of Teasdale does not automatically make it unreliable, as "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed," including

evidence that would be inadmissible "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Although Defendants challenge the reliability of the techniques used by Marshall to form his opinions, they do not argue that an expert in the particular field would not reasonably rely on information such as a subset of the overall data or another expert's opinion in forming an opinion. Marshall's opinion would be inadmissible if it relied solely on the data and opinion of Teasdale, and the court had previously determined that Teasdale's testimony was unreliable and inadmissible, but the court has made no such determination and concludes that Plaintiff has satisfied its burden of establishing that the data collected by Teasdale and relied on by Marshall is sufficiently reliable. *See* Pl.'s Resp. 4-7.

Finally, the court determines that Defendants' contention regarding the cumulative nature of Marshall's testimony is premature and better suited for resolution in the context of a pretrial motion in limine under Rule 403. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Accordingly, for all of these reasons, the court determines that Marshall's testimony is reliable under Rule 702. The court also agrees with Plaintiff that his testimony is relevant and will assist the trier of fact. The court, therefore, **denies** Defendants' motion to strike Marshall's testimony under Rule 702.

## C. Defendants' Motion to Strike Expert Testimony of Nilles (Doc. 190)

Defendants move to strike the testimony of Nilles under Rule 702 on the ground that it is not relevant to the issues in this case. Defendants contend that neither Paul Nilles nor representatives of GC3 should be allowed to provide expert testimony at trial because such testimony will not assist

the jury. In a footnote of the brief filed in support of their motion, Defendants also contend, without explanation, that "[Defendants] also believe[] that this testimony shows that Nilles'[s] testimony is not reliable and is inadmissible" under Rule 702. Defs.' Br. 9 n.1. In their reply, Defendants elaborate on this argument, contending that Nilles's testimony is not reliable because he did not create his own estimates and simply relied on the estimate and data of the site provided by Hallmark.

Plaintiff responds that it "designated Paul Nilles as an expert to testify regarding the construction management, general contracting, coordination of the estimates and solicitation of bids for the actual work. Specifically, Nilles collected bids for various trades, checked for code compliance and necessary improvements to comply with applicable building codes, and determined a fair and reasonable price to perform the scope of work." Pl.'s Resp. 4-5 (citation omitted). Plaintiff maintains that his testimony is relevant to damages in so far as its request for declaratory judgment is concerned. Plaintiff contend that Defendants fail to present any evidence to show that Nilles's testimony is not reliable. Plaintiff, nevertheless, maintains that Nilles is "clearly qualified as an expert to testify on topics relating to the construction, management, general contracting, coordination of the estimates and solicitation of bids for the actual work," and his testimony is reliable because:

> [he] relied on data provided by roofing subcontractors, Hallmark, and reviewed code compliance to determine fair and reasonable prices for the scope of work. Defendants have not raised any concerns regarding the reliability of Hallmark's data provided to Nilles. As such, Nilles'[s] reliance on Hallmark's numbers should not be in dispute. There is simply nothing in the record that would indicate that by relying on Hallmark, Nilles'[s] methods are somehow unreliable.

*Id.* at 7.

Defendants correctly note that Plaintiff has the burden of establishing the admissibility of Nilles's testimony under Rule 702. Nilles's report consists of a two-page list of "all opinions" by

him, most of which are actually factual statements regarding what his company GC3 was retained to do and did, and what services were performed by others such as Hallmark and Critical Electric Systems Group, LLC ("CESG") in connection with this Property roof(s). While Plaintiff asserts that it designated Nilles to testify regarding "construction management [and] general contracting" and maintain that he "checked for code compliance and necessary improvements to comply with applicable building codes," no facts or opinions regarding these matters are included in his report. Moreover, although, as noted, Nilles recites a number of events that occurred, such as, "GC contacted and coordinated bidding services," it is unclear why such events or facts support the only opinion expressed in his report:

> It is GC3's and my opinion that[,] if it is determined that the properties are determined to be damaged by events covered by Freehold's insurance policy[,] that the reasonable and necessary costs to repair or replace the roofs and other structures are the amounts provided in the bids and estimates of Hallmark (Kenny Hall) and [CESG] (Hoyt Moore). This opinion is based on reasonable construction certainty.

Pl.'s Resp. App. 98. Nilles also indicates that he relied on the following facts or data: "State Auto adjusters scope of loss"; "Hallmark Roofing site inspection and bids"; and "Critical Electric Systems Group, LLC site inspection and bid." Pl.'s Resp. App. 98. He fails, however, to explain in his report why he believes that these facts or data support his opinion that "the reasonable and necessary costs to repair or replace the roofs and other structures are the amounts provided" in Hallmark's and CESG's bids and estimates. The court cannot simply "take his word" for it that Hallmark's and CESG's bids and estimates support his opinion. Accordingly, this opinion by Nilles is unreliable and inadmissible under Rule 702. The court, therefore, **grants** Defendants' motion to strike Nilles's testimony as unreliable and **excludes** Nilles's testimony for all purposes.

**D.** **Plaintiff's Motion to Strike Expert Testimony of Matt Phelps, Rocco Calaci, Roger Grimm, Gary B. Treider, and Carolyn Coleman (Doc. 196)**

Plaintiff moves to strike the testimony of Phelps, the engineer hired by Defendants to conduct an independent investigation of damage to the Property roof(s), as well as the testimony of Rocco Calaci ("Calaci"), Roger Grimm ("Grimm"), Gary B. Treider ("Treider"), and Carolyn Coleman ("Coleman") on the grounds that their testimony is not relevant or reliable for purposes of Rule 702 and *Daubert*. Plaintiff also moved to strike Grimm's testimony under Rule 26. Defendants contend that most of Plaintiff's contentions go to the weight of these witnesses' opinions, not admissibility, and can be addressed in the context of cross examination.

**1.** **Phelps**

Phelps was retained by Defendants to inspect the built-up gravel roofs of the Property to determine whether they sustained hail or wind damage on April 3, 2014. Phelps concluded that it was more likely than not that the damage sustained to the roofs was caused by the April 3, 2014 storm, which was accompanied by high winds and hail. He also concluded that the extent of the damage to the roofs necessitated their replacement.

Plaintiffs move to exclude his testimony under Rule 702 on the grounds that it is unreliable and would not assist the jury because it is based on inaccurate data and unreliable methodology that is not properly applied to the facts of this case. Plaintiff contends that the data relied on by Phelps is inaccurate because he did not visit the Property until almost two years after the April 3, 2014 storm, and his findings are based on his observations at the Property and of meteorological data collected from a nearby airport that is approximately four miles from the Property. For this reason, Plaintiff contends, based on the testimony of Justin Kestner ("Kestner"), who Plaintiff sought leave to designate as an expert witness on June 6, 2018, that Phelps's testimony is "[c]onfusing, if not

misleading" because Kestner would have collected data in a different manner and from a different area taking into account other factors such as the reduced roof height of the Property. Pl.'s Br. 7.

Regarding reliability, Plaintiff contends that Phelps's testimony should be excluded because he acknowledged in his deposition that certain aspects of his methodology (weather data and other data collected, visual assessment of the flat roof, photographic evidence) have not been tested, have no known rate of error, and are not generally accepted, and his expert reports are not peer-reviewed. In addition, Plaintiff asserts that Phelps relied upon and extrapolated data using a vacuum uplift test known as ASTM E907, which has not been the industry standard since 2013 and is less stringent than the current industry standard FM 1-52 test. Plaintiff contends that, according to Kestner, Phelps incorrectly cited and labeled tables and graphs in his report, which could confuse the jury.

Plaintiff also takes issue with certain statements by Phelps, contending that they are conclusory and unsupported by evidence and, for this reason, his opinion should be excluded for the same reason his opinion was excluded in *Hahn v. United Fire and Cas. Co.*, No. 6:15-CV-218, 2017 WL 1289024 (W.D. Tex. Apr. 6, 2017). Plaintiff contends that, although the term "damage" was defined differently in the policy in *Hahn*, the court's reasoning should apply because, like *Hahn*, Phelps's methodology does not take into account the roofing material or the ability of the roofs to withstand the amount of force described. Plaintiff notes the various bases for Phelps's opinion but takes issue with his conclusion that "it is more likely than not that the capacity of the entire roof membrane has been reduced, and the membrane is no longer compliant with present building codes," contending that there is no evidence in his report that supports this conclusion. Pl.'s Br. 10-11. Plaintiff contends that Phelps is unable to "opine that the wind and hail measured nearby was also present at the Property at issue," and never explains what current building codes require.

Defendants disagree and respond that Phelps's testimony is admissible under Rule 702 because his opinions are relevant and based on reliable methodology, and he is qualified to make the opinions offered. Defendants also contend that *Hahn* is inapplicable because the court's ruling in that case turned on a policy provision excluding coverage for cosmetic damage that does not exist in this case.

