IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **STATE AUTOMOBILE MUTUAL** | § | |
| **INSURANCE COMPANY,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:16-CV-2255-L** |
| | § | |
| **FREEHOLD MANAGEMENT, INC.;** | § | |
| **RETAIL PLAZA, INC.; and** | § | |
| **RPI DENTON CENTER, LTD.,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are Defendants' Motion for Reconsideration on the Admissibility of the Expert Testimony of Rocco Calaci (Doc. 321) and Motion for Reconsideration on the Admissibility of the Expert Testimony of Matthew Phelps (Doc. 324) (collectively, "Motions" or "Motions for Reconsideration") and Request for Hearing. After conducting a hearing on the Motions and considering the them, parties' briefs and arguments, the testimony of Mr. Calaci and Mr. Phelps, and the legal standard for Rule 702 witnesses, the court **denies** Defendants' Motion as to Mr. Calaci (Doc. 321) and **grants in part** Defendants' Motion as to Mr. Phelps (Doc. 324).

## I.      Background

### A.  State Auto initiates this action to resolve an insurance coverage dispute.

This case involves a commercial property insurance coverage dispute that arose between the parties to this case after a storm struck the Denton, Texas area on April 3, 2014. State Automobile Mutual Insurance Company ("Plaintiff" or "State Auto") originally brought this action, pursuant to 28 U. S. C. § 2201 and 28 U.S.C. §1332, against Defendants Freehold Management, Inc. ("Freehold") and Retail Plazas, Inc. ("Retail") seeking a declaratory judgment

regarding the parties' rights and obligations under an insurance policy ("Policy") and whether roof damage—alleged to have been sustained by the retail shopping center located at 500-1900 West University Drive, Denton, Texas (the "Property") as a result of the April 3, 2014 storm—was covered by the Policy. RPI Denton Center, Ltd. ("RPI") was subsequently allowed to join the action as a Defendant and Counterclaimant. The court refers collectively to Freehold, Retail, and RPI as "Defendants" or "Freehold."

In response to a claim submitted by Defendants under the Policy, State Auto paid Defendants $1,036,397.17 for repairs that have been made to the Property since the April 2014 storm. Disagreeing with State Auto's assessment of the Policy coverage and roof damage to the Kroger roof located in the shopping center, Defendants hired engineer Matt Phelps of APEC Engineering and Laboratory LLC to conduct an independent investigation of the roof damage. Based on an initial report prepared by Mr. Phelps on March 31, 2016, Defendants sought additional damages under the Policy to repair the Kroger roof.

This declaratory judgment action by State Auto followed on August 3, 2016. Defendants countersued for approximately $900,000, alleging that State Auto failed to make a proper claims decision on their request for additional damages, delayed adjusting this claim in bad faith, and has not fully paid Defendants for roofing repairs to the Property. Defendants now contend that a second report by Mr. Phelps in 2017 confirms that the Kroger roof, as well as the other remaining roofs at the Denton shopping center, sustained wind and hail damage as a result of the April 3, 2014 storm and need to be replaced rather than repaired.  Defendants also retained Rocco Calaci who provided a report regarding the weather conditions that existed on April 3, 2014, that he concluded "affected" the Property, and Mr. Phelps relied on Mr. Calaci's opinions in reaching his own opinions.

**B.  The Rule 702 testimony of Messrs. Calaci and Phelps is stricken as unreliable.**

The parties designated their respective experts in 2018. Docs. 37, 42, 58.  Mr. Phelps and Mr. Calaci are among the Rule 702 witnesses designated by Defendants (Docs. 42, 58) that State Auto moved to strike (Doc. 196).  Doc. 261.  The court excluded Mr. Phelps's and Mr. Calaci's testimony and opinions as unreliable.  The court excluded Mr. Calaci's opinions because the link between the data relied on by him and his conclusions were not sufficiently developed or explained in his report or his subsequent declaration. *See* Doc. 261 at 29-31.  Although he described in detail his data collection process and findings, the court determined that he did not sufficiently explain why the data he relied on supported his opinions and the conclusions in his report and declaration. Consequently, his opinions and conclusions were found to be unreliable under Federal Rule of Evidence 702. Having determined that Mr. Calaci's opinions were excludable on this ground, the court did not address in detail each argument raised by State Auto, except to note that some of its arguments regarding the sources of data relied on by Mr. Calaci went to the weight of his testimony rather than the admissibility of his opinions. The court similarly concluded that the analytical gap or link between the data relied on by Mr. Phelps and his conclusions was too great and not sufficiently explained.  The grounds relied on by State Auto in moving to strike the testimony of these experts and the court's reasoning for striking their testimony are set forth in more detail in the next two sections and the court's March 31, 2019 memorandum opinion and order (Doc. 261).

**1.  Mr. Calaci's testimony**

In his report, Mr. Calaci concluded that:

It is my professional opinion that the following meteorological events affected 500-1900 West University Drive, Denton[,] Texas on April 3, 2014:

1.  Hail up to 4.25 inches near 3:40PM CDT.

2. A second wave of hail moved over the property near 6:00PM CDT with hail sizes up to 2.0 inches. The hail fell intermittently between 6:00PM and 7:00PM CDT, April 3, 2014. After 6:15PM, the hail sizes dropped to less than 1 inch in diameter.

3. A tornado moved over the subject property near 6:02PM CDT. The tornado lasted for approximately 3 minutes.

Defs.' App. 35 (Doc. 328).[1]

State Auto moved to strike Mr. Calaci's opinions under Rule 702 and related legal authority on the grounds that he is not qualified to give the opinions offered, and his opinions are not reliable or relevant:

Rocco Calaci's testimony regarding the analysis of the meteorological conditions on April 3, 2014, as well as his analysis of the hail and wind conditions on said date fails to rise to the level required by *Daubert* or its progeny. Calaci's opinions are neither reliable nor relevant, and therefore fail both prongs in *Daubert*. Further, it is clear that Calaci's expertise on hail and wind analysis is far more limited than how Plaintiff presents Calaci's capability.

Calaci's report contains numerous generalizations and is based on mere speculation, which will not assist the jury in any way. For instance, Calaci's report refers to photographs of telephone poles that tilted due to alleged tornadic activity. *Appendix Ex. F, p. 551, 556* at 10, 15. These pictures contain no dates or explanations as to when this tornadic activity occurred, thus leading the reader to believe that the April 3, 2014 storm caused these telephone poles to tilt. However, at Calaci's deposition, he was presented with photographs showing the very telephone poles tilting as far back as 2013 on Google Maps, over one year before the alleged storm. *Appendix Ex. G, p. 572-573* at 31:23-33:1. Calaci could not provide an explanation as to why he did not conduct any research whatsoever to determine the reliability or the relevance of his observations, and instead argued that he found it to be compelling and worth citing to in his report. *Id.* This flagrant speculation on his part is simply not reliable or relevant to the case at hand and will not assist the trier of fact.

Moreover, Calaci utilized tests that are highly speculative to garner results that are highly subjective. Calaci admitted many of the tests he relied upon to assess weather conditions on the day of the incident can be inaccurate. For instance, during his deposition Calaci admitted that when scanning radar images through the height

---

[1] Defendants provided a hearing notebook to the court that contained some of the documents filed in support of their Motions for Reconsideration. Unlike the appendix that was filed in support of Defendants' Motion as to Mr. Calaci, the pages of the hearing notebook were not numbered sequentially.  As a result, there was some confusion during the hearing on Defendants' Motions as to which appendix pages and evidence the witnesses and counsel were referencing.

of storms, it is frequently the case that . . . [,] while there is hail in the atmosphere, the hail never actually touches the ground. *Id. Appendix Ex, G, p. 573* at 34:18-:21. In other words, Calaci admitted that the radar data he relied upon to state that hail hit the ground on the day of the incident is flawed and often yields inaccurate results. Similarly, while his report indicated that there was tornadic activity on the day of the storm by stating that there was presence of hook activity and wind sheer or gate-to-gate sheer, he conceded that the presence of hook activity, wind sheer, and gate-to-gate sheer does not actually indicate tornadic activity. *Appendix Ex. F, p. 551, 562, 564* at 10, 21, 23; *Appendix Ex. G, p. 573* at 33:2-:l6.

Finally, Calaci's testimony is not the product of reliable principles and testimony. Not only did Calaci rely on indicators that are not accurate, but he failed to conduct any sort of test to determine the potential or known rate of error. *Appendix Ex. G, p. 574* at 44:12-45:9. During his deposition, Calaci even admitted that "they're opinions, and depending on how you want to look at things, you could either decide for yourself and decide against yourself." *Id. Appendix Ex. G, p. 575* at 45:1-:3. In other words, Calaci admits that his report and the methodology he utilized is highly subjective, and therefore, not accurate. Calaci also admitted that he didn't even know how to conduct a test to determine the possible rate of error, as he stated that, "I don't know how I would go about doing it." *Id. Appendix Ex. G, p. 575* at 45:8-:9. Because Calaci relied on subjective, unreliable methods, his testimony will not assist the jury in any way, and therefore, his testimony should be excluded.