The court has reviewed all of the materials submitted by the parties and determines that Phelps is qualified to give the opinions offered on the subject matters expressed; however, it, nevertheless, determines that Phelps's opinions are not reliable as expressed. The court does not reach this conclusion because of the reasons argued by Plaintiff, which the court addresses below, but, instead, because the link between the facts and data relied on by Phelps and the conclusions made by him in support of his opinion are not sufficiently developed or explained. *See Knight*, 482 F.3d at 355 (citation and internal quotation marks omitted). He also does not explain why he believes that the Property roofs require replacement, which is apparently an issue in dispute, because, as noted above, Plaintiff contends that the bases for Phelps's opinion that the roof "membrane is no longer compliant with present building codes" is not explained. Pl.'s Br. 10-11.

Regarding his qualifications, Phelps states in a September 2018 declaration, to which his report is attached, that he is a licensed engineer in nineteen states, including Texas; he is certified by the Texas Department of Insurance as a Windstorm Engineer; and he is a member of the Texas Department of Insurance's Forensic Engineering Working Group, which was formed to develop forensic engineering guidelines for investigating compliant construction. While Phelps was not retained to opine whether the Property was designed and constructed to meet Texas wind conditions, this experience and his experience as a windstorm engineer do provide him with needed insight in

determining the cause of the Property damage that is the subject of Defendants' insurance claim. In addition, Phelps states in his declaration that he developed a curriculum and teaches classes regarding forensic wind and hail damage investigations to engineers, insurance adjusters, and public adjusters that are certified by the Texas Department of Insurance. This combined experience qualifies him to provide an expert opinion on the issue of whether the April 3, 2014 storm, which Defendants' contend included hail and high winds, caused the damage to the roof of the Property.

Phelps's declaration also sets forth the methodology and steps for performing a forensic storm damage assessment of a flat roof that he used in assessing the April 3, 2014 damage to the Property roof. While he does not state in his expert report that he followed any particular methodology or steps, his investigation and assessment of the Property roof tracks the methodology in his declaration, and Phelps states in his declaration that this methodology is regularly used by engineers and roofing consultants in Texas in performing forensic investigations of storms.[4] He also explains the steps he took and describes the data he considered with respect to each step. The court, therefore, determines that the methodology and his application of the methodology to the facts of this case are sufficiently reliable for purposes of Rule 702.

In making this determination the court does not consider Kestner's testimony, as Plaintiff's request to designate him approximately six months after the expert disclosure deadline set by the court was denied. Moreover, Plaintiff's contentions regarding the sources and accuracy of the data relied on by Phelps and his use of a less stringent industry standard that was in place near the time of the April 3, 2014 storm rather than an allegedly more accurate standard that is currently used in

---

[4] The court does not normally consider information in an expert's declaration or affidavit, unless it is consistent with and does not significantly change or add new opinions or bases previously disclosed in the expert's report, as this would defeat the purpose of requiring expert disclosures under Rule 26.

the industry go to the weight of Phelps's testimony and opinions, which can be explored on cross examination. Additionally, contrary to Plaintiff's assertion, Phelps's report indicates that the Property roofs he assessed were flat "gravel ballast roof(s)" or "built-up gravel roofs." Defs.' Resp. App. 24, 53, 86; *see also* Defs.' Resp. App. 4, 7, 8, 9, 10, 12 (Phelps Decl. ¶¶ 5, 6, 20, 21, 22, 23, 24, 28, 36, 41). Accordingly, the ruling in *Hahn* does not assist the court in determining whether Phelps's testimony in this case is sufficiently reliable.

Further, Plaintiff's contention that Phelps acknowledged in his deposition that his methodology or opinions and certain data have not been tested, have no known rate of error, and are not generally accepted, and his expert reports are not peer-reviewed—is misleading. Plaintiff argues, on one hand, that Phelps acknowledged in his deposition that "his *methodolog*y has not been tested, is not subject to peer-review or publication, has no known rate of error, if any, and is not generally accepted." Pl.'s Br. 7-8 (emphasis added). Plaintiff, however, does not cite testimony from Phelps's deposition testimony to show whether he was asked or admitted that his *methodology* was not tested, not peer reviewed, not generally accepted, and had no known rate of error. Plaintiff, instead, cites a case that lists the nonexhaustive list of factors that courts may consider. Moreover, Phelps states in his declaration that the methodology described and relied on by him is regularly used by engineers and roofing consultants in Texas in performing forensic investigations of storm damage.

Plaintiff also contends, on the other hand, that Phelps acknowledged that his *reports or opinions* have not been "measured" or "peer-reviewed." Phelps was asked whether his expert reports were peer-reviewed in his deposition; however, the *Daubert* factor that focuses on peer review and publication does not concern the error rate of the data collected, but, instead, whether "the *theory or technique* used by the expert has been subjected to peer review and publication," and this is but one

of several nonexhaustive factors that the court may consider in determining whether Phelps's testimony is sufficiently reliable. *Johnson*, 685 F.3d at 459 (internal quotation marks omitted) (emphasis added); *see also Broussard v. State Farm Fire and Cas. Co.*, 523 F.3d 618, 631 (5th Cir. 2008).[5]

Additionally, Phelps's deposition testimony cited by Plaintiff dealt with and was in response to questioning regarding the rate of error associated with nonscientific matters such as his visual assessment of the Property roofs and his collection of data and analysis of data collected, as well as the rate of error for the weather data and photographic evidence he used. Phelps explained that the error rate for his visual assessment of the roof damage was not quantitative because this involves:

> a qualitative assessment. It is not quantitative, therefore, a numerical statistical analysis is not possible. But it is based on a comparative analysis, and that the reason that we look at other areas on the same building and, in this case, . . . other parts of the adjacent building that was not where the Kroger store was located.

Pl.'s App. 18. Phelps similarly explained that the flat roof assessment he performed "is also a qualitative uncertainty assessment and, like all of the others, it has a very low measure of uncertainty because it is only a [type of] data collection . . . so there is not a statistical analysis associated with it." *Id.* at 20. Phelps also explained that the "National Weather Service and NOAA do not publish

---

[5] In affirming the district court's decision to admit expert testimony, the court in *Broussard* reasoned as follows:

> Slider, whose specialty is in structural engineering, opined that wind destroyed the Broussards' home prior to the arrival of the storm surge. He considered and ruled out other causes for the initial damage to the Broussards' home by evaluating data from the Stennis Space Center and eyewitness testimony. He also based his conclusions on physical evidence left on the Broussards' property. **State Farm objected to his testimony in part because his work had not been peer reviewed and he did not know of others who had used his methods.** The district court evaluated Slider's testimony in a written order and found that the data he relied on was sufficiently reliable to support his opinions. After reviewing the record, we affirm and hold that the district court did not abuse its discretion when it admitted Slider's testimony.

*Broussard*, 523 F.3d at 631.

a measurement of uncertainty regarding their data."[6]  *Id.* at 19.   Regarding the error rate or uncertainty of his data collection and analysis of data, Phelps testified that:

> the data collection process is a qualitative assessment, so it's not possible to do a numerical or statistical analysis of the collection. The analysis of standard deviation, which is the statistic that is most commonly used for measurements of uncertainty, does not apply to damage assessments because we are not looking for consistency in the outcome of our analysis. We, in fact, are looking for it to be inconsistent, if it truly is damaged.

*Id.* at 20.  Consistent with his deposition testimony, Phelps states in his declaration regarding the rate of error:

> Although the evaluation of storm damage involves the mathematical equations used in my reports, synthesizing the quantitative data (measurements, test data and mathematical computations) and the qualitative data (visual observations and eyewitness accounts) to formulate a forensic opinion is not a quantitative process that can be statistically quantified.

Defs.' Resp. App. 11 (Doc. 217).

Further, while "the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation" is one of the nonexhaustive factors that courts consider in determining whether an expert's opinions are reliable, the court has discretion in determining which factors are most germane in light of the nature of the issue, the particular expertise, and the subject of the expert's testimony.  *Daubert*, 509 U.S. at 593- 95; *Kumho Tire Co.*, 526 U.S. at 142.  Plaintiff takes issue with Phelps's methodology using ASTM E907 and the types and sources of the data relied on by him.  According to Phelps's declaration, however, his stated methodology, which includes collection of weather data, visual inspection of the roof at issue and surrounding buildings, and other means of collecting data in performing a forensic storm damage

---

[6] NOAA is an acronym for National Oceanic and Atmospheric Administration, a federal agency that is a source of historical weather and climate data.

assessment of a flat roof, is commonly used in the industry. As noted, the issue of whether an expert's opinions are based on sufficient facts or data calls for a "quantitative rather than qualitative analysis" that requires the court to determine whether the expert considered enough facts, data, or information to make the proffered opinion reliable without making a credibility determination or choosing between competing expert opinions. *See infra* n.2. Thus, even if Plaintiff had been allowed to designate Kestner, it would be improper for the court to conclude, as urged by Plaintiff, that Kestner's opinion is more credible than that of Phelps, or that Phelps's opinion is unreliable because Kestner's opinion is more credible, and there is no evidence to support Plaintiff's contention that Phelps's chosen methodology is not generally accepted in the industry; nor is there any indication that his opinion is not based on the amount of data that a reliable methodology requires. 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268 (2d ed. 1987).