Pl.'s Br. Mot. to Strike 12-14 (Doc. 197).

Defendants disagreed with Plaintiff's criticism of Mr. Calaci's testimony and contended that State Auto's Motion to Strike his testimony as unreliable was based on "a fundamental misunderstanding of [his] methodology," and its argument regarding the "known rate of error" was a "red herring" because the "'Daubert factors' do not always have to be met." Defs.' Resp. 13 (Doc. 216). In this regard, Defendants contended:

State Auto complains that Calaci used generalizations and highly speculative tests to come to his opinion. These arguments, however, show a fundamental misunderstanding on Calaci's methods. State Auto initially claims that Calaci used tests that are highly speculative to gather results that are highly subjective. This argument fails for multiple reasons. State Auto can point to no "test" that Calaci used. Instead, it attacks the sources of data relied upon, claiming that certain sources, like radar, are unreliable. This goes to the weight of Calaci's testimony, not the admissibility. *See Nielsen v. Alcon, Inc*., No. 3-08-CV-2239-B-BD, 2011 WL 4529762 at *7 (N.D. Tex. Sept. 2, 2011), *rec. adopted*, 2011 WL 4529674 (N.D. Tex. Sept. 30, 2011) ("However, both objections attack the bases

and sources of the experts' opinions, which go to the weight, not the admissibility, of their testimony")[.]

State Auto's complaints about the reliability of radar and tornadic indicators (hook activity, wind shear, and gate to gate sheer) assume that he relied upon only those items in a vacuum and are based upon a fundamental misunderstanding of Calaci's methodology. (Appx 806-808 ¶16) As discussed in his declaration, Calaci reviewed data from multiple sources and synthesized the data to come to his conclusions. (Appx 806-808 ¶12) He didn't solely use the radar or look for the tornadic indicators. (Appx 806-808 ¶16)

State Auto alleges Calaci's testimony is not the product of reliable principles and testimony because Calaci did not conduct any sort of test to determine the potential or known rate of error. As discussed above, the "known rate of error" argument is a red herring, as the "Daubert factors" do not always have to be met.

Defs.' Resp. to Pl.'s Mot. to Strike 12-13 (Doc. 216).  In support of their response to Plaintiff's

Motion to Strike, Defendants provided a declaration of Mr. Calaci in which he similarly concluded

in paragraph 13 that:

As a result of my analysis of the data and based upon my education, training, and experience, it is my opinion within a reasonable degree of Meteorological certainty that the property located at 500-1900 University Drive was affected by hail of up to 4.25 inches in diameter and strong winds from tornadic activity on April 3, 2014.

Defs.' App. 4 (Doc. 328).

The court reasoned as follows in granting Plaintiff's Motion to Strike Mr. Calaci's

testimony as unreliable:

After reviewing Calaci's report, the declaration he submitted in support of Defendants' response to the motion to strike, and the deposition testimony cited by Plaintiff, the court determines that Calaci's extensive experience in the area of meteorology and, in particular, forensic meteorology and investigations of storm activity, qualifies him to testify regarding the weather conditions that existed on April 3, 2014, near the Property. Additionally, for the same reasons discussed with respect to Phelps, the court determines that Plaintiff's contentions regarding the data or sources of the data relied on by Calaci and the effect, if any, on his conclusions do not make his opinions or methodology unreliable. *See 14.38 Acres of Land*, 80 F.3d at 1077 (explaining that questions regarding the bases or sources of an expert opinion generally go toward the weight of the testimony, as opposed to its admissibility, and are properly left for the jury to consider) (citation omitted).

**Memorandum Opinion and Order – Page 6**

The court, however, has . . . concerns because the link between the data relied on by Calaci and his conclusions is not sufficiently developed or explained in his report or his declaration. . . . Calaci describes in detail his data collection process and findings, but he does not sufficiently explain why the data he relies on support[s] his opinion and the various conclusions included in his report and declaration. To be reliable and helpful to a trier of fact, the[re must be a] link between the conclusions and opinions expressed by Calaci [and the facts or data relied on by him]. As this was [not] done, Calaci's opinions are not reliable, even if the court takes into account his declaration, which was submitted by Defendants in an attempt to cure the deficiencies in his report. As there remains "too great an analytical gap between the [basis for Calaci's expert opinion] and the opinion proffered," *Joiner*, 522 U.S. at 146, the court **grants** Plaintiff's motion to strike his testimony and **excludes** it for all purposes as unreliable.

Doc. 261 at 29-31.[2]

### 2.  Mr. Phelps's testimony

Mr. Phelps was retained by Defendants to inspect the built-up gravel roofs of the Property to determine whether they sustained hail or wind damage on April 3, 2014. Mr. Phelps concluded that it was more likely than not that the damage sustained to the roofs was caused by the April 3, 2014 storm, which was accompanied by high winds and hail. He also concluded that the extent of the damage to the roofs necessitated their replacement.

State Auto moved to strike Mr. Phelps's opinions under Rule 702 and related legal authority on the grounds that he is not qualified to give the opinions offered, and his opinions are not reliable or relevant. State Auto argued that Mr. Phelps's testimony would not assist the jury because it is based on inaccurate data and unreliable methodology that is not properly applied to the facts of this case.  Plaintiff contended that the data relied on by Mr. Phelps is not accurate because he did not visit the Property until almost two years after the April 3, 2014 storm, and his

---

[2] The additional bracketed material in these sentences corrects typographical errors contained in the court's March 31, 2019 Memorandum Opinion and Order (Doc. 261): "To be reliable and helpful to a trier of fact, the[re must be a] link between the conclusions and opinions expressed by Calaci [and the facts or data relied on by him]. As this was [not] done, Calaci's opinions are not reliable, even if the court takes into account his declaration, which was submitted by Defendants in an attempt to cure the deficiencies in his report."

findings are based on his observations at the Property and of meteorological data collected from a nearby airport that is approximately four miles from the Property. For this reason, Plaintiff contended, based on the testimony of Justin Kestner, who Plaintiff sought leave to designate as an expert witness on June 6, 2018, that Mr. Phelps's testimony is "[c]onfusing, if not misleading" because Mr. Kestner would have collected data in a different manner and from a different area taking into account other factors such as the reduced roof height of the Property. Pl.'s Mot. to Strike Br. 7 (Doc. 197).

Regarding reliability, Plaintiff argued that Mr. Phelps's testimony should be excluded because he acknowledged in his deposition that certain aspects of his methodology (weather data and other data collected, visual assessment of the flat roof, photographic evidence) have not been tested, have no known rate of error, and are not generally accepted, and his expert reports are not peer-reviewed. In addition, Plaintiff asserted that Mr. Phelps relied upon and extrapolated data using a vacuum uplift test known as ASTM E907, which has not been the industry standard since 2013 and is less stringent than the current industry standard FM 1-52 test. Plaintiff further asserted that, according to Mr. Kestner, Mr. Phelps incorrectly cited and labeled tables and graphs in his report, which could confuse the jury.

Plaintiff also argued that certain statements by Mr. Phelps are conclusory and unsupported by evidence and, therefore, his testimony should be excluded for the same reason it was excluded in *Hahn v. United Fire and Cas. Co.*, No. 6:15-CV-218, 2017 WL 1289024 (W.D. Tex. Apr. 6, 2017). Plaintiff contended that, although the term "damage" was defined differently in the insurance policy in *Hahn*, the district court's reasoning in that case should apply here because, like his prior testimony in *Hahn*, Mr. Phelps's methodology does not account for the roofing material or the ability of the roofs to withstand the amount of force described.

Plaintiff noted the various bases for Mr. Phelps's opinion but took issue with his conclusion that "it is more likely than not that the capacity of the entire roof membrane has been reduced, and the membrane is no longer compliant with present building codes." Pl.'s Mot. to Strike Br. 10-11 (Doc. 197). Plaintiff argued that there is no evidence in his report that supports this conclusion. Plaintiff contended that Mr. Phelps is unable to "opine that the wind and hail measured nearby was also present at the Property at issue," and he never explained what current building codes require.

Defendants countered that Mr. Phelps's testimony is admissible under Rule 702 because his opinions are relevant and based on reliable methodology, and he is qualified to make the opinions offered. Defendants argued that *Hahn* is inapplicable because the district court's ruling in that case turned on a policy provision excluding coverage for cosmetic damage that does not exist in this case.