The court, nevertheless, determines that Phelps's opinions are not reliable as expressed because the link between the facts and data relied on by him and the conclusions made by him in support of his opinion is not sufficiently developed or explained in his report or his declaration. *See Knight*, 482 F.3d at 355 (citation and internal quotation marks omitted). Phelps's description of the data and information collected and the steps he took in assessing the damage to the Property roofs in his report and declaration is fairly detailed; however, he does not explain why this data, information, his observations, or his investigation support his opinion and the various conclusions included in his report and declaration. For example, the following conclusions are some of the conclusions identified by the court that are not sufficiently tied to the data or explained: (1) "It is my professional engineering opinion that on April 3, 2014 the buffeting winds at the Denton Center contained sufficient speed to cause wind damage to the built-up gravel roofs"; (2) "My findings were

[consistent] with storm damage that did not result from natural weathering"; (3) "It is clear in the damage threshold table that the subject storm hail energy exceeded the damage threshold for the roofing systems as the subject property"; (4) "I tested the samples taken from the inspection openings and found the evidence was consistent with storm damage and not with natural weathering"; (5) "In my professional engineering opinion many of the delaminated samples showed interplay crush from hail impacts"; and (6) "[I]t is my opinion that hail and buffeting winds on April 3, 2014 damaged the field and underlying decking of the built-up gravel roofs at the Denton Center," and "[b]ecause of the extent of this wind and hail damage, the current moisture readings, and the possibility of future leaks and further damage, the built-up gravel roofs and the underlying decking at Denton Center need to be replaced." Defs.' Resp. App. 6-10, 12 (Phelps Decl. ¶¶ 15, 16, 24, 32, 36, 41). Thus, even if the court considers Phelps's declaration, which was submitted by Defendants in an attempt to cure the deficiencies in his report, there remains "simply too great an analytical gap between the [basis for Phelps's expert opinion] and the opinion proffered." *Joiner*, 522 U.S. at 146. Phelps's opinions, therefore, are not reliable. Accordingly, the court **grants** Plaintiff's motion to strike Phelps's testimony and **excludes** the testimony for all purposes as unreliable.

### 2. Calaci

Calaci was retained by Defendants to testify regarding the weather conditions on April 3, 2014, near the Property. In his report, Calaci expressed the opinion that the following meteorological events occurred on April 3, 2014, in Denton, Texas, at the location of the Property: (1) "Hail up to 4.25 inches near 3:40PM CDT"; (2) "A second wave of hail moved over the property near 6PM CDT with hail sizes up to 2.0 inches. The hail fell intermittently between 6:00PM and 7:00PM CDT, April 3, 2014. After 6:15PM, the hail sizes dropped to less than 1 inch in diameter";

and (3) "A tornado moved over the subject property near 6:02PM CDT. The tornado lasted for approximately 3 minutes." Defs.' Resp. App. 838. Calaci's report also includes a number of conclusions that were made in support of the foregoing opinion. Most of Plaintiff's concerns regarding Calaci's report and opinion focus on reliability or rate of error of data or sources of data he used and the effect on his conclusions. Plaintiff contends that the data relied on by Calaci and his conclusions based on this data are both speculative. Plaintiff also contends, without explanation, that Calaci is not qualified to give the opinion proffered.

After reviewing Calaci's report, the declaration he submitted in support of Defendants' response to the motion to strike, and the deposition testimony cited by Plaintiff, the court determines that Calaci's extensive experience in the area of meteorology and, in particular, forensic meteorology and investigations of storm activity, qualifies him to testify regarding the weather conditions that existed on April 3, 2014, near the Property. Additionally, for the same reasons discussed with respect to Phelps, the court determines that Plaintiff's contentions regarding the data or sources of the data relied on by Calaci and the effect, if any, on his conclusions do not make his opinions or methodology unreliable. *See 14.38 Acres of Land*, 80 F.3d at 1077 (explaining that questions regarding the bases or sources of an expert opinion generally go toward the weight of the testimony, as opposed to its admissibility, and are properly left for the jury to consider) (citation omitted).

The court, however, has similar concerns because the link between the data relied on by Calaci and his conclusions is not sufficiently developed or explained in his report or his declaration. Like Phelps, Calaci describes in detail his data collection process and findings, but he does not sufficiently explain why the data he relies on support his opinion and the various conclusions included in his report and declaration. To be reliable and helpful to a trier of fact, the link between

the conclusions and opinions expressed by Calaci. As this was done, Calaci's opinions are not

reliable, even if the court takes into account his declaration, which was submitted by Defendants in

an attempt to cure the deficiencies in his report. As there remains "too great an analytical gap

between the [basis for Calaci's expert opinion] and the opinion proffered," *Joiner*, 522 U.S. at 146,

the court **grants** Plaintiff's motion to strike his testimony and **excludes** it for all purposes as

unreliable.

### 3. Grimm

Plaintiff first contends that Grimm's "threadbare" opinions regarding bad faith should be

excluded under Rule 702 because they are not relevant or reliable and do not comply with Rule 26's

requirement that disclosures of expert testimony include "a complete statement of all opinions the

witness will express and the basis and reasons for them" unless otherwise stipulated or ordered by

the court. Pl.'s Br. 14-17. Plaintiff also contends that Grimm's opinions that were not designated

timely should be excluded under Rule 26.

Plaintiff contends that Grimm's opinions that State Auto breached its duty of good faith and

fair dealing that are premised on his view that Haag is biased are not relevant or reliable, and,

therefore, do not satisfy Rule 702:

> Grimm's opinions concerning State Auto's handling of this case, specifically
> with respect to the hiring of Haag Engineering, are not reliable given that they are not
> based on any scientific facts or data and are not the product of reliable principles and
> methodology. A review of Grimm's report illustrates that his basis for concluding
> Haag's hiring constituted bias is because Haag has previously been found to be
> biased in favor of insurance companies and the same is likely in this case. . . .
> Grimm's assertion that Haag Engineering is biased is derived [from] the court's
> holding in *Nicolau v. State Farm Lloyds*, 951 S.W.2d 444 (Tex. 1997). However,
> aside from the court's holding in *Nicolau*, Grimm has not provided any additional
> information or insight based upon experience or otherwise that support his
> conclusion about [Haag's] bias in this case. Grimm's opinion that Plaintiff breached
> its duty of good faith and fair dealing is based solely on [*Nicolau*] . . . where Haag

engineers were found biased. Grimm's opinion that Haag was biased was formed long before he was retained in this action and is not based on any case-specific information. This is supported by the fact that the only information Grimm relied upon in forming his opinions of bias were the pleadings, three of Haag's reports prepared in this action, and three court case summaries. . . . [T]he courts' holdings finding bias can be described as "obvious to the layperson," and would not assist the trier of fact in rendering a decision on whether State Auto committed bad faith.

Pl.'s Br. 14-15.

Plaintiff further contends that any testimony by Grimm that other actions by State Auto, for example, in handling Defendants' insurance claim, constitute bad faith should also be excluded because, when deposed, he was unable to provide a basis as to why these acts constituted bad faith and his opinions in this regard were not included in his expert report or disclosed as required under Rule 26(a)(2)(B).

Defendants disagree that Grimm's opinions are irrelevant or will be unhelpful simply because they are "obvious." Defendants contend that they intend to offer testimony from him regarding "Texas Insurance claim handling standards and the actions of Sherri King, Plaintiff's adjuster. Specifically, Grimm believes that Sherri King's actions were abnormal and did not comport with State Auto's duties under the duty of good faith and fair dealing and Texas law." Defs.' Resp. 14. Defendants contend that Grimm has over 28 years of experience in the insurance industry and has been a licensed insurance adjuster in Texas since 1984. Defendants maintain that his testimony is relevant because:

This specialized experience is beyond the understanding of ordinary witnesses and will help the jury decide the disputed issues of fact regarding the claims handling by State Auto in this case and allegations of bad faith. Using Grimm's experience, the jury can gain knowledge into the claims handling process and the insurance industry to determine whether State Auto's actions were committed in bad faith.

*Id.* Defendants contend that Grimm's declaration, which was submitted in support of Defendants' response to Plaintiff's motion to strike, shows that: (1) he has extensive experience as a claims adjuster and in evaluating insurance claims adjusters that will assist the jury in deciding whether Plaintiff acted in bad faith as alleged in their counterclaim; and (2) he used reliable data and methodology, even though Plaintiff does not object to his methodology and, instead, argues that his opinions are not based in scientific data or facts. *Id.* (citing to Defs.' App. 840-44). Defendants contend that Plaintiff's objection to Grimm's testimony goes to the weight of the testimony, not its admissibility. Defendants further assert that expert testimony does not have to be based in science to be admissible.