The court addressed at length the parties' arguments in ruling on Plaintiff's Motion to Strike.[3]  It determined that Mr. Phelps is qualified to give the opinions offered, but it excluded his opinions as unreliable because the link between the facts and data relied on by him and the conclusions made by him in support of his opinions were not sufficiently developed or explained in his report or the declaration that he submitted for the first time in response to Plaintiff's Motion to Strike. The court noted that Mr. Phelps's description of the data and information that he collected and the steps he took in assessing the damage to the Property roofs in his report and declaration were fairly detailed, but it determined that he did not explain why this data, information, his observations, or his investigation supports his opinion and the various conclusions included in his report and declaration.

---

[3] *See* Doc. 261 at 21-29. It is not necessary for purposes of ruling on Defendants' current Motions to set forth all of the court's prior rulings as to Mr. Phelps, which are included in its March 31, 2019 memorandum opinion and order.

By way of example, the court noted that the following conclusions by Mr. Phelps were some of the opinions that the court had determined were not sufficiently tied to the data or adequately explained: (1) "It is my professional engineering opinion that on April 3, 2014 the buffeting winds at the Denton Center contained sufficient speed to cause wind damage to the built-up gravel roofs"; (2) "My findings were [consistent] with storm damage that did not result from natural weathering"; (3) "It is clear in the damage threshold table that the subject storm['s] hail energy exceeded the damage threshold for the roofing systems as the subject property"; (4) "I tested the samples taken from the inspection openings and found the evidence was consistent with storm damage and not with natural weathering"; (5) "In my professional engineering opinion many of the delaminated samples showed interplay crush from hail impacts"; and (6) "[I]t is my opinion that hail and buffeting winds on April3, 2014 damaged the field and underlying decking of the built-up gravel roofs at the Denton Center," and "[b]ecause of the extent of this wind and hail damage, the current moisture readings, and the possibility of future leaks and further damage, the built-up gravel roofs and the underlying decking at Denton Center need to be replaced." Doc. 261 at 28-29 (citing Defs.' Resp. App. 6-10, 12 (Phelps Decl. ¶¶ 15, 16, 24, 32, 36, 41).

The court determined that, even considering Mr. Phelps's declaration, which was submitted by Defendants in an attempt to cure the deficiencies in his report, there remained "simply too great an analytical gap between the [bases for Mr. Phelps's expert opinion] and the opinion proffered." *Joiner*, 522 U.S. at 146. The court, therefore, concluded that Mr. Phelps's opinions were not reliable and granted Plaintiff's Motion to Strike his testimony.

### C. The court denies the parties' summary judgment motions and schedules a *Daubert* hearing to address unresolved issues regarding the remaining experts.

Also pending when the court ruled on the parties' motions to strike expert testimony were the parties' motions for summary judgment. On August 22, 2019, the court denied the parties'

cross-motions for summary judgment after determining that genuine disputes of material fact existed.  It also scheduled a hearing to address before trial some additional outstanding expert issues.  At Plaintiff's request, which was not opposed by Defendants, this hearing was continued to September 24, 2019.

### D. Defendants moves for reconsideration of the rulings excluding the testimony of Messrs. Phelps and Calaci.

Before the hearing scheduled for September 24, 2019 was held, Defendants requested that the court reconsider its rulings as to Mr. Calaci and Mr. Phelps.  Defendants also requested that Mr. Calaci and Mr. Phelps be allowed to provide testimony at the hearing.  Specifically, on Friday, September 20, 2019, Defendants filed their Motions for Reconsideration and requested that the court conduct a hearing to address any concerns it may have regarding the admissibility of Mr. Phelps's and Mr. Calaci's testimony under Federal Rule of Evidence 702.  Defendants' six-month delay in seeking reconsideration and the voluminous nature of materials they filed in conjunction with their Motions threatened to significantly delay the trial of this already old case. The court, therefore, entered an order requiring them to show cause why they and their counsel should not be sanctioned for unnecessarily causing the trial to be delayed without good cause. Doc. 330.  After hearing from Defendants, the court determined that the timing of their Motions for Reconsideration was not due to malice, bad faith, or ill motive, but the Motions and the COVID Pandemic that hit a few months later did cause the trial of this case to be delayed for quite some time until after the undersigned was able to clear its backlog of criminal trials created by the Pandemic, including a complex, multi-defendant healthcare fraud trial that finally concluded on November 17, 2023. Doc. 334.

Defendants contend in their Motions that, because the court struck the testimony of these two expert witnesses as unreliable for reasons other than those raised in Plaintiff's Motion to

Strike, they did not have an opportunity to address the court's concern regarding the analytical gaps between these witnesses' bases and opinions. In support of their Motions for Reconsideration, Defendants submitted forty-one pages of briefing and slightly more than 2,000 pages of evidence, most of which was filed in connection with their Motion as to Mr. Phelps, whose opinions rely to some extent on the opinions of Mr. Calaci.[4]  On March 30, 2021, the court granted the Motions (Docs. 321, 324), but only to the extent that it agreed at that time to conduct a hearing before commencement of the trial for the purpose of revisiting its opinion regarding the admissibility of Mr. Phelps's and Mr. Calaci's testimony under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Incorporated*, 509 U.S. 579, 589 (1992), to determine whether the ruling as to these witnesses should be modified.  *See* Doc. 344.

**E.   An evidentiary hearing on the Motions for Reconsideration is held.**

On August 11, 2022, the court conducted a hearing on the Motions for Reconsideration. Defendants presented the testimony of Mr. Phelps and Mr. Calaci, and Plaintiff was allowed to cross-examine both witnesses.[5] Defendants (and Plaintiff) were given a chance to address and put on evidence relevant to the specific reasons that the court previously found Mr. Phelps's and Mr. Calaci's opinions to be unreliable.  Both parties were also allowed to explore and put on evidence and argument regarding the experts' qualifications and the reliability of their testimony with respect to methodology and facts underlying their opinions. In other words, the parties' presentations with respect to these potential Rule 702 witnesses were not limited by the court as far as the areas they chose to explore and develop.  This is so even though the undersigned indicated in its March 30, 2021 order that the focus of this hearing would be the reliability of Mr.

---

[4] Together, the parties filed approximately 3,000 pages of materials in connection with their original motions to strike and exclude experts.

[5] Defense counsel was offered the opportunity to recross-examine the witnesses but elected not to do so.

Phelps's and Mr. Calaci's opinions and, more specifically, the link between the facts and data relied on by these witnesses, and the conclusions made by them in support of their opinions. At the end of the hearing, the court advised that a ruling on the Motions would follow in a subsequent order.

## II.     Legal Standard Applicable to Defendants' Motions for Reconsideration

In a diversity case, the admissibility of evidence is a procedural issue governed by federal law. *See Reed v. General Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985). Federal Rule of Evidence 702, as amended on December 1, 2023, governs the admissibility of expert testimony and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial court acts as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge" that is non-scientific in nature. *Kumho Tire Co. v. Carmichael*, 526 U.S.

137, 141 (1999).[6] In its gatekeeping role, the court determines the admissibility of expert testimony based on Rule 702, *Daubert*, and its progeny.[7]

"The court may admit proffered expert testimony only if the proponent . . . demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *E.E.O.C. v. S & B Indus., Inc.*, No. 3:15-CV-641-D, 2017 WL 345641, at *2 (N.D. Tex. Jan, 24, 2017) (citing *Kumho Tire Co.*, 526 U.S. at 147) (internal quotation marks omitted). The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012); Fed. R. Evid. 702 advisory committee's notes (2023 amendments). The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turn[] upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted).

To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Fed. R. Evid.

---

[6] In *Kumho Tire*, the Supreme Court resolved a split among the circuits and held that *Daubert*'s "gatekeeping" function applied to all expert opinion testimony based on specialized knowledge, not merely scientific expert testimony. Before *Kumho Tire*, the Fifth Circuit had held that Daubert applies to expert testimony based on engineering principles and practical experience. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir.1997).

[7] The amendments to Federal Rule of Evidence 702, effective December 1, 2000, essentially codify *Daubert* and *Kumho Tire*. The Advisory Committee's note to Rule 702 states that the determination of whether an expert's opinions are reliable if based upon sufficient facts or data calls for a "quantitative rather than qualitative analysis." In addressing this issue, the "question is whether the expert considered enough information to make the proffered opinion reliable. . . . The expert must base [his or her] opinion on at least the amount of data that a reliable methodology demands." 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268 (2d ed. 1987). Further, in reviewing a *Daubert* challenge, the court makes no credibility determinations; it only decides whether the threshold reliability standards have been satisfied. *See* Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

702(d) (requiring that an "expert has reliably applied the principles and methods to the facts of the case").

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Fed. R. Evid. 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Knight*, 482 F.3d at 355 (citation and internal quotation marks omitted). While "there is no requirement that an expert derive his opinion from firsthand knowledge or observation," *Deshotel v. Wal–Mart La., L.L.C.*, 850 F.3d 742, 746 (5th Cir. 2017) (internal quotation marks omitted), "[t]he reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted).