In addition, Defendants contend that exclusion of his undisclosed opinions is not necessary under Rule 26(a), as any errors in Grimm's disclosure were harmless. Defendants assert that any disclosure errors were harmless because, in accordance with the court's Third Amended Scheduling Order, Plaintiff was provided with Grimm's "preliminary report" on February 20, 2018, the same date Defendants made their initial disclosures and reserved the right to supplement his opinions. According to Defendants, "[u]nder the scheduling order, this designation was required to be made before State Auto produced many key emails or provided the deposition of its two adjusters (Sherri King and Paul Douglas) and their supervisor Mark Chenetski." Defs.' Resp. 16-17. Defendants contend that, while no supplemental report for Grimm was ever prepared, they supplemented their disclosures for him on May 15, 2018, and Plaintiff had the opportunity to depose Grimm on May 16, 2018, regarding all of his opinions.

Defendants further assert that Plaintiff's obstructionist discovery tactics substantially justify any technical deficiency in Defendants' designation for Grimm because:

Sherri King was the primary insurance adjuster charged with adjusting the Freehold claim for State Auto. In an August 1, 2017 letter, Freehold requested Sherri King's deposition. (Appx 990) After a series of cancellations and reschedules, on November 22, 2017, the parties agreed to postpone Ms. King's deposition until after a December 2017 or January 2018 mediation.

In a March 16, 2018 letter, Freehold's counsel explained the need to depose Sherri King and State Auto's corporate representative before the depositions of either party's bad faith expert. (Appx 991) Sherri King was finally deposed on April 24, 2018, and Grimm's disclosure was supplemented with his opinions about Ms. King's testimony prior to his deposition.

Freehold's March 16, 2018 letter also explained that it needed State Auto's Corporate representative's deposition for Grimm's testimony. Freehold deposed State Auto's corporate representative on July 19, 2018 and August 2, 2018. After the corporate representative could not or would not answer several key questions, Freehold filed a motion to compel and for sanctions which is currently pending before Magistrate Rutherford. 4 (Document 119)

Now after, delaying and preventing Freehold from obtaining key information about State Auto's adjustment of the claim until after the February 20, 2018 designation deadline, State Auto seeks to strike Grimm's expert's opinions based upon the very discovery State Auto delayed or refused to produce.

Defs.' Resp. 17-18.

Grimm's proposed testimony and Defendants' expert disclosures for him are problematic for

a number of reasons. In their February 20, 2018 expert disclosures for Grimm, Defendants indicate

that the disclosures are being made pursuant to the court's Third Amended Scheduling Order (Doc.

40) and state as follows regarding Grimm's experience and the matters he will testify:

Roger Grimm is an insurance specialist with over 31 years of experience in the insurance industry. After a 28 year career handling first-party insurance claims for Allstate Insurance Company, Mr. Grimm started Roger Grimm Insurance Consulting and provides consulting and expert witness services to insureds and insurers on claims handling and bad faith in first-party insurance claims. Mr. Grimm may testify about State Auto's duties under the Freehold Entities' insurance policy and duties of good faith and fair dealing under Texas law. Specifically, Mr. Grimm is expected to testify that State Auto's use of Haag Engineering consultants, David Teasdale and Timothy Marshall that have a reputation for being biased for insurers

and creating result-oriented reports is improper, and evidence Plaintiff's handling of the Freehold Entities' claim in bad faith.

Mr. Grimm's mental impressions are based on his training, experience, and his review of the pleadings in this case. Mr. Grimm may also respond to or rebut evidence or opinions offered by Plaintiff or its designated experts concerning any of the above or related matters. He may also offer expert opinions and conclusions in response to any rebuttal reports, opinions, conclusions, evidence or testimony that may be offered by Plaintiff's designated experts.

Attached to this designation as Exhibit "C-1" is a copy of Mr. Grimm's report which also contains his fee schedule. Mr. Grimm reserves the right to supplement this report based upon facts and evidence developed in the discovery of this case, including but not limited to depositions of Plaintiff's adjusters, representatives, consultants, and experts. Additionally, attached hereto as Exhibit "C-2" purposes and bates is a copy of Mr. Grimm's resume/CV which also contains a list of testimony. These exhibits are incorporated by reference herein for all purposes.

Defs.' Expert Disclosure 7-8 (emphasis added).

The totality of Grimm's proffered expert opinion is set forth in two paragraphs of the one and a half page "preliminary report" that Defendants assert was provided to Plaintiff with their initial disclosures. In this report, Grimm opines as follows:

On behalf of Freehold Management, Inc. (Freehold) and Retail Plazas, Inc. (RPI), you have retained me to opine on State Automobile Mutual Insurance Company's (State Auto) hiring of Haag Engineering (Haag) to Investigate a storm loss that happened to Denton Center on April 3, 2014.
. . .
[T]his loss occurred as a result of a wind and hail storm that damaged the Denton Center on April 3, 2014. As part of their claim adjusting, State Auto's adjusters hired Haag Engineering (Haag) to investigate the loss. Haag was hired despite State Auto's knowledge that Haag had previously been involved in multiple cases in which they were found to have acted with bias in favor of Insurance companies. In fact, the two Haag engineers involved In this case, David Teasdale and Tim Marshall, were also involved in the previous litigation. Given Haag's history[,] one has to question State Auto's reasons for hiring Haag to investigate this claim.

An insurance company and its adjusters have the duty to conduct fair and impartial investigations into claims presented by their insureds. They have a responsibility to give equal, (if not greater, consideration to the interests of the insured as that of the company. This would mean hiring experts whose only goal is

to complete investigations without any preconceived ideas or bias. Given Haag's history, and in particular the history of the two engineers involved, I find it very hard not to have the perception of biased hiring in this case. The question has to be asked, why Haag? There are many other Engineering firms in Texas that State Auto could have hired to investigate this loss that do not have Haag's history. At this time, I cannot find a reasonable basis for Haag's hiring if the goal is to conduct a fair and unbiased investigation of this loss.

Pl.'s App. 579-80. In reaching this opinion, Grimm states in his report that he was provided the following materials for consideration by Defendants: (1) "Plaintiff[']s [O]riginal Complaint for [D]eclaratory Relief"; (2) "Defendant's Amended Original Answer and Amended Counterclaim"; (3) the "Haag Report dated June 10, 2014"; (4) the "Haag Report dated August 28, 2017"; (5) the "Haag [R]eport dated November 4, 2017"; (6) "Nicolau v[.] State Farm Lloyds case summary"; (7) "Rigsby v[.] State Farm Fire & Casualty case summary";[7] and (8) "Watkins v[.] State Farm case summary."[8] *Id.* at 582.

Defendants' May 15, 2018 supplemental expert disclosures for Grimm include the foregoing information and also state:

> Mr. Grimm's initial opinions are specified in his report that has been produced. Mr. Grimm's report, resume/CV, fee schedule, and prior testimony have already been produced as exhibits to Freehold's original expert disclosure. These exhibits are incorporated by reference herein for all purposes.
>
> After the issuance of his report, as discovery in this case progressed, Mr. Grimm reviewed further documentation produced in discovery, including but not limited to the deposition and exhibits to the deposition of Sherri King, claim

---

[7] Grimm's reference to "Rigsby v State Farm Fire & Casualty case summary" appears to refer to a case summary provided by defense counsel of *United States ex rel. Rigsby v. State Farm Ins. Co.*, 2009 WL 2461733, at *1 (S.D. Miss. Aug. 10, 2009), as this was the only case the court was able to locate on Westlaw that involved Rigsby, State Farm, and Haag.

[8] No citations to these cases was provided. The quoted information is the only information referenced or included in Grimm's report regarding these cases. The court was unable to locate any case by Watkins against State Farm, so it is unclear what was provided to Grimm for consideration in preparing his report as far as his reference to "Watkins vs State Farm case summary."

correspondence and emails between the parties, emails produced by Sherri King, and photographs taken by Paul Douglas.

> After his review of these documents, Mr. Grimm has developed further opinions and[,] in addition to the opinions in his report, is also expected to testify that State Auto's early anticipation of litigation and retention of counsel in this matter without notifying Freehold was improper and in bad faith, and that State Auto's reservation of rights/partial denial letter did not contain the requisite information and explanation of the basis for the denial of Freehold's claim as required by the Texas Insurance Code and the duty of good faith and fair dealing. Mr. Grimm is prepared to testify to all of his opinions at his May 16, 2018 deposition.

Defs.' Supp. Expert Disclosures 3-4 (Doc. 58) (emphasis added).