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018) (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)). "The proponent need not prove to the judge that the expert's testimony is correct, but [it] must prove by a preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). On the other hand, if "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable, as "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

When conducting a reliability analysis, courts consider the following non-exclusive list of factors:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Johnson*, 685 F.3d at 459 (internal quotation marks omitted). These factors are not definitive or exhaustive. In conducting the *Daubert* analysis, courts have discretion in determining which factors are most germane in light of the nature of the issue, the particular expertise, and the subject of the expert's testimony. *Daubert*, 509 U.S. at 593-95; *Kumho Tire Co.*, 526 U.S. at 142.

The Advisory Committee's Notes to Rule 702 contemplate that expert testimony may be based on experience, training, or both:

> Nothing in this amendment is intended to suggest that experience alone— or experience in conjunction with other knowledge, skill, training or education— may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *See, e.g., United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail); *Tassin v. Sears Roebuck*, 946 F. Supp. 1241, 1248 (M.D. La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches"). *See also Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

The Advisory Committee's Notes to Rule 702 further explain: "If the witness is relying solely or primarily on experience, then [he or she] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that

experience is reliably applied to the facts." *Id.* This is because the "trial court's gatekeeping function requires more than simply taking the expert's word for it" that the claimed basis supports the opinion. *Id.* (citation and internal quotation marks omitted); *Pipitone*, 288 F.3d at 245-47 (finding expert testimony reliable when the expert explained how his experience in the field led him to opine that an absence of contamination of some samples did not undermine his conclusion that the plaintiff's infection came from the same drug). Overall, the trial court must strive to ensure that the expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. The relevance and reliability of expert testimony turn upon the nature of the testimony and the purpose for which the proponent offers the testimony. *See, e.g., Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 195 (5th Cir. 2006) ("Of course, whether a proposed expert should be permitted to testify is case, and fact, specific.") (citing *Kumho Tire*, 526 U.S. at 150-51).

The district court's gatekeeping role is not meant "to serve as a replacement for the adversary system: Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Primrose Operating Co. v. National Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)); *accord Williams*, 898 F.3d at 624 (quoting *Daubert*, 509 U.S. at 596). Thus, the district court's "*Daubert* analysis should not supplant trial on the merits," *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) (citation omitted), and, *generally*, issues regarding the bases and sources of an expert's opinion that affect the weight of an opinion rather than the admissibility of the opinion "should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). The reasoning

**Memorandum Opinion and Order – Page 17**

behind this general rule is consistent with the Advisory Committee's Notes to Rule 702, which state:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

The court previously emphasized the word *generally* because the 2023 amendments to Rule 702 explain that issues pertaining to the sufficiency of facts or data relied upon by an expert and the sufficiency of an expert's bases do not always concern questions of weight that should be left to the jury:

> [M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a).
> . . . .
> The amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard. But it remains the case that other admissibility requirements in the rule (such as that the expert must be qualified[,] and the expert's testimony must help the trier of fact) are governed by the Rule 104(a) standard as well.
>
> Some challenges to expert testimony will raise matters of weight rather than admissibility even under the Rule 104(a) standard. For example, if the court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility. But this does not mean, as certain courts have held, that arguments about the sufficiency of an expert's basis always go to weight and not admissibility. Rather it means that once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence.

Fed. R. Evid. 702 advisory committee's notes (2023 amendments).

Additionally, the 2023 amendments to Rule 702 "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology," particularly when dealing with forensic expert testimony:

> Rule 702(d) has also been amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology. Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support.

> **The amendment is especially pertinent to the testimony of forensic experts in both criminal and civil cases. Forensic experts should avoid assertions of absolute or one hundred percent certainty—or to a reasonable degree of scientific certainty—if the methodology is subjective and thus potentially subject to error. In deciding whether to admit forensic expert testimony, the judge should (where possible) receive an estimate of the known or potential rate of error of the methodology employed, based (where appropriate) on studies that reflect how often the method produces accurate results. Expert opinion testimony regarding the weight of feature comparison evidence (i.e., evidence that a set of features corresponds between two examined items) must be limited to those inferences that can reasonably be drawn from a reliable application of the principles and methods. This amendment does not, however, bar testimony that comports with substantive law requiring opinions to a particular degree of certainty.**

> Nothing in the amendment imposes any new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702. Similarly, **nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The Rule 104(a) standard does not require perfection. On the other hand, it does not permit the expert to make claims that are unsupported by the expert's basis and methodology.**

*Id.* (emphasis added).

## III.   Discussion

### A.   The court's gatekeeping role is not limited to the parties' arguments.

Defendants take issue with the court's decision to exclude the testimony of Mr. Phelps and Mr. Calaci as unreliable for reasons other than the precise reliability grounds raised in Plaintiff's

Motion to Strike. Defendants contend that they should have been given an opportunity to address any concerns the court might have regarding the admissibility of these witnesses' opinion under Rule 702 before their testimony was excluded.   Defendants acknowledge that an expert's testimony must be reliable to be admissible. They appear, however, to argue, based on *Fair v. Allen*, 669 F.3d 601 (5th Cir. 2012), that State Auto, as the opposing party, had the initial burden of "expos[ing] that lack of reliability," and they were only required to respond to the precise arguments raised by State Auto. Defs.' Br. as to Phelps 3 (Doc. 327); Defs.' Br. as to Calaci 4 (Doc. 322) (quoting *Id.* at 607).   Defendants further assert that, because of briefing constraints under this district's Local Civil Rules, they were only able to address State Auto's specific arguments about Mr. Phelps, Mr. Calaci, and the four other experts that State Auto moved to exclude in a single motion.   Alternatively, for preservation and appellate purposes, Defendants assert that they are presenting an offer of proof under Federal Rule of Civil Evidence 103 of the facts, opinions, and data to which Mr. Phelps and Mr. Calaci would testify at trial.

Plaintiff responds that any new arguments Defendants attempt to offer at this late juncture are waived, unless Defendants can show good cause under Federal Rule of Civil Procedure 16(b) for the untimely filings that were submitted long after briefing on the parties' original expert motions was complete.[8] Plaintiff asserts that Defendants' explanation regarding briefing limitations lacks merit because they could have but failed to seek leave to exceed the page limitation. In addition, Plaintiff contends that Defendants' offer of proof is similarly unviable because offers of proof under Rule 103 do not give a party "*carte blanche* to introduce evidence on issues already decided on a motion to strike." Pl.'s Resp. 5 (citing *United States v. Bell*

---

[8] This argument by State Auto piggybacks off a comment included in the court's September 24, 2019 Show Cause Order (Doc. 330). As the court determines that Defendants' Motions fail on the merits, it is not necessary to address the parties' waiver argument or other procedural contentions.

**Memorandum Opinion and Order – Page 20**

*Petroleum Servs., Inc.*, 64 F.3d 202, 205 (5th Cir. 1995) ("A specific offer of evidence is not needed whe[n] an entire class of evidence has been in advance formally declared inadmissible by the trial court during preliminary argument or colloquy, for the court's ruling relates forward to all possible offers of such evidence and renders them needless.")). Finally, Plaintiff asserts that the arguments and evidence Defendants now rely on as to Mr. Phelps and Mr. Calaci fail on the merits and do not save their opinions from being unreliable.

Defendants reiterate in their reply that:

> Without notice of what aspects of the expert testimony need to be established, Freehold did not know what additional evidence to present. State Auto timely challenged Freehold's experts on certain grounds; Freehold timely responded to those arguments and convinced the [c]ourt that State Auto was incorrect. The [c]ourt then concluded—for reasons that Freehold did not have a reason or opportunity to address—that the experts were not reliable. Freehold had good cause to seek reconsideration of that ruling.

Defs.' Reply 4.

It is well established that the proponent of an expert's testimony bears the burden of proving that it meets the requirements of Rule 702. *Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 808 (5th Cir. 2018) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)). The Fifth Circuit's opinion in *Fair* and the language quoted by Defendants from this opinion do not suggest anything to the contrary with respect to the parties' respective burdens. *See Fair*, 669 F.3d at 607. Thus, as the proponents of Mr. Phelps's and Mr. Calaci's expert testimony, Defendants, not State Auto, had the burden of establishing that their proposed testimony satisfies Rule 702's requirements. *See Sandifer*, 907 F.3d at 808.