The first issue with Defendants' disclosures for Grimm is that they were both made after the deadline(s) in the Third Amended Scheduling Order for expert disclosures under Rule 26(a)(2), which required expert disclosures by a plaintiff to be made by January 15, 2018, expert disclosure's by a defendant to be made by February 15, 2018, and rebuttal expert disclosures to be made thirty days later. As Grimm was designated to testify as an expert in support of Defendants' counterclaims that are based on State Auto's alleged bad faith and for which they had the burden of proof as the Counter-Plaintiff, the deadline for disclosures pertaining to his expert opinions was January 15, 2018. Defendants did not file their disclosures for Grimm until February 20, 2018, thirty five days after this deadline and five days after the deadline for defense disclosures, and did so without seeking and obtaining leave of court, so, contrary to Defendants' assertion, their initial disclosures for Grimm were not made in accordance with the Third Amended Scheduling Order, which incorporated the extended deadlines agreed upon by the parties.

Moreover, while Defendants argue that State Auto prevented them from obtaining key information about State Auto's adjustment of this claim until after their deadline for making expert disclosures for Grimm, they fail to identify the information that was needed but withheld or

demonstrate that such information was actually sought timely before their expert disclosure deadline. Defendants also fail to offer any proof that they did not possess "State Auto's reservation of rights/partial denial letter" that is the subject of the defense's May 15, 2018 supplemental expert disclosures for Grimm, although it would seem that this letter would have been in Freehold's possession all along, as the letter is from State Auto to Freehold. Additionally, if Defendants believed a further extension of this agreed-upon deadline was necessary to some time after Plaintiff produced requested key documents or Defendants deposed Plaintiff's adjusters Sherri King ("King") and Paul Douglas, and their supervisor Mark Chenetski, they could have and should have requested an extension of their expert disclosure deadline prior to its expiration.

Defendants supplemented their disclosures for Grimm on May 15, 2018, but leave was not sought or obtained before doing so, even though this designation disclosed new opinions for Grimm, including one regarding "State Auto's reservation of rights/partial denial letter," at 5 p.m. on the day before Grimm's deposition was scheduled. Although the court had granted an agreed motion by the parties on April 16, 2018, to extend the discovery deadline to June 4, 2018, and the deadline for challenging experts to June 18, 2018, **it did not further extend the deadline for expert disclosures and was not requested to do so.**

Defendants' reservation of the right under Rule 26 to make or supplement their expert disclosures does not save their disclosures from being untimely. Rule 26 anticipates that expert disclosures and reports may require supplementation, and Rule 26(a)(2)(E) requires parties to supplement their expert disclosures when required under Rule 26(e). The timing of expert disclosures, however, is governed by Rule 26(a)(2)(D), which requires parties to identify their experts and provide expert reports within the deadlines set by the district court's scheduling order.

Fed. R. Civ. P. 26(a)(2)(D) (*"Time to Disclose Expert Testimony*. A party must make these disclosures at the time and in the sequence that the court orders" or "at least 90 days before the date set for trial" in the absence of a court order.). A district court has broad discretion in preserving the integrity and purpose of its pretrial orders. *Geiserman*, 893 F.2d at 790. A district court may grant a party leave to supplement an expert's report after the deadline in the scheduling order has expired, but only if good cause is shown under Rule 16(b). Defendants at no time sought leave before filing and providing to Plaintiff their untimely initial and supplemental designations for Grimm and Grimm's report.

### a.    Exclusion of Grimm's Testimony Under Rule 26

As noted, in deciding whether to exclude evidence that was not properly designated, a district court should consider: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Id*. at 791. Defendants have not met their burden with respect to any of these factors.

#### i.    *Explanation for Failure to Disclose Timely Grimm's Opinions*

As a preliminary matter, the court agrees that Defendants' disclosures for Grimm, even when viewed in conjunction with his expert report and Defendants' supplemental disclosures, are wholly inadequate and do not satisfy Rule 26's requirement that disclosures of expert testimony include *"a complete statement of all opinions* the witness will express *and the basis and reasons for them.*" Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added). Defendants' initial disclosure (Doc. 22) that "Grimm may testify about State Auto's duties under the Freehold Entities' insurance policy and duties of good faith and fair dealing under Texas law" fails to disclose any opinion or the bases for an opinion.

Rather, it merely discloses, without detail, a broad topic on which Grimm might testify. Moreover, it is the court's job to instruct the jury regarding the law, including the parties' duties under Texas law and the Policy, if the Policy is determined to be unambiguous as argued by the parties.[9] In three sentences, Grimm also expresses the opinion in his report that insurers owe certain duties to insureds in investigating claims in a fair and impartial manner. Again, however, this opinion appears to be an expression of what Grimm believes is required under Texas, as no other basis is provided for either of these opinions. Grimm's other supplemental opinions fare no better.

The supplemental disclosures for Grimm are inadequate for similar reasons. Any opinion by him as to what Texas law or the Texas Insurance Code requires insurers to disclose in a reservation of rights or claim denial letter is a legal issue and, thus, not an appropriate topic to which an expert may testify. Any opinions by Grimm that State Auto's conduct in (1) hiring Haag despite its knowledge that Haag had been previously involved in cases in which they were found to be biased in favor of insurance companies; and (2) retaining counsel and anticipating litigation in this case establishes that State Auto handled or investigated Freehold's insurance claim in bad faith or breached its duty of good faith and fair dealing are also improper, as they will invade the province of jurors whose role it is to decide fact issues based on the evidence presented in a case. *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998) ("[W]hether an insurer has breached its duty of good faith and fair dealing is a fact issue.") (citing *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 and 81 (Tex. 1997) (Enoch, J., concurring); *Thompson v. Zurich Am. Ins. Co.*, 664

---

[9] "Under Texas law, insurance policies are construed according to ordinary contract principles. The interpretation of an insurance policy is a question of law for the court to determine. . . . If policy language can be given a definite or certain legal meaning, it is not ambiguous, and we will construe it as a matter of law without admitting evidence for the purpose of creating an ambiguity." *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 859 (5th Cir. 2014) (citations and internal quotations marks omitted).

F.3d 62, 71 (5th Cir. 2011) ("The 'Texas Constitution confers an exceptionally broad jury trial right upon litigants." *Giles*, 950 S.W.2d at 56. Nevertheless, the plaintiff still must show there is a material issue of fact about whether the insurer denied coverage despite an indication that coverage had become "reasonably clear" or the insurer acted unreasonably in failing to investigate."); *cf. United States Fire Ins. Co. v. Williams*, 955 S.W.2d 267, 268 (Tex. 1997) (when the summary judgment proof "conclusively establishe[s]" that there is "no more than a good faith dispute" between the parties concerning the insurer's liability, bad faith is not shown, the bad faith claim may be decided as a matter of law).

Further, the Texas Supreme Court's determination in *Nicolau* that insurer "State Farm denied the claim without a reasonable basis or without attempting to objectively determine whether its liability had become reasonably clear" was based on the facts in that case. *Nicolau*, 951 S.W.2d at 448. Specifically, this determination was based on the *Nicolau* court's reasoning that the insured had "*presented evidence from which a fact-finder could logically infer* that Haag's reports [regarding foundation damage to the insured's home] were not objectively prepared, that State Farm was aware of Haag's lack of objectivity [regarding foundation damage], and that State Farm's reliance on the reports was merely pretextual." *Id.* (emphasis added). Thus, the jury's finding in *Nicolau* or any other case that involved Haag is not evidence of Haag's bias in this case. It is also not evidence that State Auto was aware of any bias by Haag in this or others cases. The holding in *Hahn*, therefore, does not support this opinion by Grimm, which appears to be based on nothing more than speculation regarding State Auto's knowledge of Haag's involvement in other cases, or a finding that State Auto acted in bad faith in hiring Haag to investigate the roof damage to the Freehold Property or in denying Freehold's claim for additional damages. *See Thompson*, 664 F.3d at 68 (rejecting

argument by the insured, based on *Nicolau* and *State Farm Lloyds v. Hamilton*, 265 S.W.3d 725 (Tex. App.—Dallas 2008, pet denied), that physician expert was biased as a result of his history of working predominantly for insurers because there was no evidence the physician gave opinions predominantly favoring insurers or that the insurer knew that he had such a predisposition and explaining that "it would be far too demanding and impractical to require insurers to hire a different doctor for every medical record review or be faced with judicial review of its decision to rely upon a credentialed expert.").

Accordingly, any such determination in this case will turn on the fact finders' consideration of the specific facts and evidence, which may or may not include, for example, whether Haag's roofing damage reports were objectively prepared, whether State Auto was aware of any lack of objectivity on Haag's part in evaluating roofing damage claims or insureds' claims in general, and whether State Auto's reliance, if any, on Haag's roofing damage reports was a pretext for denying Freehold's claim for additional damages. Regardless, it is not an expert's role to opine whether State Auto acted in bad faith or breached its duty of good faith and fair dealing. *Simmons*, 963 S.W.2d at 44 (citing *Giles*, 950 S.W.2d at 56 and 81) (Enoch, J., concurring).