Moreover, Defendants' argument that the court was limited to addressing only the arguments briefed by the parties "ignores the mandate of *Daubert* that the district court must act as a gatekeeper." *See Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020) (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 294 (3d Cir. 2012)); *see also Bailon v.*

*Landstar Ranger, Inc.*, No. 3:16-CV-1022-L, 2020 WL 7046852, at *7 (N.D. Tex. Nov. 30, 2020) ("As part of its gatekeeping function, the court must ensure that expert testimony complies with Rule 702, *Daubert*, and *Kuhmo Tire . . .* even if an issue is not raised by a party.") (citing *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 & 201 (5th Cir. 2016)). Expert testimony "must be reliable at each and every step or else it is inadmissible." *Carlson*, 822 F.3d at 201 (quoting *Knight*, 482 F.3d at 355).

> In assessing the reliability of an expert's testimony, courts may consider:
>
> whether the expert's opinion was developed for purposes outside of litigation; whether there is an analytical link connecting the case facts with the expert's opinion; whether the expert "adequately accounted for obvious alternative explanations"; whether the expert used the same level of intellectual rigor that would be used in the field; and whether the expert's field of expertise is known to be reliable for the relevant type of opinion.

*Guzman v. State Farm Lloyds*, 456 F. Supp. 3d 846, 852 (S.D. Tex. 2020) (quoting Advisory Committee Notes to Fed. R. Evid. 702 (2000 Amendment)).   Thus, the court's analysis is not limited to the arguments asserted by the parties and, instead extends to "all aspects of an expert's testimony."   *Knight*, 482 F.3d at 355 (citation omitted).

As noted, a district court's inquiry under *Daubert* is flexible and need not take any specific form.   *Kumho Tire*, 526 U.S. at 142.   For this reason, courts have recognized "[t]he ability of a district court to evaluate expert testimony *sua sponte* and exclude such testimony whe[n] appropriate." *Accident Ins. Co. v. Classic Bldg. Design, LLC*, No. 2:11CV33KS-MTP, 2012 WL 3913090, at *14 (S.D. Miss. Sept. 7, 2012), *aff'd sub nom. by Accident Ins. Co. v. Classic Bldg. Design, L.L.C.*, 539 F. App'x 465, 2013 WL 4564846 (5th Cir. 2013) (quoting *Brenord v. Catholic Med. Ctr.*, 133 F. Supp. 2d 179, 188 n.4 (E.D.N.Y. 2001) (citing *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir.1998) ("[W]e have not required that the *Daubert* inquiry take any specific form and have, in fact, upheld a judge's *sua sponte* consideration on the admissibility of expert

testimony) (other citations omitted)); *see also Miller v. Baker Implement Co.*, 439 F.3d 407, 413 (8th Cir. 2006) (explaining that "*sua sponte* consideration of the admissibility of expert testimony is permissible so long as the [district] court has an adequate record on which to base its ruling") (citing *Kirstein*, 159 F.3d at 1067).

Further, a district court may, but is not required to hold a *Daubert* hearing, as long as it "perform[s] its gatekeeping function by performing some type of *Daubert* inquiry." *Carlson*, 822 F.3d at 201 (citation omitted). Other circuit courts have similarly held that no *Daubert* hearing is necessary in ruling on the admissibility of expert witnesses if the district court has before it an adequate record. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) ("In upholding the trial court's exclusion of Dr. Maris' testimony, we do not suggest that it would have been impossible for Cook to extract from Dr. Maris some admissible expert opinions; we simply find that Cook did not carry her substantial burden of doing so here. We recognize that a *Daubert* hearing before the trial court might have given Cook an additional opportunity to meet this burden, but . . . the trial court was under no obligation to hold one."); *Miller*, 439 F.3d at 412 (rejecting argument that the district court was required to conduct a *Daubert* hearing before ruling on motions to strike and excluding expert testimony on reliability grounds, noting that the plaintiff had an adequate opportunity to present his arguments through legal memorandum addressing *Daubert* and affidavits detailing expected testimony); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) (holding that district court did not abuse its discretion in not holding a *Daubert* hearing when the court already had before it expert reports, deposition testimony, and expert affidavit in response to summary judgment motions).

Here, approximately 3,000 pages of materials were filed in connection with the parties' original motions to strike and exclude experts, which included extensive briefing, expert reports, deposition transcripts, and expert declarations. Thus, Defendants had a sufficient opportunity to

present any arguments and evidence they wished the court to consider in ruling on State Auto's Motion to Strike the testimony of Mr. Phelps and Mr. Calaci, and the court had more than an ample record from which to analyze their expert opinions under Rule 702.  The court, therefore, disagrees with Defendants' contention that it was required to point out all of the deficiencies regarding these experts' opinions and give them an opportunity to cure the deficiencies through additional briefing, evidence, or a *Daubert* hearing before excluding Mr. Phelps's and Mr. Calaci's testimony as unreliable.  It is not incumbent on the court to educate litigants or give them multiple chances to lay the foundation for their experts under Rule 702. *See Reliance Ins. Co. v. Louisiana Land & Exploration Co.*, 110 F.3d 253, 257-58 (5th Cir. 1997). **In any event, now that Defendants have had the benefit of a *Daubert* hearing during which neither side was precluded from presenting any evidence and argument that they wished the court to consider, this argument by Defendants appears to be moot.**

Having considered all evidence and arguments of the parties on this matter, including prior evidence and arguments submitted in conjunction with State Auto's Motion to Strike, and the additional evidence and arguments presented at the August 22, 2022 hearing and in connection with the Motions for Reconsideration, the court **determines** for the reasons herein explained that Mr. Calaci's testimony and opinions should be stricken in their entirety, and Mr. Phelps's opinions should be stricken in part.

### B.  Defendants' Motion (Doc. 321) as to Mr. Calaci's testimony is denied.

#### 1.  Defendants' arguments are insufficient to meet their burden of establishing by a preponderance of the evidence that Mr. Calaci's testimony is reliable.

In addition to contending that the court erred in excluding Mr. Calaci's testimony based on reliability grounds not raised in State Auto's Motion to Strike, Defendants contend that Mr. Calaci's opinions should not be excluded under Rule 702 or *Daubert* because the court previously

determined that he is qualified to testify, his opinions are relevant, and his methodology is reliable. Defendants further contend that his "conclusions are supported by data with appropriate explanations," and there is no analytical gap between the data relied on and the opinions proffered by him because he "provided his methodology (that the [c]ourt found reliable) for coming to meteorological conclusions, and then he applied that methodology to the data received from the evidence in this case, including his own [site] visit and various weather reporting agencies." Defs.' Br. 5-6 (Doc. 322).

Defendants assert that, "[a]s with his hail opinion, [Mr.] Calaci corroborated [his tornadic activity] data with personal observations of people at the Denton Center." *Id.* at 16. As an example, Defendants contend that Mr. Calaci found and watched a YouTube video of the hail and extreme windstorm videoed by Tyler Short, a shopping center patron. Defendants, therefore, argue that Mr. "Calaci's opinions are not only reliable based upon his thorough analysis, but also because other data corroborates his opinions," including "[a]n Associated Press story about the April 3, 2014 storm in Denton," which Defendants contend "showed significant hail damage at the Denton Center from the storm." *Id.* at 10. In addition to this article, which includes a photograph of Pablo Loza, an employee of the El Matador restaurant, standing next to a vehicle with a broken windshield, Defendants point to evidence of trained weather spotters and the deposition and eyewitness testimony of Pablo Loza; Tyler Short; and Isaac Ebson, who worked in a store in the Denton Shopping Center.

### 2. Mr. Calaci's testimony is not reliable.

There are a number of issues with Defendants' argument. First and foremost, although State Auto previously argued in its Motion to Strike that Mr. Calaci's methodology is not reliable for several reasons, the court did not address this argument in excluding Mr. Calaci's testimony because it determined that his opinions were unreliable for other reasons. Thus, contrary to

Defendants' repeated assertion in their Motion (and during the hearing on their Motion), the court never expressly found Mr. Calaci's methodology to be reliable or "expressly approved" his methodology.  Likewise, contrary to an argument made by defense counsel during the hearing, the court never previously determined that the data relied on by Mr. Calaci was reliable.  *See* Tr. 67.[9] Instead, the court determined that State Auto's arguments regarding the sources and accuracy of Mr. Calaci's data went to the weight rather than the admissibility of his opinions and declined to exclude his testimony and opinions on this ground.  Doc. 261 at 30.

Now, after revisiting the parties' prior arguments regarding the reliability of Mr. Calaci's methodology, and hearing from Mr. Calaci himself, the court determines that Defendants have not met their burden of establishing by a preponderance of the evidence that his methodology is reliable.  Defendants correctly note in their Motion that: (1) "[t]he reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief"[10]; and (2) "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate."[11] There is no indication, however, whether Mr. Calaci's conclusions are grounded in any methods or procedures of science; nor is it evident whether his testimony is "the product of reliable principles and methods" and based on "a reliable application of the principles and methods to the facts of the case" as required by Rule 702.  *See* Fed. R. Evid. 702 (c)-(d).  Instead, he has merely expressed opinions based on data he collected without any reference to methodology.  Thus, it is not clear from his Rule 702 report, his deposition testimony, his declaration, or his hearing testimony whether his opinions are

---

[9] The pages of the hearing transcript referenced herein may change slightly after the transcript is finalized by the court reporter.