Defendants offer no explanation for their failure to comply with the deadline set by the court for expert disclosures and did not seek leave before supplementing their disclosures for Grimm with new opinions. Likewise, Defendants fail to explain why they could not have produced timely an expert report that included all of Grimm's opinions and the bases for those opinions. Defendants contend that Grimm's opinions do not fail simply because they are not scientific in nature. This, however, does not excuse Grimm from setting forth the bases for his opinions in his report; nor does it excuse Defendants from including the bases for his opinions in their Rule 26 disclosures.

Defendants appear to contend that the basis for all of Grimm's opinions is his experience as an insurance adjuster, but this is not readily apparent from either of Defendants' disclosures or Grimm's report.

Defendants' contention regarding their inability to obtain needed, unspecified key documents and depositions, including those for King and State Auto's corporate representative, before scheduling depositions for the parties' bad faith experts is also unpersuasive. This case had been pending almost two years by the time Defendants deposed King and State Auto's corporate representative. Defendants waited until May 11, 2018, three weeks before the June 4, 2018 discovery deadline that had been extended numerous times, to notice State Auto's corporate representative deposition for May 31, 2018, and subpoena key documents such as the Haag reports that go to the heart of their bad faith counterclaims for production at the deposition. While Defendants contend that they were unable to obtain these and other key documents or reach agreement regarding deposition dates, they waited until June 11, 2018, almost two years before filing motions to compel State Auto to produce documents and the corporate representative deposition of State Auto and did so only *after* Plaintiff moved on May 30, 2018, to quash the corporate representative deposition and sought a protective order. In support of their motion to compel production of the Haag reports, Defendants attached a copy of their May 11, 2018 subpoena duces tecum for State Auto's corporate representative and a Second Set of Request for Production that was not served by Defendants until June 4, 2018, the deadline for completion of discovery deadline, although the court's scheduling order makes clear that "[c]ompletion of discovery means that the discovery must be sent or done so that the answers or responses are produced on or before the deadline date herein set forth." Scheduling Order ¶ 5 (Doc. 52). Thus, nothing in the record

indicates that Defendants exercised diligence or sought production of the Haag reports or other unspecified key documents timely before the deadline for completing discovery.

By Defendants' admission, King's deposition was not taken until April 24, 2018. According to a November 2, 2017 motion by Plaintiff to quash a deficient deposition notice for King, Defendants noticed King's deposition to take place on November 28, 2017, when King was no longer unavailable due to Defendants' delay in confirming the deposition date. Plaintiff indicates in the motion to quash that it provided Defendants with six alternate dates during the first full week of December 2017 or, alternatively in January 2018, but Defendants would not agree to schedule the deposition in December. Ultimately, this motion was denied as moot because the court was notified that the parties had reached agreement regarding King's deposition, which did not take place until almost six months later, although Defendants were aware when they noticed King's deposition to take place on November 28, 2017, that the scheduling order in effect at that time included a November 15, 2017 deadline for a plaintiff's expert disclosures. *See* Scheduling Order ¶ 4 (Doc. 27). As noted, this deadline was extended to January 15, 2018, as a result of the parties' agreed motion on January 29, 2018, even though Defendants had not yet made any disclosures for any of their expert witnesses and did not do so for the first time until February 20, 2018, after the deadlines for disclosures by a plaintiff and defendant had expired. This indicates Defendants knowingly disregarded the court-imposed expert disclosure deadlines, and they were fully aware that they would not be able to meet the earlier or amended the expert disclosure deadlines, whether by a plaintiff, a defendant, or for purposes of rebuttal, when they agreed to depose King on April 24, 2018, and delayed until May 2018 before noticing State Auto's corporate representative deposition.

Defendants also blame State Auto for their untimely designation and expert disclosures for Grimm, arguing that they deposed State Auto's corporate representative on July 19, 2018, and August 2, 2018, but the corporate representative could not or would not answer several key questions. Defendants maintain that this required them to file a motion to compel and request for sanctions (Doc. 119), which at the time of Defendants' response to Plaintiff's motion to strike was pending before the newly assigned magistrate judge.[10] Aside from the issues already noted by the court regarding Defendants' failure to act diligently in pursuing discovery and disregarding the deadline for expert disclosures in the court's scheduling order, this argument fails for another reason.

Defendants' motion to compel (Doc. 119) was not filed until July 25, 2018, after the court-ordered June 11, 2018 deadline for filing motions to compel. While this motion to compel relates to the earlier motion filed by Defendants on June 11, 2018, to compel the deposition of State Auto's corporate representative, Defendants acknowledge in their July 25 motion to compel that their earlier motion to compel was resolved by agreement on June 8, 2018, pursuant to a Rule 29 Stipulation, to extend the discovery deadline until July 13, 2018, to depose King on certain corporate representative topics. As King's deposition as State Auto's corporate representative on these topics did not occur until July 19, 2018, five days after the agreed-upon discovery extension, the court assumes that it also occurred by agreement of the parties to further extend the discovery deadline. Defendants also acknowledge that the dispute in their July 25, 2018 motion involves the adequacy of King's responses to questions posed during her July 19, 2018 deposition, which took place after the June 4, 2018 discovery deadline by agreement of the parties.

---

[10] On December 20, 2018, the magistrate judge denied without prejudice this motion to compel by Defendants, as well as Plaintiff's related motion to quash and for protective order, and directed Defendants to notify the magistrate judge, within seven days of this court ruling on the parties' summary judgment motions, whether they intend to pursue another deposition of Plaintiff's corporate representative. *See* Order ¶ 3 (Doc. 256).

Every scheduling order entered in this case, however, makes clear that "[t]he court will not entertain any discovery dispute that is a result of an agreed extension." Scheduling Order ¶ 5 (Doc. 52). In addition, the court's scheduling order states that any discovery extension agreed to by the parties must "not affect the trial setting, dispositive motions deadline, or pretrial submission dates." *Id.* Federal Rule of Civil Procedure 29 similarly provides, "[u]nless the court orders otherwise, the parties may stipulate to take a deposition at a given time and modify "other procedures governing or limited discovery . . . but a stipulation extending the time for any form of discovery must have court approval if it would interfere with the time set for completing discovery, for hearing a motion, or for trial." Fed. R. Civ. P. 29(a)-(b). Defendants did not seek or obtain court approval before stipulating to an extension of the discovery deadline to depose State Auto's corporate representative and two of State Auto's experts, even though they knew at the time they agreed to extend the discovery deadline that it would affect other court-ordered deadlines. In fact, the parties' Stipulation was the basis for a joint motion filed only five days later on June 13, 2018 (Doc. 91), to extend the deadline for challenging experts, filing summary judgment motions, and to reset the trial to January 2019.[11] Because the parties knew their agreed-upon discovery extension would affect the trial setting, dispositive motions deadline, and pretrial submission dates, it also violated the court's scheduling order. Scheduling Order ¶ 5 (Doc. 52). Accordingly, this is not a valid basis for excusing Defendants' failure to make their expert disclosures for Grimm by the deadline set by the court; nor

---

[11] An electronic order entered by the magistrate judge on June 5, 2018 (Doc. 76), indicates that defense counsel had reported to the magistrate judge that Plaintiff's motions to quash depositions noticed by Defendants for its corporate representative and King as its corporate representative had been resolved by agreement. The order also indicates that the parties were ordered to file a joint status report or agreed order on these motions by June 8, 2018. Pursuant to this order, the parties filed a Joint Status Report (Doc. 78) on June 8, 2018, indicating agreement had been reached by Stipulation pursuant to Rule 29 to extend the discovery deadline to depose King as State Auto's corporate representative on certain topics. The parties, however, did not notify this court of their agreement to extend discovery or seek the court's approval to do so, although they knew this agreement would affect other deadlines in violation of Rule 29 and the court's scheduling order.

is it a valid basis for seeking relief from the court regarding the discovery dispute involving State Auto's corporate representative that arose from the parties' agreement to extend the discovery deadline. For these reasons, the court **vacates** the referral to the magistrate judge (Doc. 122) of Defendants' Second Motion to Compel the Deposition of Plaintiff's Corporate Representative and Motion for Sanctions (Doc. 119) and concludes that Defendants' explanation for failing to disclose timely Grimm's opinions is not supported by the record and does not excuse their failure to comply with the court's scheduling order. *See Barrett v. Atlantic Richfield Co.*, 95 F .3d 375, 380 (5th Cir. 1996) (noting that a party's explanation for its failure to comply with the district court's discovery order is a relevant factor in determining whether exclusion of expert testimony is appropriate).