[10] Defs.' Br. 4 (Doc. 322) (quoting *Johnson*, 685 F.3d at 459).

[11] *Id.* at 4 (quoting *Daubert*, 509 U.S. at 595).

**Memorandum Opinion and Order – Page 26**

the product of him reliably applying any particular methodology that has been "generally accepted by the scientific community." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted).  It is also unclear whether Mr. Calaci arrived at his conclusions by applying professional standards that others in the forensic meteorology field would recognize as acceptable.  *See* Fed. R. Evid. 702 advisory committee notes (2000 amendments).

In his declaration, Mr. Calaci states that he currently provides forensic meteorologist services for a company named LRC, and that he was retained to perform a forensic meteorological investigation of the Property for the April 3, 2014 storm event.  He further states that:

> 10.  When LRC Services gets an assignment, it is **our regular course of business** for me to pull available data, radar, and photographs; to visit the site to confirm my assumptions about the [P]roperty; and to memorialize my opinion and conclusions about the site[-]specific weather events in a report . . . [that] is **created by me at or near the time I finish my analysis**.

> 11. LRC was retained to perform a forensic meteorological investigation of [the Property] for the April 3, 2014 storm event. I performed this investigation **in the methods as LRC's regular course of business**. **I created the report for the [P]roperty . . . at or near the time of my investigation**.  A true and correct copy of my report is attached as Exhibit 2.

> 12. In preparing the report, I used data from the following sources: Google Earth, National Weather Service (NWS), National Climatic Data Center (NCDC), Federal Meteorological Handbook, Number 11, Part D (FMH-11D), Severe Weather Database Inventory Tool (SWDI), Severe Weather Events Database (SED), Storm Prediction Center Mesoscale Discussion Archive, Archived date from WSR-88D (NEXRAD), Storm Prediction Center, Photos taken from the site visit on December 7, 2017 and various websites. **These sources are the kinds of databases and information sources that a forensic meteorologist normally relies upon to come to his or her conclusions.**

> . . . .

> 16. In reaching the conclusion that there was tornadic activity, I did not rely solely on hook echo, gage to gate shear, and wind shear. I also reviewed images from the TDRW from Dalla-Love Field and used surface observations from Denton Municipal Airport to reach my conclusions.

Defs.' Mot. App. 4-5 (Doc. 323) (emphasis added).  As indicated, Defendants relied on paragraphs 12 and 16 of Mr. Calaci's declaration in responding to State Auto's Motion to Strike.

While Mr. Calaci clarifies that the sources of information are those that forensic meteorologists normally rely on, he does not articulate the methodology or steps normally taken by meteorologists in conducting a forensic meteorological analysis.  Defendants similarly conflate sources of data with methodology.  Mr. Calaci's references to "regular course of business" and created "near the time" of his conclusions do not cure this deficiency. The inclusion of these words in his declaration might have some bearing on whether his report falls within the business records exception to the hearsay rule under Federal Rule of Evidence 803(6), but it has no relevance to whether his opinions are "the product of reliable principles and methods" and based on "a reliable application of the principles and methods to the facts of the case" as required by Rule 702. *See* Fed. R. Evid. 702 (c)-(d).  Likewise, the use of these words does not assist the court in assessing whether Mr. Calaci adhered to and applied a reliable method that has been generally accepted or recognized by the scientific community or his peers in the meteorology field for conducting a forensic analysis of a weather event at a particular site.  It simply suggests that LRC itself has a method or procedure that it normally follows in conducting and preparing forensic meteorological investigations and reports.

On page 7 of his report, Mr. Calaci states that "[t]he first step to determining the presence of severe weather[] is to examine the Base and Composite Reflectivity products," Defs.' App. 15, but he does not identify the remaining steps or the method from which the step is derived. He also does not indicate whether this step or the process as a whole is generally accepted and practiced in the field of forensic meteorology.

During the hearing on cross-examination, Mr. Calaci's testimony touched upon the standards and methods applicable to conducting a forensic meteorological site-specific analysis

Memorandum Opinion and Order – Page 28

like the one he did for the Property. *See, e.g.*, Tr. 55 ("Well, we have methods, so again, I would disagree with you. We have methods."). His testimony in this regard, however, was never developed, and Defendants opted not to ask him any additional questions on re-direct. As a result, the court has only Mr. Calaci's conclusions and the data upon which he relied. Without more, this information does not assist the court in determining whether Mr. Calaci's testimony is "the product of reliable principles and methods," and whether his opinions reflect "a reliable application of the principles and methods to the facts of this case." Fed. R. Evid. 702; *see also Smith v. Chrysler Group, LLC*, 909 F.3d 744, 749 (5th Cir. 2018) (affirming exclusion of expert testimony and conclusory opinion because the expert did "not explain his methodology for reaching his conclusion, leaving the district court to guess at how he applied the newly produced evidence to form his new conclusion.")

> Moreover, the court has no information from which it can ascertain:
>
> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Johnson*, 685 F.3d at 459 (internal quotation marks omitted). While these factors are not definitive or exhaustive, and the reliability inquiry under Rule 702, *Daubert*, and *Kumho Tire* is flexible, all that has been presented here for the court's consideration in evaluating the reliability of Mr. Calaci's testimony is his opinions and the data upon which he relied. Without a discernible reliable methodology or verifiable explanation of how he formed each opinion based on the data relied upon, his opinions amount to little more than *ipse dixit*. *See Joiner*, 522 U.S. at 146; *Black v. Food Lion, Inc.*, 171 F.3d 308, 313-14 (5th Cir. 1999) (citing *Joiner* and reasoning: "The magistrate judge either substituted his own standards of reliability for those in *Daubert*, or he confused the *Daubert* analysis by adopting an excessive level of generality in his gatekeeping inquiry. . . .The

court's task was to determine whether Dr. Reyna's methodology tied the fall at Food Lion by some specific train of medical evidence to Black's development of fibromyalgia.").

Further, given the admittedly subjective nature of Mr. Calaci's testimony, the admonition against forensic experts making "assertions of absolute or one hundred percent certainty" is particularly relevant here in light of the 2023 amendments to Rule 702.  Fed. R. Evid. 702 advisory committee's notes (2023 amendments). During the hearing, Mr. Calaci also contradicted himself a number of times, and his testimony was circular, nonresponsive, and difficult to follow.  He acknowledged that there was no certification for forensic meteorologists and that "[n]othing is absolute," but he expressed the opinion on more than one occasion that "I have a high degree of meteorological confidence that my analysis is correct." Tr. 61; *see also* Tr. 41, 48.

On cross-examination, he acknowledged that "weather is peculiar and that what happens in very close proximity can be very, very, different" such that, for example, hail could strike one car in a parking lot but not others.  Tr. 44-45, 48. He attempted to downplay this, however, by describing counsel's example as a "generalization" while at the same time refusing to concede, without elucidation, that he too was making generalizations by opining that hail struck the Property or affected it.  *Id.* At the same time, Mr. Calaci contradicted himself by admitting, on one hand, that he could not say how hail may have fallen or struck the Property on the day in question, while, on the other hand, insisting that he had provided a weather analysis "for that specific [P]roperty" of "what happened at that time at that place." Tr. 48-49.

He maintained that his opinions did not amount to generalizations because he was "making a site[-]specific analysis, not generalizations." Tr. 45. He testified that his opinions are site-specific as opposed to generalizations because he relied on "data collected by the National Weather Service" and the Federal Meteorological Handbook. Tr. 44-45, 48. He even went as far to say, based on this data, that he had "a *high degree of meteorological certainty* that those [weather]

events were what was affecting the ground" where the Property was located.  Tr. 41, 44 (emphasis added).  Unexplained, though, was the issue of why it was acceptable for him to rely on the same type of data in conducting a site-specific forensic analysis as that frequently used by the National Weather Service and Department of Defense in *forecasting* future weather, given his prior deposition testimony that forecasts are based on National Weather Service information, which applies to a broad area such as the Dallas-Fort Worth area, not specific sites.  Defs.' App. 100 (Doc. 323).

Often, the sources of data go to the weight of an expert's testimony, but this issue went to the heart of his testimony given the lack of information regarding the appropriate methodology for conducting a site-specific forensic weather analysis. Despite the amount of time spent during the hearing discussing the distinctions between forecasting future weather events, which Mr. Calaci conceded were prone to error, and forensic analysis of past weather events, he was unable to identify any standard of scientific scrutiny for determining the accuracy of his forensic opinions. Tr. 52-53.  In addition, he was unable to adequately explain why he believed his opinions and site-specific forensic weather analysis for the Property had a much higher degree of accuracy than forecasting.  *Id.*  He instead continued to refer throughout the hearing to forecasting and the data used in forecasting.