### ii. Importance of Grimm's testimony

Defendants do not address the importance of Grimm's testimony. They, instead, contend merely that Grimm's extensive experience "will assist the jury in "decid[ing] the disputed issues of fact regarding the claims handling by State Auto in this case and allegations of bad faith" and provide the jury with insight "into the claims handling process and the insurance industry to determine whether State Auto's actions were committed in bad faith." Defs.' Resp. 14. Grimm, however, has not expressed any opinions regarding standards in the insurance industry for claims handling, and neither of Defendants' designations for Grimm indicates that Grimm would provide testimony in this regard. Defendants also maintain that Grimm's testimony is relevant and reliable based on a declaration by Grimm submitted in support of Defendants' response to Plaintiff's motion to strike, *id.* (citing Defs.' App. 840-44), but pages 840 through 844 were not included in the appendix filed by Defendants in support of their response or the courtesy hard copy they provided

to the court.[12]  Accordingly, the importance of Grimm's testimony is not readily apparent, particularly in light of the court's determination that most of the proposed testimony would either invade the court's or jury's province and has no stated basis.  Moreover, even important expert testimony cannot  "singularly override the enforcement of local rules and scheduling orders," and the importance of any proposed expert testimony underscores why it is always critical for the proponent of the testimony "to have timely designated" the expert witness.  *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 883 (5th Cir. 2004) (internal quotation marks omitted).

### iii. Potential Prejudice in Allowing Grimm's Testimony

Plaintiff contends, and the court agrees, that the potential prejudice in allowing Grimm's testimony was not cured simply because Plaintiff had the opportunity to depose him on May 16, 2018.[13]  Litigants in federal court are entitled to the disclosures that are required to be made under

---

[12] It is unclear what information was included in Grimm's declaration that Defendants intended to file in support of Plaintiff's motion to strike or exclude Grimm's testimony. In any event, the court, for the reasons already explained, would not have considered anything in a declaration or affidavit that was inconsistent with or added new information not previously disclosed in Grimm's expert report.

[13] Defendants contend that the technical failure to provide an amended or supplemental expert report for Grimm was harmless because Plaintiff was able to depose Grimm regarding his opinions, including those in their untimely supplemental designation for him. In the deposition pages cited by Defendants, Grimm indicated that he held the following opinions: (1) based on the reasons given by State Auto's corporate representative Sherry King ("King") for filing this action, State Auto's decision to file a declaratory judgment action and sue the insured was an act of bad faith; (2) because of King's decision to file suit and hire Haag, "I don't think [] King adjusted the claim. I think the adjustment of the claim was done by counsel and . . . that goes back to my statement of what I was saying before. The insurance company's duties, in my opinion, when investigating a claim is to do it fair and unbiased"; (3) based on his review of State Auto's file, "I don't believe that was State [Auto]'s  intent in this case because they did hire counsel 2 weeks after [the] date of loss, before they even had their expert's report. So that right there is, in my opinion, setting up an adversarial position" and "[f]ast forward, [State Auto's] using the same counsel and the same engineering firm or vendor that they used in investigating the claim to defend State [Auto] is clearly—it's a team effort, and in my opinion, indicates bias"; (4) if a jury finds that the amount paid by State Auto for Defendants' claim was not enough, this would be a violation of Chapter 542 of the Texas Insurance Code; (5) State Auto has a duty under Chapter 541 of the Texas Insurance Code to conduct a fair, reasonable, and unbiased investigation of Defendants' claim; (6) State Auto breached this duty in hiring Haag because Haag has been "proven in the past [in a court of law] to be biased. So the possibility of them being biased in this case exists"; (7) Haag's and Haag engineer Teasdale's involvement in this litigation as an advocate for State Auto, including Teasdale's attendance at depositions of the insured and their contractor and supplying questions to be asked of these persons, is an indication of Haag's or Teasdale's bias in this case or, at a minimum, shows that Teasdale is not a neutral party because Teasdale also prepared the engineering report that formed the basis for State Auto's claim

Rule 26(a)(2)(B), and it is not incumbent on the opposing party to investigate or ferret out that information as best as it can through deposition or other means of discovery at the expense of its client. Moreover, Defendants do not dispute that they provided Plaintiff with their supplemental disclosures for Grimm and a large number of documents on the eve of his deposition, which put Plaintiff at a further disadvantage. To accept Defendants' argument that inadequate, untimely, and last-minute disclosures are harmless whenever the opposing party has the opportunity to later depose the expert defeats the purpose of the rule and turns it on its head by shifting the burden to the opposing party to discover the expert's opinions and the bases for those opinions and allowing conclusion-only expert disclosures and reports such as Grimm's to be gap-filled via deposition. "[A] party should not have to hunt-and-peck through initial discovery disclosures" or a volume of documents produced on the eve of an expert's deposition "to try to piece together the opinions an expert witness will offer at trial or the basis for those opinions, and then see if [it] guessed correctly during the expert's deposition." *Nutmeg Group, LLC*, 2017 WL 4925503, at *5 (explaining that "[a]n after-the-fact deposition is not a substitute for what Rule 26(a)(2)(C) requires before-the-fact as far as an expert witness is concerned. The Rule requires a party to provide its opponent with a summary of what the expert will say and a summary of the main facts related to the expert's opinions. The receiving party then can take the proposed expert's deposition, *if it chooses to do so*, and probe the matters about which the disclosure put it on notice.") (emphasis added). This court

---

decision; (8) the letter from King to Defendants stating that State Auto had not changed its position despite receiving Defendants' engineer's report and King's deposition testimony as to whether she drafted the letter herself or edited it is evidence of State Auto's improper claims handling and improper investigation of Defendants' claim; (9) State Auto's reliance on Teasdale's report alone after receiving the report prepared by the engineer hired by Defendants is "questionable." Defs.' App. 1004-1007. Most of these opinions fall outside of Grimm's expert report and Defendants' initial disclosures, and some also exceed Defendants' supplemental disclosures. Moreover, Defendants' explanation as to why the information needed for most of these opinions was not available and could not have been provided to Grimm before the designation and expert report deadline in accordance with the court's scheduling orders is inadequate and unsupported.

agrees completely with the court's statements made in *Nutmeg Group*. Additionally, because Defendants' supplemental disclosures were made long after the expert designation deadline set by the court, State Auto was deprived of the opportunity to designate any rebuttal experts. Accordingly, the shortcomings in and untimeliness of Grimm's disclosures and report are neither harmless nor justified under the circumstances.

### iv. Availability of a Continuance to Cure Such Prejudice

Neither party addressed the availability for a continuance to cure the prejudice caused by the deficient and untimely expert disclosures and report for Grimm. Regardless, the court determines that a continuance would not cure the prejudice to State Auto, given the timing and inadequacies in the expert disclosures for Grimm and Grimm's report. It is apparent from Grimm's deposition that Plaintiff's counsel attempted to elicit and "nail down" all of Grimm's opinions, but the bases for all of those opinions is still not entirely clear, and, as indicated, it was not Plaintiff's responsibility to uncover all of the bases for his opinion, which should have been disclosed by Defendants beforehand. For this reason, the court does not believe that giving Plaintiff another opportunity to redepose Grimm without the benefit of full disclosure and a report would be useful.

Further, continuing expert designations deadlines at this late juncture to allow Defendants to further supplement Grimm's disclosures and allow Grimm to amend his expert report to include all of his opinions and the bases for those opinions and cure the deficiencies noted would prejudice Plaintiff. Instead of focusing on preparing for the upcoming trial, Plaintiff will have to address any new materials in Grimm's amended report and will likely request to conduct additional discovery. Out of fairness, the court would also have to allow Plaintiff to designate a rebuttal expert. All of this will disrupt the September 2019 trial date, which has already been continued a number of times as

a result of numerous prior requests for extensions of discovery and expert deadlines. Thus, further extension of these pretrial deadlines and the trial setting is not a viable option at this stage of the litigation. Moreover, as noted, Defendants never sought a continuance before filing their initial or supplemental disclosures after the expert designation deadline and have taken the position that their disclosures and the information in Grimm's report are adequate. Regardless, it is not incumbent on the court to give "ineffective litigants a second chance to develop their case." *Reliance Ins. Co. v. Louisiana Land and Exploration Co.*, 110 F.3d 253, 258 (5th Cir. 1997) ("affirming denial of request to modify scheduling order to cure deficiencies in expert's report and noting that "[d]istrict judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case.") (citing *Turnage v. General Electric Co.*, 953 F.2d 206, 208-09 (5th Cir. 1992)).

For all of these reasons, the court determines that none of the *Geiserman* factors weigh in favor of allowing Grimm to testify regarding the matters not disclosed as required under Rule 26 or the matters that were disclosed untimely after the court-imposed deadline for expert designations without leave of court. The court, therefore, **grants** Plaintiff's motion to strike Grimm's testimony under Rule 26.[14] Even if the court had determined that the deficiencies in Defendants' disclosures and Grimm's report were harmless or justified, Grimm's opinions would still not be admissible under Rule 702.