The certainty with which Mr. Calaci expressed his opinions during the hearing was also in direct contrast to the testimony he gave in his deposition.  When asked what the rate of error was in his field with respect to the opinions he was providing in this case, Mr. Calaci initially appeared to not understand what was meant by this question.  He then admitted that he had no idea how he would go about calculating the rate of error, and that his conclusions were nothing more than opinions that could either be accepted or rejected depending on how one wants to look at things:

Q: What—if you know, what is the rate of error in your field, as far as the opinions that you're giving in this case?

A: Can you explain that for me please, sir?

Q: Yeah. Obviously[,] you can't be 100 percent correct in your opinions all the time, correct?

A: I agree with that.

Q: Okay. So there is frequently an error rate. Do you know what the error rate is in the opinions you're providing in this case?
. . . .
A: I've never tried to calculate that[] because as you said, they're opinions, and depending on how you want to look at things, you could either decide for yourself and decide against yourself.

Q: Okay. So you've never measured that, correct?

A: Correct. It would be tough to figure out.

Q: But you've never made that attempt, correct?

A: Correct. Because I don't know how I would go about doing it.

Defs.' App. 120-21 (Doc. 323).

This testimony by Mr. Calaci not only underscores the admittedly subjective nature of his opinions and lack of evidence regarding the known or potential rate of error of the unexplained methodology used by him, it also undermines and contradicts his hearing testimony that he has a "high degree of meteorological confidence that [his] analysis" and conclusions are "correct." Tr. 61; *see also* Defs.' App. 26-27 (Calaci Report concluding from data that there was a "100% probability of hail and 100% probability of severe hail," from which Mr. Calaci further concluded that this "prov[ed]" that the Property "was affected by hail sizes up to 4.25 inches near 3:42PM CDT and with a second wave of hail starting near 6:00PM and lasting for approximately 60 minutes."). Additionally, the high level of confidence expressed by him regarding the accuracy of his opinions is inconsistent with the 2023 commentary to Rule 702, which cautions against forensic

experts making "assertions of absolute or one hundred percent certainty or a reasonable degree of scientific certainty" when, as here, expert opinions or the bases for opinions are subjective and "thus potentially subject to error." *See* Fed. R. Evid. 702 advisory committee's notes (2023 amendments).

While the 2023 amendments to Rule 702 clarify that the Rule 104(a) standard does not require perfection, they also make clear that this standard does not allow a Rule 702 expert witness to "make claims that are unsupported by the expert's basis and methodology." During the hearing, Mr. Calaci talked about the data and data sources he relied upon and the conclusions he reached from such data. Conspicuously absent, however, was an explanation of why he believed the data supported his conclusions.

Defendants attempted to shore up Mr. Calaci's testimony by contending that it is corroborated by the eyewitness testimony of Pablo Loza, Isaac Ebson, and Tyler Short, including Mr. Short's YouTube video. Mr. Calaci's report and declaration, however, do not reference these individuals or their eyewitness accounts. During the hearing on direct examination, Mr. Calaci was questioned about the photograph depicting Mr. Loza standing next to a vehicle in a parking lot, but there is no indication that Mr. Calaci previously relied on this photograph or news article in reaching his opinions. Defendants' counsel nevertheless asked Mr. Calaci whether the damage to the windshield depicted in the photograph was consistent with hail damage and whether "all those [are] the basis for your opinion that 4.25-inch hail struck the Denton [Shopping] Center at approximately 3:40 p.m. on April 3, 2014, to which he responded: "Correct. For up to 4.25." Tr. 26.

On cross-examination, though, Mr. Calaci clarified that "what happened on the ground or how people react is something that I have no control over and doesn't play into my analysis of the weather conditions" or analysis. Tr. 50. Similarly, when asked whether anyone "from the site gave

news, interviews, statements to the car insurance companies, statements to [State Auto's] insurance company that investigated the structure or . . . YouTube videos that said they saw a tornado in the sky," Mr. Calaci responded that he did not know anything "about those incidents"; "about what other people said"; or "anything about any interviews, witnesses, things like that." Tr. 58; *see also* Tr. 40 (agreeing that, in conducting his investigation and analysis, he did not obtain "statements, interviews, press reports [regarding eyewitness accounts at the Property], . . . YouTube videos [of] people in the [Shopping Center] parking lot . . . [or] investigative materials that other people may have found about hail or wind at the [P]roperty.").

Mr. Calaci does reference a YouTube video in his report and states that it is a video of the "tornadic event" described in his report. Defs.' App. 10, 31 (Doc. 323). In his deposition, though, he conceded that the indicators relied on by him are not always indicative of tornadic activity. *Id.* at 108-09, 118. More importantly, while his report is replete with references to tornadic activity, and he concludes that "a tornado *moved over* the subject [P]roperty," *id.* at 35 (emphasis added), he admitted during the hearing that, by definition, "[t]o be a tornado, it has to touch down," and there was no tornado here because it did not touch down or strike the Property. Tr. 58, 14. Accordingly, his and Defendants' repeated references to tornadoes and tornadic activity are unsupported and misleading.

Also misleading are Mr. Calaci's numerous statements that the Property was "affected" by tornadic activity, wind, and hail. He has consistently taken the position in his deposition and during the hearing that he is not offering any opinions regarding damage to the Property caused by the storm. Tr. 14 ("I don't speak to damage. I only speak to weather conditions."); Defs.' App. 130 (Doc. 323) (same). He nevertheless repeatedly and unequivocally concludes in his declaration and report that the April 3, 2014 meteorological events detailed in his report "affected" the Property. This conclusion is misleading because it implies without any scientific support or

**Memorandum Opinion and Order – Page 34**

evidence that the weather events discussed in his report and declaration altered, modified, or damaged the Property.

As Mr. Calaci's testimony is riddled with inconsistencies and not supported by a specific methodology that can be relied on in this case, it is unreliable.  The court, therefore, **concludes** that his testimony is unreliable and **denies** Defendants' Motion for Reconsideration (Doc. 322) as to Mr. Calaci.

### C.  Defendants' Motion (Doc. 324) as to Mr. Phelps's testimony is granted in part and denied in part.

Defendants argue in their Motion for Reconsideration that Mr. Phelps's testimony and opinions are relevant and reliable, and there is not too great of an analytical gap between his conclusions and the bases for his conclusions, particularly in light of the information he provided in his declaration regarding his methodology and his application of that methodology to the data in this case.

State Auto disagrees and responds that Defendants' arguments amount to nothing more than a "regurgitation of their arguments regarding Phelps['s] methodology," and the emphasis on his methodology does not address the problems with the "analytical gap" in his testimony.  Pl.'s Resp. 8.  Alternatively, or in addition, State Auto contends that his opinions remain unreliable for the reasons stated by the court.

As a preliminary matter, the court notes that, because it has once again determined that Mr. Calaci's testimony and opinions are unreliable, Mr. Phelps will not be allowed to express any opinion that is based on the hail, wind, or tornado conclusions reached by Mr. Calaci. While Mr. Phelps's hearing testimony alleviated many of the court's concerns regarding his testimony, issues remain regarding his roof replacement opinion.  The court's analysis, therefore, focuses on this issue.

In his report, Mr. Phelps concluded that the six roofs of the Property were damaged as a result of the April 3, 2014 storm and "must be replaced" because:

> On the reported date of loss, there was sufficient wind energy to result in the observed damage based upon the NOAA weather reports. The 82 mph 3-sec gust was reported by a local NOAA affiliate at the Denton Municipal Airport. NOAA confirms the high wind event was the result of a microburst. The microburst produced sudden and extreme gusts that exceed the uplift capacity of the roofing system. The microburst driven wind event uplifted the roofing membrane. Uplifted roofing materials have significantly reduced hail resistance.

> Hail impact points have been observed on the gravel ballast roof. Hail impacts resulted in granular loss and thinning of the cap sheet membrane, which has more likely than not reduced its tension and tearing capacity. Those portions of the roof were both more susceptible to wind uplift and hail damage. Thus, the roof membrane is no longer compliant with the present building codes.

Defs.' App. 51, 306 (Doc. 328).

In an attempt to address the concerns identified by Plaintiff regarding his roof replacement opinion, Mr. Phelps supplemented his report by submitting a declaration in which he states that: (1) "hail and buffeting winds on April 3, 2014, damaged the field and underlying decking of the built-up gravel roofs at the Denton [Shopping] Center; and (2) "[b]ecause of the extent of this wind and hail damage, the current moisture readings, and the possibility of future leaks and further damage, the built-up gravel roofs and the underlying decking at Denton [Shopping] Center need to be replaced" as opposed to being repaired.  Defs.' App. 12 (Doc. 328).