---

[14] In so ruling, the court does not consider evidence submitted by Plaintiff for the first time in support of its reply, as it was filed without leave of court, and it is generally improper for a party to introduce new evidence at the reply stage of a motion proceeding. *See* N.D. Tex. L. Civ. R. 7.2(e) (appendix may accompany a motion or response); *Lewis v. Southwest Airlines Co.*, No. 3:16-CV-1538-M, 2017 WL 879225, at *3 (N.D. Tex., 2017) (citing *Tovar v. United States*, 3:98-CV-1682-D, 2000 WL 425170, at *4, n. 8 (N.D. Tex. Apr. 18, 2000)). The reason for this is that the purpose of a reply brief is to rebut the nonmovant's response, not to introduce new evidence. *Id.* at 3. Moreover, "a reply brief that presents dispositive evidence by way of new affidavits and exhibits deprives the nonmovant of a meaningful opportunity to respond." *Springs Indus., Inc., v. Am. Motorists Ins. Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991). Accordingly, leave to file new evidence in support of a reply is rarely granted. *See Dethrow v. Parkland Health Hosp. System*, 204 F.R.D. 102, 104 (N.D. Tex. 2001). Thus, even if Plaintiff had sought leave to file new evidence in support of its reply, the request likely would have been denied.

### b.     Exclusion of Grimm's Testimony Under Rule 702

Based on Defendants' response to State Auto's motion to exclude Grimm's testimony under Rule 702, it appears that they are taking the position that his opinions are reliable because he has extensive experience as an insurance adjuster.  Grimm, however, fails to explain how that experience leads to any of the conclusions reached by him, why that experience is a sufficient basis for his conclusions, or how that experience is reliably applied to the facts in this case.  Fed. R. Evid. 702 advisory committee's notes (2000 amendments).  The factual bases for Grimm's opinions are also lacking.  Absent this information, Grimm's opinions are nothing more than *ipse dixit*,[15] as the court is left only with Grimm's conclusions and Defendants' assurances of reliability, which are insufficient under *Daubert*.  *General Elec. Co.*, 522 U.S. at 146; *Daubert*, 43 F.3d at 1319.

In addition, for the reasons already explained, most of Grimm's opinions, as expressed, impermissibly invade the province of the jury or the court.  While an expert witness is permitted to provide an opinion on an "ultimate issue" of fact under Rule 704, if he is qualified to do so, he is not permitted to make credibility determinations or offer legal conclusions. *Goodman v. Harris Cnty*., 571 F.3d 388, 399 (5th Cir. 2009) ("[A]n expert may never render conclusions of law . . . nor, may an expert go beyond the scope of his expertise in giving his opinion."); *Owen v. Kerr–McGee Corp*., 698 F.2d 236, 240 (5th Cir.1983) ("Fed. R. Evid. 704 abolished the per se rule against testimony regarding ultimate issues of fact [but] does not open the door to all opinions.").

As noted, any opinion by Grimm regarding State Auto's duties under the Policy or as an insurer under Texas law and whether State Auto breached those duties or acted in bad faith invades the province of the jury and the court. Even if the Policy is determined to be ambiguous, Defendants

---

[15] In plain English, "ipse dixit" means a doctrinaire but unproven statement.

do not explain why they believe that any of Grimm's proffered testimony would assist the trier of fact. Moreover, whether Haag was found to be biased in other cases has no relevance or bearing on this case unless the facts in this case show that Haag lacked objectivity in investigating the roof damage in this case, and State Auto was aware that it lacked objectivity. Grimm states in his expert report that State Auto hired Haag despite its knowledge that Haag and Teasdale had been involved in multiple cases in which they were found to be biased in favor of the insurer, but his report is devoid of any factual bases to support this opinion and, instead, relies solely on the holdings in other cases. Without any factual bases, this opinion, as well as Grimm's opinion that he found it hard to believe that State Auto was unaware that Haag have previously been found to be biased, amounts to nothing more than unsupported speculation and subjective belief.

Additionally, without substantiation, the probative value of any opinion that Haag must be biased because of its prior actions in other cases would be substantially outweighed by a danger of unfair prejudice, confusion of the issues, and misleading the jury. *See* Fed. R. Evid. 403. Because the court is not required to admit evidence based only on the *ipse dixit* of the expert and determines that Grimm's testimony is unreliable, the court **grants** Plaintiff's motion to exclude his testimony under Rule 702.

### 4. Treider and Coleman

Plaintiff contends that Treider's and Coleman's opinions regarding damage estimates are not relevant or reliable because both relied on incorrect data by using current higher price lists as opposed to 2014 price lists in calculating damages using an Xactimate software program. Plaintiff asserts that Coleman did not consider the contested damage to the Kroger section of the Property in calculating her original estimate, likely because she relied on an incorrect higher 2016 price list. In

addition, Plaintiff contends that Treider did not visit the Property until one year after the storm or rule out whether the damage observed to the Property roofs could have been caused by a storm that occurred outside of the policy period, and his reliance on Phelps's and Calaci's flawed opinions makes his opinions unreliable. Plaintiff notes that Coleman is a friend of Defendants and contends that Coleman's experience as a general contractor who specializes in submitting bids for repairs to commercial properties does not qualify her as an expert to assess the scope and cost of the storm damage to the Property because she does not know how to conduct scientific tests to determine the extent of suspected hail damage on commercial roofs. Plaintiff asserts that Coleman's varying estimates will confuse the jury.

Defendants respond that Treider's testimony is relevant to whether the April 3, 2014 storm damaged the "BURs and underlying decking"[16] of the Property roof(s) and cost to repair the Property. Defendants contend that Coleman's testimony is relevant, and she is qualified to testify regarding the cost to replace the BURs and underlying decking based on her Xactimate estimates and note that she is not being offered as an expert on causation. Defendants maintain that Plaintiff's contentions regarding inflated Xactimate estimates based on incorrect price lists, Coleman's relationship with Defendants, and the date(s) Treider visited the Property all go to the weight of their testimony, not admissibility. Defendants assert that the variance in Coleman's estimates is reasonable and not a basis for excluding her testimony, as the variance simply reflects an investigation that revealed different information and additional damage over time as Defendants' insurance claim progressed.

---

[16] "BURs" refers to built-up roofing. *See* Defs.' Resp. App. 857 (Doc. 217-4).

The court agrees that most of the matters raised by Plaintiff, including the varying estimates using Xactimate, go to the weight of Treider's and Coleman's testimony. Other district courts in this circuit have found that Xactimate is "the standard replacement cost estimating software used by adjusters in the insurance repair industry," and errors made by an expert in calculating or inputting data into a *Daubert*-compliant software program do not justify exclusion of the expert's testimony because any miscalculations or inaccuracies go to the weight of the expert's opinions, not its admissibility. *See Mahli, LLC v. Admiral Ins. Co.*, No. 1:14-CV-175-KS-MTP, 2015 WL 4915701, at *7 (S.D. Miss. Aug. 18, 2015) (citing cases). Plaintiff's contention regarding Coleman's qualifications to testify regarding causation is also mooted by Defendants' clarification that she is only being offered to testify regarding replacement cost.

Finally, Plaintiff does not cite to any testimony by Treider to show that he relied on Phelps's or Calaci's opinions, and neither his report nor his declaration that was submitted by Defendants in response to the motion to strike indicates that he relied on their opinions. Treider, instead, indicates only that he reviewed and considered Calaci's weather data, and it is common and acceptable for experts to rely on data developed by others if it is a kind ordinarily used by experts in that field. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."); *Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.") (citation omitted); *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1432 (5th Cir. 1989) (rejecting argument that physician or toxicologist's opinion lacked an adequate basis for not personally examining the decedent because "[a] personal examination of the person or object of the expert's testimony is not required under Fed. R. Evid. 703") (citations

omitted), and taking judicial notice that "the facts relied on by [the physician] [were] those usually considered by medical experts") (citation omitted). Accordingly, Plaintiff's motion to exclude the testimony of Treider and Coleman is **denied.**

## IV.    Conclusion

For the reasons explained, Defendants' Motion to Strike the Expert Testimony of Hallmark Roofing (Doc. 135) is **granted**; Defendants' Amended Motion to Strike the Expert Testimony of Timothy Marshall (Doc. 183) is **denied**; Defendants' Amended Motion to Strike Expert Testimony of Paul Nilles (Doc. 190) is **granted**; Plaintiff State Automobile Mutual Insurance Company's Amended Motion to Strike and/or Exclude the Expert Testimony of Matt Phelps, Rocco Calaci, Roger Grimm, Gary B. Treider, and Carolyn Coleman (Doc. 196) is **granted** with respect to Matt Phelps, Rocco Calaci, and Roger Grimm, and **denied** with respect to Gary B. Treider and Carolyn Coleman.

**It is so ordered** this 31st day of March, 2019.

Sam A. Lindsay
United States District Judge