As indicated, Defendants assert that Mr. Phelps's declaration cures any perceived analytical gap in his roof replacement opinion.  State Auto disagrees and argues as follows:

> Notice that there are two aspects of Opinion 6. First, Phelps opines that hail damaged the roofs. Second, he concludes that because of multiple factors, the roofs and underlying decking must be replaced. While Defendants ineffectively argue the first point, no argument is made to bridge the analytical gap for the second statement regarding the need to replace the roof and underlying decking. This is critical because a significant portion of the damages being sought by Defendants is for replacement of the roof. And yet, Defendants do not even attempt to address this specific conclusory statement made by Phelps in an effort to demonstrate that he somehow bridged the obvious analytical gap present here. There is no

explanation or justification for the conclusory and unsupported statement that the roof was damaged to the extent that the entire roof must be replaced. All we have is the mere *ipse dixit* of Phelps that the roof must be replaced. *See Joiner*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). For that reason alone, this [c]ourt should deny Defendants' Motion for Reconsideration of Phelps.

      With regard to the first part of Opinion 6, Defendants set out general scientific principles on how a roof shingle can be damaged by the impact of hail. (Doc. 327 at 7-8). Defendants then lay out various formulas showing the impact energy of hail. (Doc. 327 at 8). The problem with this information is that nothing is said of how these formulas "measure up to *Daubert*'s indicia of reliability." *See Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005). When an expert fails to explain how his scientific reason or formula satisfies *Daubert*, the expert's opinion is unreliable and should be struck. *Id*. Therefore, an expert cannot testify when his opinion rests on basic science principles, yet fails to "bridge the analytical gap between these basic principles and his complex conclusions." *Id*. at 536. Defendants further state that the "underlying physics and math of hail impacts are explained in the article contained in Appendix D of Phelps'[s] report." (Doc. 327 at 8). However, an expert is unreliable when he simply refers to some source outside the expert's report without stating "what exactly that articulated scientific reason is." *Fuesting*, 421 F.3d at 535. Phelps['s] reliance on some external source to explain the scientific reason behind his opinions, without explaining what exactly that scientific reason is, becomes a fatal flaw in his report. Moreover, Phelps further fails to bridge the analytical gap when he does not explain how these undisclosed scientific reasons warrant the conclusions he draws.

Pl.'s Resp. to Mot. to Reconsider 8-9.  State Auto, therefore, contends that the court's prior ruling in excluding Mr. Phelps's roof replacement opinion was correct, and Defendants' Motion for Reconsideration as to this opinion should be denied.  Defendants did not address this argument in their reply brief. Doc. 337.

      The court agrees with State Auto that there remains an analytical gap with respect to Mr. Phelps's opinion regarding the need to replace the roof and underlying decking.  In his declaration, Mr. Phelps concludes that the roofs need to be replaced because of the hail/wind damage and possibility of future leaks and additional damage, but he fails to explain why, from a scientific perspective or his experience, that these reasons necessitate full replacement of all of the roofs as opposed to repair.  This failure was compounded by his hearing testimony that, even if portions of

the roofs were not damaged or leaking, they would still, in his opinion, need to be replaced and could not be repaired because he had no way of knowing where problems with the roofs were located without removing portions and testing them, which would result in the repair option no longer being available presumably because this kind of testing would damage the roof beyond repair:

> Q: If a roof has fractures in it but not leaking during the water column test, what is your opinion about whether or not it needs to be repaired or replaced?
>
> A: Well, it can only be replaced. It can't be repaired. For you to know where that is occurring, I would have to take it out and test it. If I have taken it out and tested, then the repair option is moot anyway.
>
> Q: And you need to do that regardless [of] whether it passed the water column test?
>
> A: That's right, and also the fact that hail impacts are so random. We don't know where they hit. Besides all of the roofs are covered with gravel. Any birds' nests have been blown flat again, and you can't look at it and tell. There is really not a repair option that is realistic for this roofing system.
>
> . . . .
>
> A: . . .The value that triggers a cause for action here is if it is a value of less than 40 pounds of resistance. If the light[]weight concrete is damaged and for whatever reason makes no difference, if it cannot resist 40 pounds of uplift resistance in the spread foot fast[e]ner, then it needs to be replaced. The reason being that anything you put on it will not have the designed wind resistance. It will blow off from the fast[e]ner that is embedded into the light[]weight concrete. What we see here is we have kind of a mixed bag. We have several on here that fail, some of them horribly. We have some that are quite good. If you will highlight the section on Building 2, the maximum load value is more than double what is required. We have 41; that's good. 40 is good. 37, no. 38, no. All these others in the 40s are all good. So you have some areas that are damaged, but not necessarily all. But here again, we have one of the same problems that we have with all the other components of the roofs is . . . that . . . how do you find it? The only way we can reliably find it is do this testing that we have done here, and by the time we have done that we have already fouled the water, if you will, for the repair option.

Tr. 109-12.

This opinion by Mr. Phelps would seemingly require replacement of a built-up gravel roof anytime the roof sustained some storm damage even if the damage did not result in leaks and did not affect the entire roof. The reasoning behind this opinion, however, was not sufficiently developed or explained. The court understood Mr. Phelps to conclude that the method he used to test for roof damage, if he were to use it to locate all potential areas of the roofs needing repair, would damage the roof beyond repair and necessitate full replacement of the roofs, but he did not explain why he believed this was the only way to ascertain whether all of the roofs needed to be replaced. He also did not indicate whether someone with expertise in the field of repairing and replacing built-up gravel roofs such as those at issue would approve of or use the same method in assessing whether the roofs could or should be repaired or replaced. Similarly, the conclusory nature of the opinion expressed by Mr. Phelps in his report that "the roof membrane is no longer compliant with the present building codes" was not adequately explained by his declaration or addressed during the hearing.

It, instead, appears that Mr. Phelps and Defendants may no longer relying on this as a reason to justify replacing all of the roofs, even though Mr. Phelps stated in his declaration that application of the proper methodology required him to "[d]etermine the applicable code requirements for repair or replacement of a damaged roof section." Defs.' App. 4 (Doc. 328). His declaration includes a conclusory passing reference to "APPLICABLE BUILDING CODES," but it does not close the analytical gap previously identified by the court:

> The current building code in The City of Denton is the 2012 IBC with local amendments. The structures must be reroofed in compliance with this building code and manufacturer recommendations and installation requirements. The replacement roof should be replaced by a roof inspector who is a registered Roof Consultant (RBC) through the RCI.

*Id.* at 11.

Moreover, in revisiting this issue and the court's prior ruling, the court now questions whether Mr. Phelps is qualified to provide a Rule 702 opinion as to whether the roofs must be replaced as opposed to repaired. While Mr. Phelps's experience as a windstorm engineer and other experience provide him with needed insight in determining the cause of the Property damage that is the subject of Defendants' insurance claim, it is not readily apparent how this experience qualifies him to provide an expert opinion on the issue of whether the specific type of roofs at issue in this case can or should be repaired or replaced, particularly if he lacks experience in installing, repairing, maintaining, and replacing roofs of this kind.

Accordingly, the court **concludes** that Mr. Phelps is not qualified to provide an expert opinion on whether the roofs need to be replaced as opposed to being repaired, and his opinion in this regard is not reliable. Thus, he will be allowed to testify regarding damage to the roofs and causes of the damage, but he will not be allowed to testify about roof repair or replacement and is **precluded** from providing any opinions on this topic. Additionally, as explained, any opinions expressed by Mr. Phelps cannot be premised on the hail, wind, and tornado conclusions reached by Mr. Calaci, which the court has determined to be unreliable. The court will also not allow Mr. Phelps to testify regarding any findings or opinions not previously disclosed. For all of these reasons, and because the extent to which Mr. Phelps relied on Mr. Calaci's opinions is not readily apparent, the court will grant in part and deny in part Defendants' Motion as to Mr. Phelps as opposed to outright denying it.

## IV.    Conclusion

For the reasons explained, Defendants' Motion for Reconsideration as to Mr. Calaci (Doc. 321) is **denied** based on the court's determination that his proffered expert testimony is unreliable under Rule 702. Thus, his testimony is **excluded** in all respects, and he will not be allowed to testify at the trial of this case. Defendants' Motion for Reconsideration as to Mr. Phelps (Doc.

324) is **granted in part and denied in part** to the extent herein set forth. Given the punctilious detail the court has accorded to the admissibility of expert testimony, it will not entertain any further motions regarding this topic as it pertains to Mr. Calaci and Mr. Phelps.

**It is so ordered** this 12th day of December, 2023.

Sam A. Lindsay
United States District Judge